**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ALFRED DEWAYNE BROWN,** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **CITY OF HOUSTON, TEXAS;** | § | |
| **HARRIS COUNTY, TEXAS;** | § | **Jury Demand** |
| **BRECK McDANIEL;** | § | |
| **DANIEL J. RIZZO;** | § | |
| **KIM OGG; TED C. BLOYD; and** | § | |
| **D.L. ROBERTSON,** | § | |
| | § | |
| *Defendants* | § | |

**<u>PLAINTIFF'S ORIGINAL COMPLAINT</u>**

Plaintiff, Alfred Dewayne Brown, files this Complaint against Defendants, City of Houston, Harris County, Breck McDaniel, Daniel J. Rizzo, Kim Ogg, Ted C. Bloyd, and D.L. Robertson  (collectively, "Defendants"), and states as follows:

**<u>INTRODUCTION</u>**

1.       Mr. Brown is a victim of an egregious miscarriage of justice that almost resulted in the execution of an innocent man.   Mr. Brown spent 12 years and 62 days in prison – including nearly 10 years on death row – for a murder he did not commit.   His conviction was the result of woeful misconduct by the Defendants.   Witnesses were pressured.   A critical witness was badgered and threatened by a biased grand jury and exploited by Defendant Rizzo.   Exculpatory evidence that was never turned over to Mr. Brown's defense at trial languished in the home garage of Defendant McDaniel for over a decade until it was remarkably uncovered.   An unfortunate and unconstitutional theme of winning at all costs permeated Mr. Brown's

wrongful conviction.  The Defendants caused Mr. Brown to be deprived of his constitutional rights and took precious years of his life from him.

2.      Mr. Brown maintained his innocence despite being falsely arrested, charged, and erroneously convicted.  Refusing to accept a generous plea bargain for a crime he did not commit, Mr. Brown risked separating from his family and friends and being put to death, in the hopes that justice would eventually prevail and that he would once again be a free man.

3.      No scientific evidence implicated Mr. Brown and none ever will.  Nevertheless, the Defendants went to unbelievable lengths to manipulate evidence such that it would support Mr. Brown's conviction and also conceal exculpatory evidence that would exonerate him.

4.      Among other instances of misconduct, the Defendants actively harassed and intimidated multiple witnesses into providing false testimony to use against Mr. Brown.

5.      For example, although Mr. Brown's girlfriend Ericka Dockery originally corroborated his alibi at the time of the crime in both statements to the police and in testimony before the grand jury, Defendant Rizzo threatened to take her children away unless she did not change her testimony to comport with the State's version of events.   Defendant Rizzo followed through on his threats and charged Ms. Dockery with perjury without basis and sought a high bail to keep her incarcerated and separated from her children.  Ms. Dockery was separated from her children and was pressured by Defendant Rizzo to change her testimony so that she could leave jail.

6.      Defendant Rizzo also pressured and intimidated numerous other witnesses to change their testimony, including one witness who received a $10,000 Crime Stoppers award for purportedly identifying Mr. Brown.  However, when that witness stated she never saw Mr. Brown, Defendant Rizzo threatened her with perjury and theft of the Crime Stoppers money.

7.     Most egregiously, for over 10 years, the Defendants knowingly withheld exculpatory evidence that ultimately exonerated Mr. Brown.

8.     Specifically, on April 24, 2003, Defendant Rizzo requested that the Harris County District Court issue a subpoena to Southwestern Bell for Ms. Dockery's land line telephone records on the day of the murders.  Mr. Rizzo made this request *the day after* Ms. Dockery testified in the grand jury that Mr. Brown made a telephone call from her home to her place of work on the morning of the murders.  The Court ordered the subpoena on April 24, 2003.

9.     The phone records were produced to the Defendants.  The records corroborated Ms. Dockery's testimony.  In a clear and intentional violation of Mr. Brown's constitutional rights, those records were not turned over to Mr. Brown's trial lawyers.

10.     Remarkably, and straight out of a fictional legal thriller, the phone records were located in April 2013, ten years after the murders, while Defendant McDaniel was "cleaning out his garage."

11.     For years, Mr. Brown's habeas counsel urged the Harris County District Attorney's Office to further investigate the case, identifying several issues that warranted additional investigation.  All the while, the Defendants did not disclose that they had and were continuing to withhold critical exculpatory evidence.

12.     As a result of this discovery, as well as other wrongful conduct by the Defendants, the Harris County District Attorney's Office dismissed the case against Mr. Brown on June 8, 2015.  Mr. Brown has been released, reunited with his daughter, and permitted to begin living his life again as a free man.  However, he has been denied over 12 years of freedom, including a decade staring at the death penalty, due to his wrongful conviction.  He now seeks relief from the Defendants for their egregious conduct.

13.     In July 2016, Rick Perry, Governor of Texas from 2000-2015, spoke about Mr. Brown's case in a speech to the annual meeting of the American Legislative Exchange Council and described the coercive tactics used on Ms. Dockery to force her to change her testimony. Governor Perry went on to describe how the telephone records were found ten years later and how, "[a]fter a delay of more than a year, the judge in the case agreed to a new trial," ultimately resulting in Mr. Brown's release from death row in 2015.  Governor Perry eloquently stated as follows:

> You could say this story has a happy ending, because Alfred was released.  But his life was almost ruined because of an overzealous prosecutor who concealed exonerating evidence.  And Ericka's children were put in harm's way because of a grand jury that acted as the arm of the prosecution, rather than as an independent check on government power. . . . When ambitious prosecutors go overboard, the true victims aren't people like you or me: they're people like Ericka and Alfred who don't have the means to fight back.

https://www.youtube.com/watch?v=9T_ZQtx1Wxs  (last visited June 7, 2017);
https://www.forbes.com/sites/realspin/2016/07/27/rick-perry-black-lives-matter-and-so-does-black-liberty/#3f44e6054b5c (last visited June 7, 2017).

## JURISDICTION AND VENUE

14.     This Court has jurisdiction under 28 U.S.C. §1331, 42 U.S.C. §§1983 and 1988, and supplemental jurisdiction under 28 U.S.C. §1367(a), to hear Plaintiff's state law claims, if any.

15.     Venue is proper in the Southern District of Texas under 28 U.S.C. §1391(b) because that is the judicial district in which the claims arose and in which defendants resided or conducted business during the relevant period herein.

## PARTIES

16.     Plaintiff, Alfred Dewayne Brown, is an individual residing in Louisiana.  He has a daughter, who was two years old when he was wrongfully convicted, and is now in her teenage years.  He has a loyal, loving family in Houston as well as in Louisiana, who supported him while he was wrongfully incarcerated and after his exoneration.  Mr. Brown has an intellectual disability, with an IQ of 69, and has difficulty reading and writing.  Mr. Brown has been living a peaceful, quiet life since his exoneration.  He has a very strong work ethic and has worked in the construction and transportation industries since his release.  Mr. Brown has also advocated for changes to the criminal justice system and for those who are wrongfully convicted because of what occurred to him in this case.  He is referred to herein as "Mr. Brown," "Dewayne," or by his nickname, "Doby."

17.     Defendant City of Houston is a municipal corporation located in Harris County, Texas, and in this judicial district in the State of Texas.  The City of Houston is sued for the constitutional violations carried out by its Police Department in pursuit of Mr. Brown's wrongful conviction and incarceration.   Defendant City of Houston may be served with process by delivering a copy of the summons and of the complaint to Mayor Sylvester Turner, City of Houston, 901 Bagby, Houston, TX 77002, as authorized by Texas state law.

18.     Defendant Harris County is a governmental organization organized under the laws of the State of Texas.  Harris County is sued for the constitutional harm suffered by Mr. Brown as a result of the County's official and unofficial policies and customs, including but not limited to:  failing to adequately train and supervise District Attorneys with respect to their constitutional obligations to disclose exculpatory material and impeachment evidence; pushing prosecutors to convict criminal defendants regardless of the weight of the evidence against them; fostering

widespread disregard for the constitutional rights of the accused; permitting District Attorneys to employ unlawful tactics, such as intimidation and bribery, to secure favorable witness testimony; and general inadequate management and administration of the District Attorney's Office. Defendant Harris County may be served with process by delivering a copy of the summons and of the complaint to the Harris County Judge, Honorable Ed Emmett, at 1001 Preston, Suite 911, Houston, TX 77002, as authorized by Texas state law.

19.     Defendant Breck McDaniel was employed by the City of Houston as a Detective in the Homicide Division of the Houston Police Department.  He was employed with the Houston Police Department at the time of the investigation and prosecution of Mr. Brown.  Upon information and belief, he is a Texas resident.  Defendant McDaniel is sued in his individual and official capacities.  Defendant McDaniel may be served with process at his usual place of abode by delivering a copy of the summons and of the complaint to 24803 Corbingate Drive, Spring, TX 77389-4036.

20.     Defendant Daniel Rizzo was employed by Harris County as an Assistant District Attorney.  He was employed by the County at the time of investigation and prosecution of Mr. Brown.  Upon information and belief, he is a Texas resident.  Defendant Rizzo is sued in his individual and official capacities.  Defendant Rizzo may be served with process at his usual place of abode by delivering a copy of the summons and of the complaint to 6326 Woodbrook Ln., Houston , TX 77008-6254.

21.     Defendant Kim Ogg is currently District Attorney for Harris County and is sued in her official capacity as the successor-in-office and successor-in-liability to former District Attorney Charles A. Rosenthal Jr., the District Attorney at the time Mr. Brown was wrongfully convicted.  Defendant Ogg may be served with process at her usual place of business by

delivering a copy of the summons and of the complaint to the Harris County District Attorney's Office, 1201 Franklin St., Suite 600, Houston, TX  77002-1923.

22.     Defendant Ted C. Bloyd was employed by the City of Houston as a police officer in the Houston Police Department Homicide Division at the time of the investigation and prosecution of Mr. Brown.  Upon information and belief, he is a Texas resident.  He is sued in his individual and official capacities.  Defendant Bloyd may be served with process at his usual place of abode by delivering a copy of the summons and of the complaint to 53277 Richard Frey Road, Waller, TX  77484-5243.

23.     Defendant Darrell Robertson was employed by the City of Houston as a police officer in the Houston Police Department Homicide Division at the time of the investigation and prosecution of Mr. Brown.  He is sued in his individual and official capacities.  Defendant Robertson may be served with process at his usual place of abode by delivering a copy of the summons and of the complaint to 70 Lupine Cir., Durango, CO 81301-8977.

## PROCEDURAL HISTORY

24.     Mr. Brown was convicted of capital murder on October 18, 2005, in the 351st District Court of Harris County, Texas, and was sentenced to the death penalty on October 25, 2005.

25.     On May 28, 2013, the Honorable Mark Kent Ellis, Presiding Judge, 351st District Court, signed an "Agreed Proposed Findings of Fact and Conclusions of Law and Order" ("Findings of Fact").  In that document, the Court held that the State withheld exculpatory material evidence in violation of Mr. Brown's constitutional rights.

26.     On November 14, 2014, the Texas Court of Criminal Appeals vacated Mr. Brown's conviction and sentence and remanded the case to the trial court for "a new trial or other proceeding consistent with this opinion."

27.     On June 8, 2015, the 351st District Court of Harris County, Texas, granted the State's Motion to Dismiss the case against Mr. Brown, and he was released that day.

## FACTS

### A.     A History of Wrongful Convictions in Harris County, Texas

28.     According to the Fair Punishment Project of Harvard Law School, Harris County is one of the country's "outlier counties" regarding its number of death sentences and executions. Harris County juries have imposed the death penalty on more defendants than any other county in the United States since the 1976 reinstatement of the death penalty, and all condemned from 2004 through fall of 2016 are minorities. *See Too Broken to Fix: Part I, An In-depth Look at America's Outlier Death Penalty Counties,* http://fairpunishment.org/wp-content/uploads/2016/08/FPP-TooBroken.pdf (last visited June 7, 2017).

29.     Harris County is also one of the most notorious counties for wrongful convictions and exonerations.  According to the National Registry of Exonerations at the University of Michigan Law School, in 2015 there were 149 people exonerated from twenty-nine states after serving an average of fourteen and a half years in prison.  Fifty-four of those were from Texas and forty-two were from Harris County.  In 2014, there were 125 wrongfully convicted people were exonerated; thirty-one of them came from Harris County alone.  *See* https://www.law.umich.edu/special/exoneration/Pages/about.aspx (last visited June 7, 2017).

30.     Fifty-two percent (52%) of Harris County's exonerees were African-American even though they make up less than 20 percent of the Harris County population.

31.     In this case, Mr. Brown almost became another sad statistic, further adding to Harris County's legacy.

**B.     A Tragic Double Murder Occurred on April 3, 2003, But Mr. Brown Had Nothing to Do With It.**

32.     On April 3, 2003, Alfredia Jones and Houston Police Department officer Charles Clark were killed during a robbery attempt at an Ace Check Cashing store in South Houston. The robbery and murders started at about 9:39 a.m. and ended at about 9:45 a.m.

33.     Law enforcement immediately began searching for suspects.  A witness near the Ace Check Cashing store provided law enforcement with a description of three men who left the scene and their getaway vehicle, a white Pontiac Grand Am.  Within minutes, breaking news alerted Houston residents to the crime and indicated that police were searching for a white Pontiac Grand Am.

34.     Earlier that morning, before the murders, friends LaTonya Hubbard and Letisha Price spotted Dashan "Shawn" Glaspie and Elijah "Ghetto" Joubert, and an individual later identified as Ernest "Deuce" Matthews at a local gas station and convenience store.  They engaged in small talk and parted ways.  The friends knew Mr. Glaspie, Mr. Joubert, and Mr. Matthews from the Villa Americana ("VA") apartment complex in South Houston.  In her first statement to police, Ms. LaTonya Hubbard identified Mr. Glaspie, Mr. Joubert, and Mr. Matthews at the gas station:

> When I pulled into the station I saw three men. I recognized all three of the men as being from the Villa Americana apartments that are located at 5901 Selinsky. These men stand around the apartments and sell dope. I do not know their real names but I know their street names. They are called "Deuce," "Ghetto" and Shawn…Deuce was wearing a dark blue bomber jacket with a hood over his head. He too was pacing in front of the store.

Witness Statement of LaTonya Hubbard, April 3, 2003.

35.     Mr. Joubert, Mr. Glaspie, and an unidentified third man ("the third man") had previously that morning attempted to rob a check-cashing establishment owned and operated by Leo Foisner, who was standing in front of his store.   When the men approached his store, Mr. Foisner flashed his pistol and cocked the hammer as a warning.   The men changed direction and left.   Mr. Foisner never identified Mr. Brown as one of the men who approached his store that morning.   After their unsuccessful robbery of Mr. Foisner's store, the three men regrouped at the local gas station and convenience store, which is where LaTonya Hubbard and Natisha Price saw them.

36.     Mr. Joubert, Mr. Glaspie, and the third man went to the VA and again regrouped. A little after 9 A.M., they made their way to the ACE check cashing store, where they parked and waited for the store clerk to arrive.

37.     Mr. Glaspie and the third man went inside a furniture store located in the same strip mall as the check cashing store in order to avoid raising suspicion.   The owner of the furniture store, Sheikah Mohammed Afzal, stood outside smoking a cigarette at the time and noticed the two men enter the store.   At trial, Mr. Afzal did not certainly identify Mr. Brown as one of those men.

38.     While the other two men waited in the furniture store, Mr. Joubert lay in wait for the store clerk, Alfredia Jones, to arrive.   When she did, he accosted her as she prepared to open the establishment.   He forced her to the back of the store, where he demanded that she open the safe.   The other two men followed Mr. Joubert into the store, and one stayed at the front of the store as a lookout while the other assisted Mr. Joubert.

39.     Ms. Jones informed the men that she needed to call store headquarters to open the store, and when she called, she provided a code for a robbery, which alerted the Houston Police Department.

40.     Houston Police Officer Charles Clark arrived on the scene and called for backup as he approached the front door of the ACE store.  Officer Clark could not wait for backup, and from his position by the front door, he fired a shot at one of the men.  He was unable to fire another shot as his gun jammed.   One of the men approached Officer Clark and shot him at close range, killing him instantly.

41.     One of the men then executed the store clerk, Ms. Jones.

42.     The men next fled from the scene in Mr. Glaspie's white Pontiac Grand Am and returned to the VA.

### C.  A VA Resident Who Saw Mr. Glaspie and Mr. Joubert Shortly After the Murders Confirmed Mr. Brown Was Not With Them.

43.     After the murders, Patricia Ann Williams, a VA resident, saw Mr. Glaspie and Mr. Joubert in the VA parking lot, and they asked her if they could go up to her apartment and watch the news.  Ms. Williams provided an affidavit to habeas counsel in which she stated:

> Shortly before [1]0:00 a.m. that morning, I left my apartment and walked down the stairs toward my car. At that time I saw two men I know as "Shawn" and "Ghetto." I met them both when I moved into the apartment complex. Ghetto has given me money in the past whenever I needed it. As I got near my car, "Ghetto" came up to me and said that they needed to go into my apartment that he would pay me $20.00. Ghetto then gave me a $20.00 bill. I noticed that both Shawn and Ghetto were not acting like they usually act.  They both came into my apartment and started watching the news.

Affidavit of Patricia Williams, December 9, 2008.  Williams stated that Mr. Brown was not with Mr. Joubert and Mr. Glaspie when she encountered them shortly before 10:00 a.m. on April 3, 2003.

### D. Witness Lisa Hubbard Identified the Third Man with Mr. Glaspie and Mr. Joubert as Ernest "Deuce" Matthews to the Houston Police.

44.     With news of the murders swirling through the VA and news descriptions of the getaway vehicle, Alisha Hubbard ("Lisa"), Latonya Hubbard's sister and a fellow VA resident, called police to state that she had seen Mr. Glaspie, Mr. Joubert, and a third man earlier that morning around Mr. Glaspie's white Grand Am.

45.     Later that day, Ernest "Deuce" Matthews was identified as the third individual in Mr. Glaspie's vehicle.  From Ms. Hubbard's witness statement:

> I also saw them [Glaspie, Joubert, and "Deuce"] at 8:00 A.M. this morning. They were standing in the parking lot of the apartment complex beside a white Chevy Lumina and a white Grand Am…

> It is very unusual for these three guys to be out of bed and hanging around 8:00 A.M. They sell dope all night long and sleep all day long. They said hello to me this morning, and that was the extent of our conversation…

> I did notice that Shaun was standing beside the Lumina. I could see that he has his silver brief case with him. This is the same brief case that he always carries his gun in…Ghetto is about 25 years old…Ghetto's .45 is blue steel…Deuce is older than Ghetto and Shaun. Deuce is about 30 years old…I know that Deuce has a gun, but I don't know what kind.

> All these guys usually hang around Nicky's apartment at 5901 Selinsky. This is apartment 250. Everyone calls it the dope house.

> When I saw these guys this morning, I could see that Shaun had his .45 lying on the hood of the Lumina. I could also see that he was loading his clips with bullets. *I then watched as Deuce and Ghetto got into the Grand Am. Deuce was driving*. Shaun got into the Lumina. Deuce drove off with Shaun following him. This was shortly after 8 a.m. this morning when they drove off. I have not seen them since this morning. (Emphasis added.)

Witness Statement of Lisa Hubbard, April 3, 2003.

**E.  Defendant Rizzo Induced, Pressured, and Intimidated Lisa Hubbard Into Changing Her Testimony To Say that Mr. Brown Had Been the Third Man.**

46.     Lisa Hubbard initially identified Mr. Matthews as the third man with Mr. Glaspie and Mr. Joubert but changed her story two days later to say that Mr. Brown was with Mr. Glaspie and Mr. Joubert:

> "D" [Brown] was with Shaun, Ghetto, and Deuce when they were standing by the Lumina and was there when I heard Sean and Ghetto talking about going to do a robbery job at the check cashing place because they were low on money. I heard "D" say, "Man, what's up? What time are we going?" Sean replied "we will be leaving in a little bit." The (sic) "D" walked toward the back where his girlfriend stays. That's when Deuce got in the Grand Am on the driver's side. Ghetto got in with him. That's when Deuce got in with him . Shaun got in the white Lumina and they drove off toward where "D" walked.

Witness Statement of Lisa Hubbard, April 3, 2003.

47.     In response to her altered testimony at trial, she received a $10,000 Crime Stoppers reward.  This conversation that Ms. Hubbard overhead was nowhere in her first witness statement. To the contrary, in her first witness statement, she noted a conversation she had with George "JuJu" Powell, another VA resident:

> JuJu told me that Shaun, "Ghetto" and "Deuce" had robbed a check cashing place on the 610 Loop, and that they had shot and killed a Houston Police Officer. I asked JuJu how he knew all of this. JuJu told me that Shaun, Ghetto, and Deuce had told him that they were low on money and that they had been cashing out a check cashing place that they were going to rob. Juju told me that he had talked to these three guys at 8:00 this morning. And that is when they told him that they were going to go rob the check cashing store.

Witness Statement of Lisa Hubbard, April 3, 2003.

48.     In October of 2003, Ms. Hubbard stated in a sworn affidavit that her trial testimony was incorrect, that her initial statement regarding Mr. Matthews was accurate, and that she was pressured to testify to her false statement by Defendant Rizzo.  She stated that he

threatened her with perjury, jail time, and theft of the Crime Stoppers reward money if she failed

to identify Mr. Brown as the third suspect during her testimony:

> About one or two weeks before the trial of Alfred Dewayne Brown my sister and I met with some of the homicide detectives, Mr. Rizzo with the District Attorney's Office and a female who was with Mr. Rizzo. I was able to read my statements. I told them that "Doby" [Mr. Brown's nickname] had nothing to do with the crime.
>
> *Mr. Rizzo told me that if I didn't stick to my statements, they could charge me with perjury. The female with Mr. Rizzo then told me that not only would they charge me with perjury but that they would also charge me with theft of the $10,000 that Crime Stoppers gave me.*
>
> I was frightened and I did not want to go to jail but I insisted to all of them that Doby had nothing to do with the shooting of the woman and the police officer.
>
> When I testified at Doby's trial I substituted Doby for Deuce because I thought that this is what Mr. Rizzo wanted me to do. I also did it because I did not want to be arrested even though I would be telling the truth. (Emphasis added.).

Affidavit of Lisa Hubbard, October 19, 2003.

49.    47.    Defendant Rizzo provided an affidavit under oath in which he denied

pressuring Ms. Hubbard to change her identification of Mr. Matthews to Mr. Brown.  Affidavit

of Dan Rizzo, July 11, 2008.  Although Defendant Rizzo denied pressuring Ms. Hubbard, he did

state that "[o]ften, I tell witnesses that the only way they could get in trouble is to lie under

oath." *Id*.   Defendant Rizzo's denial is either false, deliberately indifferent, or reckless.

### F.  Defendant Rizzo Also Pressured LaTonya Hubbard to Change her Testimony to Misidentify Mr. Brown.

50.    LaTonya Hubbard, Lisa's sister, testified during Mr. Brown's trial that she was

unable to identify the third man with Mr. Glaspie and Mr. Joubert during the morning of the

murders because the man was wearing a hood.   However, Ms. Hubbard's testimony from

Joubert's separate trial was introduced at Mr. Brown's trial in which she stated that she did

identify Mr. Brown with Mr. Glaspie and Mr. Joubert.

51.     Ms. Hubbard's identification of Mr. Brown during Mr. Joubert's trial was also the product of intimidation by Defendant Rizzo.  Ms. Hubbard provided an affidavit to habeas counsel which stated that she has no personal knowledge that the third person was Mr. Brown, but only identified him at Mr. Joubert's trial because Defendant Rizzo supplied her with the information:

> Approximately two days before the trial of Elijah Joubert, also known as "Ghetto," I was taken to the office of Assistant District Attorney Dan Rizzo. Mr. Rizzo showed me photographs of "Ghetto," "Shawn" and the person I now know as "Doby."  Mr. Rizzo told me that "Doby" was in fact the third person at the gas station on the morning of April 3, 2003 with "Ghetto" and "Shawn."

> When I testified at the trial of Elijah "Ghetto" Joubert that "Doby" was the person with "Ghetto" and "Shawn" at the gas station and when I affirmed those statements at Alfred Brown's trial, I did so only because Mr. Rizzo told me that "Doby" was the person with "Ghetto" and "Shawn" on that morning, not because I was able to positively identify "Doby" as the third person. (Emphasis added.)

Affidavit of Lisa Hubbard, October 19, 2003.

52.     Defendant Rizzo compounded this wrongful conduct by specifically asking Ms. Hubbard whether anyone told her who to pick as the third person, to which Ms. Hubbard said no because she feared Defendant Rizzo's intimidation.  This testimony concealed the true origins of Ms. Hubbard's identification of Mr. Brown.

53.     Defendant Rizzo provided an affidavit under oath in which he denied pressuring, threatening, or coercing any witness to identify or change their identification to inculpate Mr. Brown.  Affidavit of Dan Rizzo, July 11, 2008.  Defendant Rizzo's actions, as well as his denial of those actions under oath, were deliberately indifferent and reckless.

### G. Houston Police and Defendant Rizzo Threatened to Take Witness Sharonda Simon's Kids Away If She Did Not Provide the Testimony They Required.

54.     When questioned by law enforcement and Defendant Rizzo, Sharonda Simon initially told them that, on April 3, 2003, she saw Mr. Joubert, Mr. Glaspie, and Mr. Brown standing around a white Pontiac Grand Am at around 10:30 A.M. in the parking lot of the VA.

55.     Ms. Simon recanted this testimony to habeas counsel. She stated that she could not identify Mr. Brown on the day of the incident:

> What I initially told police investigators on April 5, 2003 is that I was standing in front of my apartment in the parking lot and that I saw the three men in and around the white Grand Am parked in the parking lot. The parking lot where the white Grand Am was parked is about the length of a football field or maybe a little further. The officers knew the distance because I went outside and pointed it out to them. I also told them that there were several other people standing around the white Grand Am.

Affidavit of Sharonda Simon at 1.

56.     Ms. Simon explained that she met with Defendant Rizzo and told him about how far away the Grand Am was and that "it looked like it could have been Doby because I just assumed that it was him because everyone else was out there that morning." *Id*.

57.     However, under threats from the Houston Police Department and Defendant Rizzo, Ms. Simon falsely testified against Mr. Brown.  At trial, Ms. Simon testified that Mr. Brown was sitting in the car on the passenger side with the door open.  It turns out that she was not close enough to accurately identify Mr. Brown.

58.     Ms. Simon admitted that her trial testimony identifying Mr. Brown as being in the Grand Am that morning was untrue.  She admitted to testifying falsely because she had been intimidated by Houston Police Department detectives investigating the case, as well as Rizzo:

> During my trial testimony I said that Dwayne was sitting in the Grand Am and what I was saying was 100 percent true. I said that I was telling the truth. I said that I initially told the police that it looked like Mr. Brown but that in truth I really

did not see him. I also said that I just didn't want to have anything to do with this case.

*This part of my testimony was not true. I felt that the police wanted me to say that I did see Dwayne inside the Grand Am. I felt pressured and frightened. Prior to the trial I was visited several times by the detectives and they kept telling me that I could be arrested and lose my children if I kept saying that I couldn't identify Dwayne inside the Grand Am.*

During my trial testimony I described the distance from where I stood to where the Grand Am was parked. This distance was not accurate. Mr. Rizzo, the police investigators and Dwayne's defense lawyers knew that this statement was not true but no one challenged me. I waited for the investigator to say something but no one came forward.  (Emphasis added).

Affidavit of Sharonda Simon.

59.     Prior to trial, Defendant Rizzo told Ms. Simon "not to discuss the distance, [how far away she was], and Ms. Simon noted she "was not asked to describe the distance during [her] trial testimony."  This instruction by Defendant Rizzo was not provided to Mr. Brown's defense counsel at trial.  Defendant Rizzo intentionally pressured and intimidated Ms. Simon into false and highly misleading testimony.

60.     Defendant Rizzo compounded this wrongful conduct by eliciting testimony from Ms. Simon during trial that the distance between her and Mr. Brown was no more than the length of the courtroom.  Defendant Rizzo pointed out the distance from the witness chair to the wall in the back of the courtroom when he knew that Ms. Simon had been much further away from the car where men were standing on the morning of the murders.

61.     Ms. Simon explained this testimony in her affidavit:

I felt that I had to put myself closer to the Grand Am to be able to identify Dwayne. *I did this because I didn't want any problems. I did not want to go to jail and I did not want to lose my children. The truth is that I was never able to identify Alfred Dwayne Brown as the man sitting inside the white Grand Am.* (Emphasis added.)

Affidavit of Sharonda Simon.

62.     Ms. Simon also stated during Mr. Brown's trial that the reason she came to testify was because she was issued a subpoena and "[f]or the love of my children."  This corroborates her assertions in her affidavit that she felt pressured and frightened by Defendant Rizzo and did not want to lose her children.

63.     Defendant Rizzo denied pressuring Ms. Simon in an affidavit sworn to under oath.  Defendant Rizzo's actions, as well as his denial of those actions under oath, were deliberately indifferent and reckless.

**H.  Despite Identification of Another Individual as the "Third Man," Defendants Refused to Pursue That Suspect for the Crime.**

64.     During the investigation of the murders, Defendant McDaniel determined that on April 3, 2003, Joubert called a telephone number which belonged to Jero Dorty.  Mr. Dorty was also identified as a suspect in a prior aggravated robbery.  He was subsequently arrested for that robbery by Defendants Bloyd and Robertson and served a five-year prison term.

65.     Mr. Joubert provided an affidavit that Mr. Brown did not participate in the murders at all.  Further, in an affidavit provided by Craig Gaver, a paralegal from habeas counsel's law firm who was present during the interview with Mr. Joubert, Mr. Joubert identified Mr. Dorty as the third man with him and Mr. Glaspie during the murders: "Mr. Joubert stated that Jero Dorty, Jr. was the third person with him and Dashan Glaspie during the incident in this case."   Affidavit of Elijah Joubert, April 22, 2008; Affidavit of Craig D. Gaver, August 16, 2010.   In the Gaver affidavit, Mr. Gaver testifies that Mr. Joubert stated that: "Mr. Dorty was with him later in the morning on April 3, 2003 during the incident at the ACE check cashing location where the murders in this case took place.  Mr. Dorty entered the ACE check cashing location.  When Mr. Dorty exited the check cashing location after the incident took place, he got

into the driver's side of the car and drove away from the scene with Mr. Glaspie and Mr. Joubert in the car." Affidavit of Craig D. Gaver, August 16, 2010.

66. On October 5, 2010, Mr. Joubert re-affirmed his statement regarding Dorty's involvement to the representatives of the post-conviction writ division of the Harris County District Attorney's Office.

67. When the Houston Police Department interviewed Mr. Dorty's mother, she related that she believed Joubert had called her son on the day of the murders. The interaction was documented in the Houston Police Department Case File:

> Dorty's mother, Rita Dorty arrived and Sergeant Allen apprised her of the facts surrounding her son's arrest and explained we were also working the double capital murder that had occurred at the Ace Check Cashing business in early *April. Ms. Dorty stated she had seen all about it on the news and those boys did come over to her house.*
>
> Allen advised Ms. Dorty that we were aware that one or two of them had called her son, J.D., on the date of the double murder and we were interested in what her son knew about it. Ms. Dorty stated she was standing right there when the call came in and she thought her son was talking to a person he calls as Getto (sic). *Ms. Dorty stated the caller said something about being in trouble and they had gone back to the apartments and something about getting rid of the gun.*

Excerpt from Houston Police Department Investigative File (Emphasis added.)

68. Defendants, including Defendants Bloyd and Robertson, never investigated Mr. Dorty as a suspect, despite the telephone records and his obvious connection to Mr. Joubert.

69. According to telephone records, Mr. Dorty had extensive communication with Mr. Glaspie and Mr. Joubert before and after the murders. On April 3, 2003, there are no calls between Mr. Dorty and Mr. Glaspie during the time of the incident, presumably because they were together.

70. Moreover, phone records indicate that Mr. Dorty was off-line during the period of time that the murders occurred, as his phone was unusually inactive. Indeed, Mr. Dorty placed a

call at 3:32 a.m. on the morning of the incident, and no other call is registered until 10:25 a.m., the same time Joubert's phone records show him receiving his first call after the murders.

71.     After the murders, contact resumed between Mr. Dorty, Mr. Glaspie, and Mr. Joubert.   Mr. Dorty called Mr. Joubert at 12:03 p.m. and 12:04 p.m., then called Mr. Glaspie at 12:04 p.m. and 12:38 p.m.  Mr. Dorty then called Mr. Joubert at 2:48 p.m. and Mr. Glaspie at 4:07 p.m. and 4:34 p.m.  These calls corroborate Mr. Dorty's mother's statement to the Houston Police Department concerning communications among the men.  Communications continued the following day, including a twelve minute call between Mr. Dorty and Mr. Joubert on April 4, 2003.

72.      Lisa Hubbard and another eyewitness, LaMarcus Colar, both identify Mr. Dorty as being with Glaspie and Joubert on the morning and afternoon of the murders.

73.     Ms. Hubbard also provided information to habeas counsel that Mr. Dorty disposed of the gun used in the offense in a body of water near Galveston, Texas.  Mr. Dorty's telephone records corroborate Ms. Hubbard's statement, showing calls to Galveston, Texas, on April 3, 2003, and April 4, 2003.

74.     If the Defendants, including Defendants Bloyd and Robertson, had investigated Mr. Dorty, they would have discovered his criminal record, including an aggravated robbery with a deadly weapon [a .38 caliber gun] for which Mr. Dorty served a five-year sentence.  If there had been a further investigation of Mr. Dorty as a subject, the Defendants would have discovered that Mr. Dorty had prior convictions for possession of marijuana and a felony of delivery of cocaine when he was seventeen years old.

75.     Defendants Bloyd and Robertson could have investigated whether the .38 caliber gun used in Mr. Dorty's aggravated robbery offense was the same as the .38 caliber gun used in

the April 3, 2003, double-murder to determine whether the double-murder weapon was the weapon Ms. Hubbard referred to when she stated that Mr. Dorty disposed of such a gun in Galveston.

76.     After Mr. Dorty was released from incarceration on the aggravated robbery charge, he was again involved in a violent crime.  On March 13, 2009, Mr. Dorty shot Justin Johnson in the 8400 block of Jason in Harris County and took a white plastic bag belonging to the victim.  Mr. Dorty pled guilty to felon in possession of a weapon and is currently serving a 10-year sentence.

77.     Additionally, while both Mr. Dorty and Mr. Glaspie were imprisoned, Mr. Dorty wrote a letter to Mr. Glaspie cautioning Mr. Glaspie to "hold your head because they shot shit at you from every angle they can think of, hoping you'll crack…But remember your hand is the best, so hold your head, it'll be alright."   This letter established Mr. Dorty's connection to Mr. Glaspie and his knowledge of the incident, and his admonishment to not "crack" despite external pressure.  The Defendants never pursued Mr. Dorty as the possible third suspect and instead focused solely on Mr. Brown.

78.     Finally, Mr. Brown's trial counsel was also in possession of a letter written from an acquaintance of Mr. Brown who informed him that he went to see Mr. Dorty to buy some marijuana; that during that transaction Mr. Dorty told the individual that he was the person who was with Mr. Glaspie and Mr. Joubert during the murders; and that Mr. Brown was wrongfully charged.  Mr. Dorty provided the author of the letter with factual details which were not public or publicly accessible, including conduct before, during, and after the murders.  The letter concluded with the harsh truth and reality about this case as it pertained to Mr. Brown: "Dobbie

that wasn't nothing but one big set up for you."  The Defendants' wrongful actions permitted this set-up to succeed.

79.     Rather than investigate Mr. Dorty, Defendant Rizzo cut a deal with him.   In connection with Mr. Dorty's aggravated robbery charge, Rizzo offered to seek a low $10,000.00 bail and a plea agreement with a recommendation of two years' imprisonment.   In exchange, Mr. Dorty agreed to wear a wire in the company of those who may have been involved with the murders, including suspected "organized crime figures."

80.     Mr. Dorty used the wire to record conversations he had with Mr. Brown's brother, Aaron Brown, and others.   Remarkably, however, the tapes from those conversations appear to have inappropriately been destroyed, and no transcripts or documentary evidence exists concerning them.   As they were not used in the prosecution of Mr. Brown, they presumably did not incriminate him.

81.     On May 19, 2013, Defendant Rizzo informed Defendants Bloyd and Robertson that Mr. Dorty's bond was revoked because he did not fulfill his plea contract.   Defendants Bloyd and Robertson went to Mr. Dorty's home and arrested Mr. Dorty.   Defendants Bloyd and Robertson did not subsequently investigate Mr. Dorty for the murders of Officer Clark and Ms. Jones despite evidentiary leads.

82.     The plea agreement, wire information, and information regarding potential "organized crime figures" were never provided to Mr. Brown's trial counsel.   The failures to turn over information regarding a person of interest in the case, the plea contract struck with that individual, and other potentially exculpatory evidence deprived Mr. Brown of his constitutional rights.

**I. Mr. Brown was at Ms. Dockery's Apartment at the Time of the Murders, As Established by Witness Testimony and Documentary Evidence.**

83.     Prior to his arrest on April 4, 2003, Mr. Brown lived with his girlfriend, Ericka Dockery, for six months.  Ms. Dockery's three children and her two cousins also lived in the household.

84.     The night before the murders, Mr. Brown and Ms. Dockery got into an argument, so he slept on the downstairs couch in the apartment.  The next morning, Ms. Dockery arose at 6:00 a.m. and went downstairs.  Mr. Brown was asleep on the couch.  Later that morning, at about 6:45 a.m., she walked her children to the bus stop. Mr. Brown was still asleep on the couch when she left the apartment and when she returned from the bus stop.

85.     Ms. Dockery provided a statement to the Houston Police Department on April 4, 2003, that confirmed Mr. Brown's alibi that he was at her home on the morning of the murders. Witness Statement of Ericka Dockery, April 4, 2003.

86.     Ms. Dockery testified in the grand jury that when she departed for work at 8:30 a.m., Mr. Brown was still on the couch.  At that time, she departed for her job as a home health care aide for her client, Alma Berry.  Ms. Dockery called her home telephone number at about 9:30 a.m. and talked with one of her cousins, Reginald Jones.  She asked him if Mr. Brown was gone, and Mr. Jones stated that Mr. Brown was still at the apartment and was upstairs sleeping.

87.     Later that morning, at around 10:00 a.m., Mr. Brown called Ms. Dockery at Ms. Berry's home.  (Ms. Dockery knew that she received the call at around 10:00 a.m., because she received the call during the time the programs "Price is Right" and "Ricki Lake" were on television.)    Furthermore, when Mr. Brown called Ms. Dockery at Ms. Berry's home, Ms. Berry's caller I.D. indicated that Mr. Brown was calling from Ms. Dockery's home.  In fact,

when Mr. Brown called, Ms. Berry looked at the caller I.D. and said, "Erica, it's your house." Ms. Dockery testified in the grand jury that "he [Mr. Brown] called from home . . . that's what my patient phone caller ID said."   Mr. Brown then spoke with Ms. Dockery.

88.     Ms. Dockery left Ms. Berry's residence at approximately 1:00 p.m. and returned to her apartment.  Mr. Brown was still there.  Mr. Brown said that he had been feeling sick, and he and Ms. Dockery took a nap together.

89.     Despite this initial testimony, Defendant Rizzo refused to accept the truth.  He badgered, harassed, and intimidated Ms. Dockery to change her testimony regarding Mr. Brown's alibi.

**J.  Defendant Rizzo Repeatedly Pressured and Intimidated Ms. Dockery to Change Her Testimony, Including Threatening to Take Her Kids Away From Her.**

90.     Defendant Rizzo was clearly unhappy with Ms. Dockery's testimony that provided Mr. Brown with a strong alibi during the time of the murders.  As a result, during her grand jury testimony, Ms. Dockery was repeatedly threatened, intimidated, and harassed in an effort to get her to change her testimony.  Defendant Rizzo threatened Ms. Dockery if she did not change her testimony, she would face charges of aggravated perjury and lose her children. Despite the intense scrutiny by Defendant Rizzo and the grand jury, Ms. Dockery maintained that Mr. Brown was on her couch between 6:00 a.m. and 8:30 a.m. when she left for work.

91.     Defendant Rizzo even elicited the help of members of the grand jury in threatening Ms. Dockery.  He plainly poisoned the grand jury against Ms. Dockery, advancing the unfounded theory that she was being untruthful.

92.     One grand juror told her she seemed like a "good, nice young lady" and "a hard-working young lady," but "if we find out that you're not telling the truth, we're coming after you."  April 21, 2003 Grand Jury Testimony of E. Dockery at p. 62.

93.     Another grand juror threatened her livelihood:

GRAND JUROR:     And if we find out that you were lying, under oath, you can be in serious trouble.

DOCKERY:     I understand.

GRAND JUROR:     And you won't be able to get a job flipping burgers.

DOCKERY:     (laughing) Yes, sir.

GRAND JUROR:     You got three children that you're trying to take care of . . .

April 21, 2003 Grand Jury Testimony of E. Dockery at p. 62.

94.     Ms. Dockery was threatened again with perjury if she did not change her story and was told she would not have another opportunity to change her story once she left the room. A grand juror threatened "[a]nd then who's going to take care of your three kids? Nobody." *Id.* at 63.  She continued to testify that when she left her home to drop off her children at school, Mr. Brown was asleep on her couch.  She stated that she could not have left her home for work earlier than 7:30 A.M. because "[Alma Berry] ain't going to let me in her house, she ain't going to let me in her house that early." *Id.* at p. 65.

95.     At the behest of Defendant Rizzo, Ms. Dockery and her family continued to come under threat of jail time and losing her kids, who she was derisively told would need "some parental guidance in the future." *Id.* at p. 80.

96.     She also faced continued attacks on her livelihood.  Furthermore, "[y]ou know by working in the home health care, and there's a felony charge brung [sic] against you, you know that's over with."  The harassment and intimidation continued:

DOCKERY:     I know. Everything is over.

GRAND JUROR:     You won't be able to get a decent job anywhere.

DOCKERY:     Nowhere. I already know.

GRAND JUROR:      And it's not worth hiding behind no man.

DOCKERY:         Oh, it's not. It's not. I can always get another man, but I could never get another life.

GRAND JUROR:     Nor is your children. That's why [Mr. Rizzo] is constantly asking you if there's anything you want to change before you leave.

DOCKERY:         You know, maybe I'm misunderstanding the question. But I'm trying to answer the best way I can.

GRAND JUROR:     It's so important.  Because he's not worth it.

April 21, 2003 Grand Jury Testimony of E. Dockery at p. 81.

97.     It was evident that Defendant Rizzo implemented these intimidation tactics. Indeed, the grand jury foreperson and Defendant Rizzo appeared to know each other on a personal level, as evidenced by the foreperson calling Defendant Rizzo by his first name while conducting a tag-team threat on Ms. Dockery's freedom.

FOREPERSON:      Hey Dan. What are the punishments for Perjury and Aggravated Perjury?

DAN RIZZO:       It's up to ten years in prison.

FOREPERSON:      In prison. Okay.

GRAND JUROR:     Oh, no.

DOCKERY:         You know I'm just-I'm just trying to answer all your questions the best of my ability.

April 21, 2003 Grand Jury Testimony of E. Dockery at p. 82.  It was later revealed that the foreperson of this grand jury was Houston Police Officer James Koteras.  Officer Koteras had been picked as the foreperson for the grand jury although the investigation involved the homicide of a local police officer.  Further, it was later revealed that Koteras, a police officer, not only served on this grand jury but also served on the nine other grand juries between 1989 and 2011.

For his placement on those grand juries to have been random is almost a statistically impossibility.

98.     It was also later revealed that one of the other grand jurors was the head of an organization which donated funds to the families of slain police officers.

99.     In this context, it is no surprise that Defendant Rizzo was able to direct the grand jury to such lengths in pressuring Ms. Dockery.

> FOREPERSON:          …Like we said, and if you are-the evidence shows that you are perjuring yourself then you know the kids are going to be taken by Child Protective Services, and you're going to the penitentiary and you won't see your kids for a long time.

April 21, 2003 Grand Jury Testimony of E. Dockery at p. 102-103.

100.     Despite the overwhelming situation, Ms. Dockery refused to change her testimony. A grand juror next told her: "[n]ext time it's going to be the cops and the Child Protective Services coming to take your children."  Relenting against the pressure, Ms. Dockery began to change her testimony, as she became legitimately concerned about losing her kids.

> GRAND JUROR:     One minute, Erica.  He wasn't in the house when put your kids on the bus, either, was he?
>
> DOCKERY:          I'm trying to remember.
>
> GRAND JUROR:     Think about your kids, darling.
>
> DOCKERY:          I'm trying to remember.
>
> FOREPERSON:      That's what we're concerned about here, is your kids.
>
> GRAND JUROR:     He was not at the house—
>
> FOREPERSON:      We're as much concerned about your kids as you are. So, tell the truth.
>
> GRAND JUROR:     He was not in the house when you put your kids on the bus, was he? Tell the truth, girl.

DOCKERY:            **Yes, he was there.**

April 21, 2003 Grand Jury Testimony of E. Dockery at p. 114-115. (Emphasis added.)

Ms. Dockery's testimony that Mr. Brown was at her apartment when she left on the morning of

April 3, 2003, did not change in front of the grand jury.

101.    In response to Rizzo's assertion that Ms. Dockery called one of the three suspects

on the morning of the murders, Ms. Dockery stated, "I never called.   I never called."

Immediately, in response, a grand juror stated, "[g]irl, you just made a big mistake." *Id*. at 143.

102.    A clearly frustrated Defendant Rizzo began to paint Ms. Dockery as a criminal

herself, stating: ". . . I think – what I think it is is I think that you're up to your neck involved in

this deal."  Indeed, although Ms. Dockery had never been accused of any crime, as the grand jury

session ended, one grand juror stated, "I think she was with him at the check cashing place." *Id*.

103.    During a break in the grand jury proceeding, Ms. Dockery was seated in a locked

room.  Defendant Rizzo approached her and threatened her, said he didn't believe her and said he

would call Child Protective Services to have her children taken away.  Defendant Rizzo also told

Ms. Dockery that he would make her a co-defendant to the murders if she did not testify in the

manner he sought.

104.    Because of the obvious conflict of interest of having an active-duty police officer

as the foreperson of a grand jury investigating a police officer shooting, the manner in which

grand juries were selected in Texas was ultimately changed.  While this rendered the grand jury

process more fair for future defendants, it unfortunately did not help Mr. Brown.

### K. Defendant Rizzo Followed Through on His Threats— He Charged Ms. Dockery with Perjury and Sought a High Bail.

105.    Shortly thereafter, Defendant Rizzo charged Ms. Dockery with three counts of

aggravated perjury.  She was arrested at her home, and her bond was set at $5,000 for each

charge, which Defendant Rizzo knew she could not afford.   Defendant Rizzo knew she would be forced to alter her story to fit his version of events.   During Mr. Brown's trial, Defendant Rizzo even boasted about asking for a high bail to keep Ms. Dockery incarcerated.

106.   For the next four months, Ms. Dockery sat in jail.   After she spent four months separated from her kids, she decided she had no choice but to change her story so she could leave jail.   She met with Mr. Rizzo at least three times before she was released, and he was present at each of her court dates for her perjury charge.   Ms. Dockery was released in approximately December 2003 based on a plea agreement negotiated by Defendant Rizzo.

107.   Part of Ms. Dockery's agreement with Defendant Rizzo was that she had to meet with Houston Police Department Detectives, including Defendants Bloyd and Robertson, once a week about her testimony or she would go back to jail.

108.   After her release from jail, Ms. Dockery provided witness statements to Defendants Bloyd and Robertson on three separate occasions, once on December 18, 2003, and twice on January 6, 2004.   Witness Statements of Ericka Dockery, December 18, 2003, and January 6, 2004.   Defendants Bloyd and Robertson were present for the interviews with Ms. Dockery, and Defendant Robertson typed the statements, which were notarized by Defendant Bloyd.

109.   The December 18, 2003, and January 4, 2004, witness statements were false and were the product of coercion, intimation, and pressure by Defendants Bloyd and Robertson, under the direction of Defendant Rizzo.   Ms. Dockery was threatened with a return to jail if she did not appear to be interviewed by Defendants Bloyd and Robertson once a week, and during the course of those interviews, Defendants Bloyd and Robertson manufactured evidence to be used against Mr. Brown at trial.   Specifically, although Defendant McDaniel was in possession

of exculpatory evidence demonstrating that Mr. Brown was at Ms. Dockery's apartment at the time of the murder that was in the investigative file and available to Defendants Bloyd and Robertson, the Defendants persisted in seeking witness statements from Ms. Dockery which were untrue.

110.    As a result of all of the coercion, pressure, and intimidation by Defendants Rizzo, Bloyd, and Robertson, at trial Ms. Dockery's testimony changed.   She falsely testified that Mr. Brown was not in the apartment at 7:25 a.m. when she returned to the apartment from dropping her daughters off at the bus stop.

111.    Ms. Dockery also testified that the last time she went to visit Mr. Brown in jail, she asked him if he had committed the crime.  She claimed that, while in the past he had always said "no," this time he purportedly said to her, "I was there, I was there."   As a result of Defendants Rizzo, Bloyd, and Robertson's extortion, harassment, and intimidation, Ms. Dockery adopted Defendant Rizzo's versions of events.

112.    Ms. Dockery provided an affidavit to habeas counsel in which she recanted her trial testimony and returned to the truth – the same truth she told in her initial statements to the Houston Police Department and before the grand jury.  Ms. Dockery also recounted specific and detailed threats she received from Defendant Rizzo during her grand jury testimony:

> Regarding the telephone call from Dewayne to me at Alma Berry's house on April 3, 2003, I specifically recall looking at the caller ID device and seeing my home telephone number on the device.  Dewayne said he was at my house when he called.
>
> Regarding my testimony at trial that Dewayne threatened me to tell the grand jury that he was home at 8:30 a.m. on April 3, 2003, Dewayne never threatened me about my testimony to the grand jury.
>
> Regarding my testimony that Dewayne said to me "I was there, I was there," Dewayne did not say to me he was there.   Dewayne always denied his involvement in the offense.

I am coming forward now because I believe it is time to tell the truth about what happened.

When I testified in the grand jury, ADA Dan Rizzo spoke to me in the room alone by the grand jury room. I was locked in the room. ADA Rizzo told me that he did not believe me, that I was not a good person, that he was going to take my children away by calling Child Protective Services, and that I was going to go to jail for a long time. *I felt very threatened by ADA Rizzo throughout his whole case.*

For example, ADA Rizzo threatened me by saying that he was going to make me a co-defendant in the murder case, and I would never see my children again. At that moment, I was very scared and threatened by Mr. Rizzo. *These threats are why I gave the testimony I did.*

Affidavit of Ericka Dockery, November 5, 2011. (Emphasis added.)

### L. Reginald Jones Corroborated Mr. Brown's Alibi and Ms. Dockery's Testimony that Mr. Brown Was at Home At the Time of the Murders.

113.    Reginald Jones, Ms. Dockery's cousin who was at the apartment the morning of the murders, corroborated Mr. Brown's alibi and Ms. Dockery's testimony. Mr. Jones stated that on the day of the murders, he spent the morning playing video games downstairs in Ms. Dockery's apartment. Later in the morning between 10:00 a.m. and 11:00 a.m., Mr. Brown came downstairs from Ms. Dockery's apartment. Mr. Jones elaborated:

> I know he came from upstairs because when I am sitting on the couch in the living room I can see who comes in the front door and who comes in the back door. there's a mirror right in front of you when you're on the couch so you can see who is coming downstairs too.

Affidavit of Reginald Jones, April 9, 2010.

114.    According to Mr. Jones, Mr. Brown had not left the house at all that morning, and if he had left, Mr. Jones would have been in a physical proximity to see him leave or return. Mr. Jones explicitly stated that "Dewayne did not walk through these doors on April 3, 2003,"

and therefore "[h]e knew Mr. Brown was at home upstairs because there is no other way into the apartment other than through those two doors." *Id*.

115.    During Mr. Jones' interviews with members of the Houston Police Department, including upon information and belief Defendants Bloyd and Robertson, he stated that "I tried to tell the police the truth about what I knew about Alfred Dewayne Brown and where he was on April 3, 2003 . . . Alfred Dewayne Brown was home with me on the morning of April 3, 2003 at my cousin, Ericka Dockery's, apartment."

116.    In an affidavit provided to habeas counsel, Mr. Jones described how he was pressured and intimidated by members of the Houston Police Department, who upon information and belief included Defendants Bloyd and Robertson:

> The only people who ever questioned me at all about the robbery were Houston Police detectives.  On numerous occasions, at least (5) five or six times, police questioned me. Every time I told them the truth about where Dewayne was, and every time they told me I was lying. *They made it very clear I was not telling them what they wanted to hear. They didn't want to hear what I had to say.*
> In my witness statement it says I woke up around 9:30 or 10:00 a.m. on April 3, 2003. I actually woke up earlier to play video games in the living room. My witness statement also says, "At about 1:00 pm Dobie came downstairs." That's not true.
>
> I signed the witness statement to get it over with. *The police kept saying "It has to be around this time" and "I know you're lying." They also said "It can't be this time because Dobie was outside the house at this time."* After the night I signed my witness statement, detectives kept coming around and questioning me. *I felt pressure to agree with the time they said because I was worried I would go to jail.*
> …
>
> *It was clear to me that the detectives wanted me to say that Dewayne was out of the house very early on the morning of April 3, 2003.*

Affidavit of Reginald Jones, April 9, 2010. (Emphasis added.)

117.    Mr. Jones testified in the grand jury that he told the members of the Houston Police Department, which upon information and belief included Defendants Bloyd and

Robertson, that Mr. Brown was at Ms. Dockery's home during the murders, but "they didn't seem to believe me."

118.     Mr. Jones also stated, "I felt the Houston detectives and the Grand Jury wanted me to change my story because they kept pressuring and harassing me to get my times right with the times they wanted to hear."  Mr. Jones ultimately altered his statement about when he saw Mr. Brown on the morning of the murders, moving the time back to 1:00 p.m. rather than between 10:00 a.m. and 11:00 a.m. as he initially stated.

119.     The Defendants repeatedly refused to consider truthful, exculpatory testimony, instead threatening and harassing Mr. Jones to change his statements to complement the prosecution of Mr. Brown.  Their actions constitute willful misconduct and plainly violated Mr. Brown's constitutional rights.

### M.  Defendants Knowingly Solicited False Testimony from Mr. Glaspie, Who Had Already Admitted to the Crime and Sought a Favorable Sentence.

120.     The primary witness against Mr. Brown was Mr. Glaspie, who confessed to police within hours of being arrested the morning following the crime.

121.     Despite Mr. Glaspie's propensity for untruthfulness and his significant incentive to testify in order to receive a favorable sentence, the Defendants still utilized Mr. Glaspie's false testimony to place Mr. Brown at the scene of the crime.

122.     In exchange for his false testimony, Mr. Glaspie received a thirty-year sentence rather than the death penalty.

123.     Defendant Rizzo was aware that evidence suggested that Mr. Glaspie himself shot Ms. Jones.  A memo from a fellow Assistant District Attorney, Jason Zendeh Del, to Defendant Rizzo stated that "[i]n each of his three statements Lamarcus [Colar, a witness] states that he overheard Shon [Glaspie] on the cell phone saying that he (Shon) had to shoot Mrs. Jones."

August 25, 2004 Memorandum from Jason Zendeh Del to Dan Rizzo.  Specifically, Mr. Colar

informed the Houston Police Department that he overheard Mr. Glaspie confess to the murder of

Ms. Jones:  "I heard Shon on his cellphone . . . he was like "bitch got out of line," and I had to do

– you know what I'm saying, had to shoot her." *Id*.

124.    Even though Defendant Rizzo was aware of this, he met with Mr. Glaspie prior to

trial, prepared him to testify, and entered into a plea agreement with him in exchange for his

testimony at Mr. Brown's trial.  Mr. Glaspie testified at Mr. Brown's trial that Mr. Joubert was

the person who shot Ms. Jones, which was false.

125.    Upon information and belief, after the Court of Criminal Appeals vacated

Mr. Brown's conviction and the matter was remanded to Harris County for a re-trial, Mr. Glaspie

informed the District Attorney's Office that he would not testify in a re-trial of Mr. Brown and

would assert his Fifth Amendment rights against self-incrimination, presumably because he was

untruthful in Mr. Brown's initial trial.

### N.  Defendant McDaniel Kept Exculpatory Evidence That Was Never Turned Over to Mr. Brown's Defense In His Home Garage.

126.    On April 8, 2013, almost ten years to the day after Mr. Brown was initially

wrongfully incarcerated, phone records relating to Mr. Brown's alibi were discovered in

Defendant McDaniel's garage.  Defendant McDaniel lived at the home where the subject records

were found with his wife, who was an Assistant District Attorney in Harris County.  On April 9,

2013, habeas counsel was notified of this incredibly unique circumstance in an e-mail from

former Assistant District Attorney Lynn Hardaway to Judge Ellis stating that:

> The purpose of this e-mail is to let you know that Breck McDaniel, the HPD
> officer who testified regarding the telephone records at the Brown trial, delivered
> to me a box of documents related to the phone records in the Brown case.  Officer
> McDaniel found these records over the weekend *in cleaning out his garage*.

April 9, 2013 e-mail from Lynn Hardaway to Judge Mark Kent Ellis, et. al. (Emphasis added.)

127.    The documents in the garage included Ms. Dockery's landline telephone records from April 3, 2003.  The records had a handwritten notation, which upon information and belief was written by Defendant McDaniel, that said "Doby [Mr. Brown's nickname] G.F. Landline on South Loop."   The notation made clear that Defendant McDaniel was well aware that this documentary evidence corroborated Ms. Dockery's testimony regarding Mr. Brown's alibi on the morning of the murders.

128.    Also included in the discovered garage records was an Application submitted by Defendant Rizzo to obtain the Dockery phone records from Southwestern Bell, which was signed by a Harris County District Court Judge on April 24, 2003.

129.    Defendants McDaniel and Rizzo knew the landline phone records would be important, relevant, and potentially exculpatory, which is why it sought court approval to subpoena them.  Indeed, the records were sought *the day after* Ms. Dockery testified to the grand jury about a telephone call she received from Mr. Brown on the morning the crime occurred.

130.    The April 24, 2003, application for the release of the Dockery phone records states, "[t]he release of said telephone records are material to the investigation of a criminal offense…an analysis of the phone's records may lead to other investigative leads."   April 24, 2003 Application for Release of Records.

131.    The discovered garage documents reflect that a call was placed from the landline at Ms. Dockery's apartment to Alma Berry's house on April 3, 2003, at 10:08 a.m.

132.    The timing of the 10:08 a.m. call from Dockery's apartment corroborates the trial testimony of Ms. Dockery and Ms. Berry regarding the time that Mr. Brown called Ms. Dockery

at Ms. Berry's home.  Specifically, it demonstrates that Mr. Brown called Ms. Berry's home number shortly after "The Price is Right" came on at 10:00 a.m., on April 3, 2003.

133.    Disturbingly, the Houston Police Department had knowledge of the phone call to Ms. Berry's residence.  Regarding Ms. Berry's address (1210 Hartwick) and telephone number the Houston Police Department investigation report stated:

> This is an address in far Northeast Houston. We were advised that there has been a call made to this address on 3 April…This had to be right after the two murders were committed on the south loop. We were met at the front door by an elderly black woman in a wheel chair. We identified herself (sic) and found out that she was Ms. Alma Berry.

Excerpt from Houston Police Department Investigative File.  Nowhere in the police report, however, is there any reference as to how the Houston Police Department knew of this call.  Now, of course, it is evident that the source was the phone records which were not turned over to Mr. Brown's defense lawyers.

134.    Although both Defendant Rizzo and Defendant McDaniel had the phone records which unequivocally showed Mr. Brown's innocence, those phone records were never given to Mr. Brown's defense counsel.

135.    Habeas counsel issued a subpoena to the Houston Police Department concerning telephone records before they were discovered in Defendant McDaniel's garage.  The Houston Police Department issued a response dated May 16, 2008, which stated, "I have spoken with the Homicide Division and provided them with a copy of your subpoena.  The detectives involved in the investigation recall delivering those records to the Harris County District Attorney's Office during the course of the trial."   May 16, 2008 letter from Ursula N. Williams, Houston Police Department, to Bethany M. Nikfar.  The letter also stated that the detectives "conducted a diligent and thorough search of their files related to this investigation and located

no records responsive to your request." *Id*.  All or part of this response is untrue as the records were never turned over to Mr. Brown's trial attorneys.

136.     Defendant Rizzo signed an Affidavit, under oath, on July 11, 2008.  In that Affidavit, Rizzo stated that with respect to the telephone records, "I did not suppress knowledge of or information about a land-line call from Ericka Dockery's apartment to Alma Berry's house."  Affidavit of Dan Rizzo, July 11, 2008.  This statement is false, deliberately indifferent, and/or reckless.  As noted above, Defendant Rizzo requested that a subpoena for those records be issued, and those records were later located in Defendant McDaniel's file.

137.     The telephone records were critical to Mr. Brown's alibi.  The trial court's Findings of Fact state that: "[t]rial counsel argued at guilt/innocence that the applicant [Mr. Brown] was at home [at Ms. Dockery's house] at the time of the primary offense . . . [and] that the applicant made the call to Berry's home phone shortly after 10:00 a.m. on April 3, 2003."  Agreed Proposed Findings of Fact, Conclusions of Law and Order, May 22, 2013.

138.     In addition, the Findings of Fact stated that "no evidence was presented at trial of additional phone calls from Dockery's apartment to Berry's house on that day by another individual" and "no evidence was presented of any phone calls from cell phones belonging to Mr. Brown's co-defendants to Berry's house."  The Findings of Fact further stated that "[t]he timing of the 10:08 a.m. call from Dockery's apartment is consistent with the trial testimony of Dockery and Berry regarding the time that the applicant called Dockery at Berry's home."  *Id*.

139.     The Findings of Fact also made legal conclusions regarding the importance of phone records.  The court stated that "the Dockery phone records are favorable and material to the applicant as they support the applicant's alibi that he was at Dockery's residence the morning of the primary offense . . . [the records] were favorable and material to the applicant's alibi and

defense that he was at home the morning of April 3, 2003, and not with co-defendants Joubert and Glaspie." *Id.*

140.    Finally, the Findings of Fact stated that "[t]he undisclosed phone records constituted material evidence because their non-disclosure undermines confidence in the outcome of the applicant's capital murder trial." *Id.*

141.    The Defendants' failures to turn over this critical evidence, subsequent concealment of the records, and false testimony regarding the existence of the records constitute willful and malicious violations of Mr. Brown's constitutional rights.

142.    On November 5, 2014, the Texas Court of Criminal Appeals issued an order vacating Mr. Brown's conviction and sentence, and remanded the case to the trial court for "a new trial or other proceeding consistent with this opinion."

143.    As a part of its opinion, the Texas Court of Criminal Appeals ruled that "[b]ased on the habeas court's findings and conclusions and our own review, we hold that the State withheld evidence that was both favorable and material to applicant's case in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)." *Ex Parte Alfred Dewayne Brown*, No. WR-68,876-01, November 5, 2014.   The court also acknowledged that "the State conceded that material exculpatory evidence was withheld from applicant."

144.    Upon remand, the 351st District Court of Harris County, Texas, granted the State's Motion to Dismiss the case against Mr. Brown on June 8, 2015.

145.    Later that same day, Mr. Brown was released from custody.

146.    Mr. Brown's release came 12 years and 62 days after he was taken into custody by the Harris County Sheriff's Department.

147.     Of the 12 years and 62 days that he was wrongfully confined, Mr. Brown spent 9 years and 27 days on death row for a crime he did not commit.   His incarceration was due to the unconstitutional and unlawful acts of the Defendants described herein.

## CAUSES OF ACTION

### COUNT 1:

**42 U.S.C. §1983 CLAIM FOR VIOLATIONS OF FOURTEENTH AMENDMENT DUE PROCESS AND FAIR TRIAL RIGHTS BY FABRICATING EVIDENCE Against Defendants Harris County, City of Houston, Rizzo, Bloyd, and Robertson**

148.     Plaintiff, Alfred Dewayne Brown, hereby incorporates by reference those allegations made in the preceding paragraphs.

149.     Defendants Harris County, City of Houston, Rizzo, Bloyd, and Robertson knowingly caused the wrongful charging, prosecution, conviction, and imprisonment of Mr. Brown.

150.     Defendant Rizzo caused and continued Mr. Brown's wrongful charging, prosecution, conviction, and imprisonment through the systemic intimidation, coercion, and harassment of evidence witnesses in order to secure his wrongful conviction and imprisonment.

151.     Defendant Rizzo harassed and threatened multiple trial witnesses, whose testimony was instrumental in wrongful conviction and incarceration of Mr. Brown, as described *supra*.   Defendant Rizzo did so in an effort to pressure those individuals into changing their testimony in order to fit his false theory of the case.

152.     For example, Defendant Rizzo threatened, harassed, and intimidated Ms. Dockery in front of the grand jury and in private outside of the grand jury, even threatening that he would deprive her of access to her own children.   He furthered his coercive behavior when he charged Ms. Dockery with perjury and sent her to jail until she would testify against Mr. Brown.

Defendant Rizzo's coercive and threatening behavior forced Ms. Dockery to falsely testify against Mr. Brown, depriving him of his constitutional rights.

153.    Defendants Bloyd and Robertson pressured and threatened Ms. Dockery in connection with her requirement that she be interviewed by them on a weekly basis after she was released from jail and in the taking of three false witness statements in December 2003 and January 2004 after the exculpatory telephone records were in the Houston Police Department's investigative file.

154.    Defendant Rizzo exhibited this same behavior with other witnesses, including Lisa Hubbard, LaTonya Hubbard, and Sharonda Simon, as described in detail *supra*.

155.    In engaging in the conduct described in the preceding paragraphs, Defendants Rizzo, Bloyd, and Robertson thereby unconstitutionally deprived Mr. Brown of his liberty and violated his rights to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the United States Constitution.  Defendants acted intentionally and with malice, or deliberate indifference and reckless disregard, in violation of Mr. Brown's rights pursuant to 42 U.S.C. §1983.

156.    Defendant Harris County condoned the wrongful pattern, custom, and practice of coercion and intimidation of witnesses, as it failed to stop Defendant Rizzo's behavior despite repeated acts of coercion and intimidation.

157.    Defendant City of Houston condoned the wrongful pattern, custom, and practice of coercion and intimidation of witnesses, as it failed to stop Defendant Bloyd's and Defendant Robertson's behavior despite repeated acts of coercion and intimidation.

158.    The Defendants' fabrication of evidence and intimidation of witnesses denied Mr. Brown liberty without due process of law, and as a proximate result of their unconstitutional actions, Mr. Brown sustained substantial compensatory damages.

159.    Because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, the Court should award substantial punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT 2:

### 42 U.S.C. §1983 CLAIM FOR VIOLATING ALFRED DEWAYNE BROWN'S FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL BY FAILING TO DISCLOSE MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE
### Against Defendants Harris County, Rizzo, and McDaniel

160.    Plaintiff, Alfred Dewayne Brown, hereby incorporates by reference those allegations made in the preceding paragraphs.

161.    Defendants Harris County and Rizzo withheld exculpatory evidence which, if presented at trial, would have corroborated Mr. Brown's assertion that he was at home at the time of the murders.

162.    Throughout the course and over the years of their investigation, Mr. Brown's habeas counsel repeatedly requested telephone records from Ms. Berry's or Ms. Dockery's phone lines for the morning of April 3, 2003.  Mr. Brown's habeas counsel was repeatedly told by Defendants that the records did not exist or no longer existed.  This was a misrepresentation.

163.    Defendant Rizzo sought the telephone records the day after Ms. Dockery testified in the grand jury about the call and received the telephone records in 2003 but did not turn over the exculpatory telephone records to Mr. Brown's trial counsel.

164.     Remarkably, the telephone records were located in Defendant McDaniel's garage in April 2013, although they were never previously provided to Mr. Brown's trial counsel.

165.     The eventual discovery and release of the withheld telephone records resulted in Mr. Brown being exonerated of the crime for which he had been maliciously prosecuted and wrongfully imprisoned, reflecting a prosecutorial judgment that the release of these records exculpated Mr. Brown.

166.     Defendant Rizzo also failed to provide information regarding his plea contract with Mr. Dorty, the wire recordings Mr. Dorty performed pursuant to the plea contract, and information about other potential suspects in the case, including "organized crime figures."

167.     Defendant Rizzo engaged in the conduct described willfully, maliciously, in bad faith, and in reckless disregard of the Mr. Brown's federally protected constitutional rights.

168.     The knowing, deliberate, and intentional wholesale suppression of exculpatory evidence or information from Mr. Brown to use in his defense of the most serious criminal charges lodged against him was an unconstitutional deprivation of his rights in violation of his rights pursuant to 42 U.S.C. §1983.

169.     The Defendants' deliberate failure to make the required disclosures denied Mr. Brown liberty without due process of law, and as a proximate result of their unconstitutional actions, Mr. Brown sustained substantial compensatory damages.

170.     Because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, the Court should award substantial punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT 3:

**42 U.S.C. §1983 CLAIM FOR CONCEALING EVIDENCE AND/OR CONSPIRING TO CONCEAL EVIDENCE REGARDING MR. BROWN'S WHEREABOUTS AND DELIBERATELY FAILING TO PURSUE KNOWN AND EXCULPATORY INVESTIGATIVE LEADS**
**Against Defendants City of Houston and McDaniel**

171.    Plaintiff, Alfred Dewayne Brown, hereby incorporates by reference those allegations made in the preceding paragraphs.

172.    Defendant City of Houston and its agents, including but not limited to Defendant McDaniel, knowingly withheld exculpatory evidence which would have confirmed Mr. Brown's alibi and exonerated him at trial in violation of his rights pursuant to 42 U.S.C. §1983.

173.    The above-named Defendants suppressed, withheld, and prevented the flow of exculpatory evidence and information gathering during the course of the investigation of the matter.   The Defendants also engaged in the systematic intimidation of witnesses which contributed to false trial testimony against Mr. Brown.

174.    Furthermore, the above-named Defendants withheld and prevented the flow of exculpatory material, specifically telephone records that would have corroborated Mr. Brown's assertions that he was not at the scene of the crime but rather at his girlfriend's home.

175.    The evidence knowingly withheld by Defendant McDaniel and was the critical piece of evidence which would have secured Mr. Brown's innocence at trial.

176.    For an unknown amount of time, Defendant McDaniel, one of the initial detectives assigned to the case and a key figure to Defendant Rizzo's malicious prosecution of Mr. Brown, withheld telephone records that corroborated Mr. Brown's alibi.

177.    These telephone records languished in Detective McDaniel's garage until they were discovered almost a decade later.

178.     Mr. Brown's habeas counsel made repeated attempts to obtain these records but were misinformed by the Defendants that such records were not withheld from Mr. Brown.

179.     It was the revelation of these records almost a decade after the Mr. Brown's conviction that exonerated Mr. Brown.

180.     Defendant McDaniel's misconduct directly resulted in the unjust and unconstitutional criminal conviction of Mr. Brown in violation of his rights pursuant to 42 U.S.C. §1983.

181.     Defendant City of Houston, by and through its continued failures to stop or censure such actions, essentially sanctioned the unlawful conduct of Defendant McDaniel and other members of the Houston Police Department.

182.     The Defendant's deliberate failure to make the required disclosures denied Mr. Brown liberty without due process of law, and as a proximate result of their unconstitutional actions, Mr. Brown sustained substantial compensatory damages.

183.      Because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, the Court should award substantial punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

### COUNT 4:

**CLAIM FOR CREATING UNCONSTITUTIONAL CUSTOMS, POLICIES, AND PRACTICES, COGNIZABLE UNDER 42 U.S.C. § 1983 AND THE 5TH, 8TH, AND/OR 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**Against Defendant Harris County**

184.     Plaintiff, Alfred Dewayne Brown, hereby incorporates by reference those allegations made in the preceding paragraphs.

185.    Defendant Harris County was at all times material to this complaint the employer of Defendant Rizzo and others through the Harris County District Attorney's Office.

186.    The violations of Mr. Brown's civil and constitutional rights, as set forth herein, were the direct and proximate results of Defendant Harris County's then-existing customs, policies and practices.  Defendant Harris County expressly or tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein and knew or should have known that such conduct was unjustified and would result in violations criminal defendants' constitutional rights, including those of Mr. Brown.

187.    Defendant Harris County's official and unofficial policies and customs were to employ Assistant District Attorneys who were inadequately trained and supervised with respect to their duty to disclose to defense counsel all material exculpatory and impeachment evidence and/or to verify the veracity of the evidence its attorneys presented at trial in violation of Mr. Brown's rights pursuant to 42 U.S.C. §1983.

188.    Defendant Harris County also had an official or unofficial policy, custom, and practice of encouraging Assistant District Attorneys to aggressively pursue convictions regardless of the weight of the evidence against a particular defendant; to secure favorable witness testimony at any cost, including unlawful means of pressure and intimidation; to unethically solicit false testimony from witnesses, so long as it is favorable; and to otherwise do whatever it takes to convict a defendant.

189.    Defendant Harris County's official and unofficial policies, customs, and practices were essentially to knowingly, willfully, and intentionally disregard the constitutional rights of the defendants it sought to convict.

190.    Charles Rosenthal, Jr. was the District Attorney of Harris County, Texas from 2001 through 2008.  Mr. Rosenthal served as the District Attorney during the arrest, prosecution, and wrongful conviction of Mr. Brown.  Charles Rosenthal was a key policymaker who allowed or encouraged his prosecutors to manipulate witness recollections, fail to keep or maintain adequate records, manufacture evidence, and fail to disclose material exculpatory and impeachment evidence to defense counsel.

191.    The Harris County District Attorney's Office has a legacy of callously glamorizing its approach to the death penalty, from former District Attorney Johnny Holmes, Jr.'s "Silver Needle Society," to a sign in the office listing all the Defendants who were executed from the County, to a rock cover band comprised of Harris County District Attorneys named "Death by Injection."

192.    Mr. Rosenthal boasted in campaign advertisements that he sent 14 individuals to death row "where they belong."

193.    In 2008, Mr. Rosenthal was personally found in contempt for deleting more than 2,500 emails after they were subpoenaed in a federal civil rights lawsuit.  Consistent with the patterns of practice from Mr. Rosenthal's office during this time period, this example shows the District Attorney had no respect for the legal system and he, himself, was willing to destroy or otherwise manipulate evidence.

194.    Former District Attorney Pat Lykos sought to change Mr. Holmes' and Mr. Rosenthal's models by establishing a Post-Conviction Review Section in 2009.  Ms. Lykos served one term as District Attorney.

195.    Ms. Lykos's successor, Mike Anderson, was elected with a campaign promise to return to the "good old days" of Mr. Holmes and Mr. Rosenthal.  In fact, Mr. Anderson invited

Mr. Holmes to speak to Harris County District Attorneys in a mandatory ethics training after he was elected.   Tragically, Mr. Anderson died of cancer after eight months in office, and his widow, Devon Anderson, served until the current District Attorney Kim Ogg was elected in 2016.

196.   The conviction culture and "us *vs.* them" mindset within the Harris County District Attorney's Office was presented during a mandatory ethics training for prosecutors on January 31, 2013, after Mr. Anderson was elected.   This publicly available training video provided a window into how Assistant District Attorneys are trained.

197.   In Mr. Anderson's opening remarks, he stated that prosecutors were "maligned" by groups like the Innocence Project.   Mr. Anderson then stated that the Texas District and County Attorney Association ("TDCAA") had a mission to challenge the Innocence Project and said that the TDCAA "had their backs."   Mr. Anderson ended his remarks by stating that "we will kick your butt if it needs to be kicked."   *See* https://www.youtube.com/watch?v=FeS-fef4Vm4  (last visited June 7, 2017).

198.   After Mr. Holmes presented to the group, Rob Kepple, the Executive Director of TDCAA and former Assistant District Attorney in Harris County, trained the group for over an hour.   In the presentation, Mr. Kepple made troubling analogies to a history of cheating in professional sports and also praised multiple prosecutors for resisting a defendant's request to conduct DNA testing.   In fact, Mr. Kepple stated that it was "legal and ethical" to resist DNA testing.   *Id.*

199.   Mr. Kepple also relayed a story that when he was an Assistant District Attorney in Harris County, he bragged that he once made an improper statement in court about a defendant

failing to testify in a trial, and he was sanctioned by being ordered to sit in a courtroom for an entire day, making light of unconstitutional conduct.

200.    Mr. Kepple also stated that the Innocence Project was a "paper tiger" and mocked its work.  *Id.*

201.    The *Houston Chronicle* stated that "a video of a mandatory ethics training class at the district attorney's office has confirmed those fears [about resorting to the past] about our new district attorney" and that the video "contains far too many troubling moments to be dismissed as an out-of-context fluke."  Ethics Training Confirms Fears About Prosecutors Mindsets, *Houston Chronicle*, February 28, 2013.  This video underscores the unconstitutional legacy of the Harris County District Attorney's Office and its training failures.

202.    Mr. Kepple and TDCAA do acknowledge, however, that *Brady* issues are serious, and in a report entitled *Setting the Record Straight on Prosecutorial Misconduct*, stated that "the troubling news is that *Brady* violations often play a role in the few confirmed cases of prosecutorial misconduct."  TDCAA, *Setting the Record Straight on Prosecutorial Misconduct*, September 12, 2012.

203.    This troubling news is evident in Harris County.   A pattern of systemic *Brady* violations show that Defendant Harris County failed to train its prosecutors, resulting in a fundamentally flawed misunderstanding of the duty to disclose evidence.   Moreover, Defendant Harris County sanctions these common, consistent *Brady* violations by accepting them and failing to properly address them.

204.    Most recently, on November 23, 2016, in *Ex Parte David Mark Temple*, the Court of Criminal Appeals overturned the defendant's conviction and held that former Harris County Assistant District Attorney Kelly Siegler committed 36 instances of misconduct and had a

"misconception" regarding her duty under *Brady* that was "of enormous significance." Ms. Siegler maintained that she was not required to turn over favorable evidence if she did not believe it to be relevant, inconsistent, or credible.  The Court noted her misconception "when it came to what constituted *Brady* evidence, her opinion is what mattered."  This misconception is a result of the training failure by Harris County regarding a prosecutor's *Brady* obligations.

205.   In *Temple*, the Court cited a troubling Harris County District Attorney's Office policy – that if a defense counsel asked for an examining trial, the prosecution would "close" its file and not give any information over to the defense.  This troubling policy is also indicative of Defendant Harris County's training failures.

206.   The *Temple* case occurred while Mr. Rosenthal was District Attorney, and, as noted above, he was the District Attorney when Mr. Brown was prosecuted.

207.   The *Houston Chronicle* reported on the *Temple* case and quoted JoAnne Musick, former president of the Harris County Criminal Lawyers Attorneys Association and current Chief of Sex Crimes at the Harris County District Attorney's Office.  Ms. Musick stated that the *Temple* case and others illustrated troubling problems with Harris County prosecutors' conduct in murder cases and that evidence was withheld by "the same group of prosecutors that were all trained in the same era and came from the same culture."   Temple Murder Conviction Tossed, *Houston Chronicle*, November 24, 2016.  This further exemplifies Harris County's training failure.

208.   Ms. Musick also wrote an article for the Harris County Criminal Lawyers Association entitled *Harris County – We Have a Brady Problem*, in which she noted the numerous examples of cases involving *Brady* violations in Harris County.  In addition to the *Temple* case noted above, the article notes several other troubling examples.  *See*

http://www.musicklawoffice.com/wp-content/uploads/2016/05/BRADY-Defender-Fall-2016.pdf

(last visited June 7, 2017).

209.    One of the examples is *Ex Parte Linda Carty*, in which Harris County District Attorneys Connie Spence and Craig Goodhart committed *Brady* violations in that they failed to disclose witness statements that conflicted with or were inconsistent with what was represented to the defense.  Prosecutors also failed to disclose a witness statement stating that the witness did not believe Carty to be a danger to society and failed to disclose a deal with another witness that was made.

210.    The trial court in *Carty* held that the Harris County District Attorney's Office operated under a misunderstanding of *Brady* in that similar to Ms. Siegler's misconception and that the prosecutors operated on "gut instinct" and "judgment calls" and did not believe that such evidence needed to be disclosed if they did not find the testimony credible.  This improper pattern of determining *Brady* on a prosecutor-by-prosecutor basis relying on independent and individual "gut instincts" and "judgment calls" is a further demonstration of Harris County's training failure.

211.    In *Ex Parte Edward McGregor*, Harris County District Attorney Elizabeth Shipley Exley tried the defendant in Fort Bend County as she was simultaneously prosecuting the defendant in a separate murder case in Harris County.  In *McGregor*, Ms. Exley did not disclose deals made with jailhouse informants regarding a parole recommendation and pending cases.  Ms. Exley stated that, because there was no specific promise for a deal, she "could" notify parole or the pending court about the witnesses' cooperation, but that she was not obligated to disclose the information.  After McGregor's trial, one informant received a favorable letter written on her behalf to the parole board, and two witnesses received favorable plea agreements.

The Court of Criminal Appeals remanded the case to the trial court for further findings on the issue on April 26, 2017.  Ms. Exley's understanding of *Brady* was erroneous and further demonstrates Harris County's training failure.

212.    In *Ex Parte Kenneth Headley*, former Harris County District Attorney Rob Freyer struck a very favorable deal with an eyewitness – misdemeanor time served on two felony charges in exchange for her testimony at the grand jury and at trial.  Mr. Freyer stated that he did not have a duty to disclose the deal, because he would have raised it during direct examination of the witness if he tried the case.  However, the case was transferred to another Assistant District Attorney, and the deal was not introduced.  The Texas Court of Criminal Appeals reversed and ordered a new trial.  Mr. Fryer's misconception about his duty to disclose further demonstrates Harris County's training failure.

213.    In *State v. Glen Kahlden*, the trial court held that the Chief of the District Attorney's Child Abuse Division failed to notify defense attorneys that the child victim in the case initially stated that she had been assaulted by a black man when the Defendant was white.  Although the court held that "the state has the duty to disclose, and the district attorneys should have revealed the information," a mistrial was denied because it was discovered during trial.  The Harris County District Attorney's Office's fundamentally flawed understanding of the timing and content of a *Brady* disclosure further demonstrates Harris County's training failure.

214.    Therefore, Defendant Harris County performed acts pursuant to municipal policies, practices, customs and usages, which ratified, tolerated, acquiesced in, maintained, authorized, and permitted the following unconstitutional conduct:

a.      The knowing deliberate and intentional wholesale suppression of exculpatory evidence or information of favorable value from Mr. Brown and his lawyers to use in his defense of the most serious criminal charges brought against him.

b.      Permitting Defendant Rizzo to approve criminal charges and investigations based upon fabricated evidence by police officers, including Defendants McDaniel, Bloyd, Robertson, and Rizzo himself, that targeted Mr. Brown for imprisonment and execution, while deliberately and intentionally ignoring descriptive evidence provided by myriad witnesses to police officers and Rizzo, as to the identities of the perpetrators of the crime, which descriptions did not fit Mr. Brown.

c.      Enabling Defendant Rizzo to engage in unconstitutional conduct of malicious prosecution of Mr. Brown, deliberately undermining Mr. Brown's right to a fair trial, right to due process of law, and the right to equal protection of the law.

d.      Permitting the Harris County District Attorney's Office and its employees, specifically Defendant Rizzo, to purchase or make deals for the perjured testimony of witnesses which played a significant role in the malicious prosecution of Mr. Brown and resulted in his wrongful imprisonment.

e.      Tolerating misconduct on behalf of the Harris County District Attorney's Office and its employees, such as Defendant Rizzo, including the concealment of exculpatory evidence, the harassment and intimidation of witnesses, the continued malicious prosecution of Mr. Brown, and the wrongful imprisonment of Mr. Brown.

f.      Failing to adequately train, supervise, monitor, control, and discipline its Assistant District Attorneys, including Defendant Rizzo and other employees, for engaging in a continuous pattern of shocking misconduct, which has led to innocent people, including

Mr. Brown, being arrested, tried, convicted, and imprisoned for crimes which they did not commit.

g.      Condoning and emboldening the Defendants to engage in misconduct, in the belief that they could violate Mr. Brown's rights with the knowledge that such flagrant conduct would not adversely affect opportunities for job promotion and benefits.

h.      Refusing to discipline Assistant District Attorneys, including Defendant Rizzo and other employees, with demonstrable histories of engaging in unethical and unprofessional misconduct; prosecuting cases that resulted in the wrongful imprisonment of innocent individuals, including Mr. Brown; and acting in concert with other prosecutors so as to cause the wrongful prosecution and imprisonment of individuals, such as Mr. Brown.

i.      Allowing Harris County District Attorney's Office and its Assistant District Attorneys, including Defendant Rizzo and other employees, to engage in subornation of perjured testimony in their quest to secure a conviction and engage in malicious prosecution and false imprisonment, as was done in this case.

215.    Mr. Brown has been damaged as a proximate result of Defendant Harris County's unconstitutional policies, customs, and practices, as described herein.  Mr. Brown is entitled to substantial compensatory damages and, because Defendant Harris County acted maliciously, willfully, wantonly, and/or with reckless disregard for his constitutional rights, to substantial punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT 5:

**42 U.S.C. §1983 CLAIM FOR UNCONSTITUTIONAL POLICIES, CUSTOMS, AND PRACTICES BY THE HOUSTON POLICE DEPARTMENT**
**Against Defendant City of Houston**

216.    Plaintiff, Alfred Dewayne Brown, hereby incorporates by reference those allegations made in the preceding paragraphs.

217.    The City of Houston, with encouragement from all the named Defendants, has created and tolerated an atmosphere of lawlessness and has developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Mr. Brown and of the public.

218.    Clarence Bradford served as Houston Chief of Police from 1997 through 2004. Chief Bradford served one of the longest tenures as a Houston Police Chief and implemented many significant programs and initiatives during his administration.  Chief Bradford had final policymaking authority over the hiring and training of many of the officers involved in Mr. Brown's wrongful arrest and prosecution in 2003.  Specifically, Chief Bradford allowed or encouraged his officers to manipulate witness recollections, fail to keep or maintain adequate records, manufacture evidence, and fail to disclose material exculpatory and impeachment evidence to prosecutors and defense counsel.

219.    Harold Hurtt served as Houston Chief of Police from 2004 through 2009.  Chief Hurtt served as chief of police during the prosecution and wrongful conviction of Mr. Brown. Chief Hurtt maintained the customs, policies, and practices described in this complaint, which were widely commented upon in the community.   Specifically, Chief Hurtt allowed or encouraged his officers to manipulate witness recollections, fail to keep or maintain adequate

records, manufacture evidence, and fail to disclose material exculpatory and impeachment evidence to prosecutors and defense counsel.

220.    The customs, policies, and procedures of mishandling of evidence by the Houston Police Department were rampant for decades.  For example, in 2005, 280 mislabeled boxes containing evidence previously thought lost were found in the Houston police property room. The evidence dated back to the 1970s, some of it dealing with 28 capital murder cases.  The mix-up came at a time when the department was reeling from irregularities at its crime laboratory.

221.    In 2009, Chief Hurtt described the century-old former awning factory that had been Houston's police property room for more than 30 years as a "nightmare."

222.    As against the City of Houston, its policies, customs, and practices regarding the hiring of its officers, the training and supervision of its officers, the handling and testing of evidence, its investigative techniques, its record keeping and documentation of evidence, and other aspects of its investigations and prosecutions during the time in which Mr. Brown was charged, tried, and filing his appeals, all contributed to this injustice.  The City was either actually aware of or deliberately indifferent to the known or obvious consequences of its policies, customs, and practices.

223.    The City of Houston failed to properly preserve evidence and/or failed to assure its employees complied with its own policies and procedures and/or their duties under Texas and federal law. Their final policymakers were either actually aware of or deliberately indifferent to the known or obvious consequences of these policies, customs, and practices, which include the fact that innocent citizens would be illegally convicted.

224.    In light of the duties and responsibilities of those police officers that participate in arrests, preparation of police reports, and subsequent investigations of alleged crimes, the need

for additional training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein, that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

225.    The deliberately indifferent and/or non-existent training and supervision provided by the Houston Police Department resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Houston Police Department and were moving forces in the constitutional and federal violation injuries suffered by Mr. Brown.

226.    The City of Houston also failed to train its employees concerning *Brady* obligations.  TDCAA's report, *Setting The Record Straight on Prosecutorial Misconduct*, states that "few law enforcement agencies have adopted written procedures or policies to insure compliance with *Brady*."  TDCAA, Setting the Record Straight on Prosecutorial Misconduct, September 12, 2012.

227.    The TDCAA report also stated that *Brady* compliance was not taught as part of the Texas Commission on Law Enforcement ("TCLEOSE") mandated 40-hour curriculum that must be completed by certified peace officers every two years.

228.    The lack of *Brady* training was a concern to TDCAA, which "highlights the need for a greater appreciation of *Brady* obligations among law enforcement officers, better coordination between prosecutors and investigating officers, and more thorough trial preparation by prosecutors." *Id*.  This concern was also stated to Harris County District Attorneys during the mandatory ethics training noted above.

229.    The issues noted by TDCAA demonstrate the City of Houston's training failures.

230.    Mr. Brown has been damaged as a proximate result of the City of Houston's policies and customs to employ police officers who were inadequately trained and supervised with respect to fundamental investigative techniques and their duty to disclose all material exculpatory and impeachment evidence.

## COUNT 6:

### 42 U.S.C. §1983 SUPERVISORY LIABILITY CLAIM
### Against City of Houston

231.    Plaintiff, Alfred Dewayne Brown, hereby incorporates by reference those allegations made in the preceding paragraphs.

232.    Defendant supervisors in the Houston Police Department, collectively, failed to adequately train and supervise Defendant McDaniel, and other individuals employed by the City of Houston, with respect to fundamental investigative techniques and duties, including the duty to avoid coaching witnesses, the duty to disclose manipulation of witness recollections, the duty to disclose material exculpatory and impeachment evidence to prosecutors and defense counsel, proper methods of securing evidence, and proper methods of locating suspects and pursuing known and exculpatory leads.

233.    Defendant City of Houston failed adequately to train and supervise Defendant McDaniel and others who were employed by the City of Houston, with deliberate indifference to the known and obvious consequences that deprivations of due process would result.

234.    As a direct and proximate result of City of Houston's failure to supervise Defendant McDaniel and others who were employed by the City of Houston, Mr. Brown was denied due process when these individuals engaged in the conduct set forth herein.

235.    As a proximate result of the actions of Defendant City of Houston, Mr. Brown sustained substantial compensatory and economic damages.

<u>**COUNT 7:**</u>

**42 U.S.C. §1983 SUPERVISORY LIABILITY CLAIM**
**Against Harris County**

236.    Plaintiff, Alfred Dewayne Brown, hereby incorporates by reference those allegations made in the preceding paragraphs.

237.    Defendant supervisors in the Harris County District Attorney's Office failed to adequately train and supervise Defendant Rizzo, and other individuals who were employed by Harris County, with respect to investigative techniques regarding the prosecution of an individual, including the duty to avoid coaching witnesses, the duty to disclose manipulation of witness recollections, the duty to disclose material exculpatory and impeachment evidence to defense counsel, proper methods of securing evidence, and proper methods of locating suspects and pursuing known and exculpatory leads.

238.    Defendants failed adequately to train and supervise Defendant Rizzo and others who were employed by Harris County, with deliberate indifference to the known and obvious consequences that deprivations of due process would result.

239.    As a direct and proximate result of Defendant Harris County's failure to supervise Defendant Rizzo and others who were employed by Harris County, Mr. Brown was denied due process when these individuals engaged in the conduct set forth herein.

240.    As a proximate result of the actions of Defendant Harris County, Mr. Brown sustained substantial compensatory and economic damages.

<u>**DAMAGES**</u>

241.    As a result of Defendants' conduct, Mr. Brown sustained damages far exceeding the minimum jurisdictional limits of this court.

## JURY DEMAND

242.    Plaintiff hereby demands a jury trial of all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against each Defendant and grant:

a.    Compensatory and consequential damages to Plaintiff as compensation for all injuries and losses Plaintiff suffered which were caused by the willful and/or deliberately indifferent acts of Defendants, in an amount to be determined at trial;

b.    Punitive damages on all claims and against such Defendants as allowed by law, in an amount to be determined at trial;

c.    Costs associated with this action, including reasonable attorneys' fees under 42 U.S.C. §1988;

d.    Prejudgment and post-judgment interest as allowed by law; and

e.       Any further relief that this Court deems just and proper, and any other appropriate

relief available at law and equity.


Date:  June 8, 2017                           Respectfully submitted,

                                              LeClairRyan

                                              By:  /s/ Gwen E. Richard
                                                   Gwen E. Richard
                                                   Texas State Bar No. 16842730
                                                   Southern District Bar No. 12923
                                                   1233 West Loop South, Suite 1000
                                                   Houston, Texas   77027
                                                   (713) 654-1111  Telephone
                                                   (713) 650-0027  Facsimile
                                                   E-Mail:  gwen.richard@leclairryan.com

                                              ATTORNEY-IN-CHARGE FOR PLAINTIFF