# EXHIBIT 1

**C.A. No. 4:-17-CV-01749;**
***Alfred Dewayne Brown v. City of Houston, et al.***

1           REPORTER'S RECORD

2         Volume 31 of 41 Volumes

3          Trial Court No. 1035159

4        Court of Appeals No. AP-75,294

5

THE STATE OF TEXAS      :   IN THE DISTRICT COURT OF

6                       :

VS.                     :   HARRIS COUNTY, T E X A S

7                       :

ALFRED DeWAYNE BROWN    :   351ST  JUDICIAL DISTRICT

8

9

10     _____

11               JURY TRIAL

12     _____

13

14        On the 13th day of October, 2005, the

15  following proceedings came on to be heard in the

16  above-entitled and numbered cause before the

17  Honorable Mark Kent Ellis, Judge presiding, held

18  in Houston, Harris County, Texas.

19        Proceedings reported by computerized

20  stenotype machine.

21

22

23

            TONI GOUBEAUD, CSR NO. 5774
24  Official Court Reporter - 351st Judicial District
            1201 Franklin, 14th Floor
25               Houston, Texas
              (713) 755-5620

14

```
 1              MR. RIZZO:  Nothing further, Your
 2  Honor.
 3              THE COURT:  You may step down, sir.
 4              Call your next witness.
 5              MR. RIZZO:  State calls Ericka
 6  Dockery.
 7                  ERICKA DOCKERY,
 8  having been first duly sworn, testified as
 9  follows:
10              DIRECT EXAMINATION
11  BY MR. RIZZO:
12      Q.   Could you pull the mike down a little
13  bit, please?
14      A.   (Witness complies.)
15      Q.   Could you state your name, please?
16      A.   Ericka Dockery.
17      Q.   And you're going to have to keep your
18  voice up for everybody to hear you?
19      A.   Okay.
20      Q.   Ms. Dockery, how old are you?
21      A.   Thirty.
22      Q.   And are you single or are you married?
23      A.   I'm married.
24      Q.   And who are you married to?
25      A.   Julius Lockett.
```

```
 1        Q.    I'm sorry.  I can't hear you?
 2        A.    Julius Lockett.
 3        Q.    And how long have you been married to
 4   him?
 5        A.    Seven months.
 6        Q.    Have you -- were you married before that
 7   at any time?
 8        A.    No.
 9        Q.    Do you have any children?
10        A.    Yes, I have three.
11        Q.    And what are their names and how old are
12   they?
13        A.    Tyecia Dockery, she's 13.  I have
14   Patrice, she's ten, and I have Carlissia, she's
15   eight.
16        Q.    Are you from Houston or someplace else?
17        A.    From Houston, Texas.
18        Q.    How far did you go in school?
19        A.    Eleventh grade.
20        Q.    What school?
21        A.    Aldine High.
22        Q.    And did you graduate?
23        A.    No, to the eleventh grade.
24        Q.    Did you get your GED?
25        A.    Yes.
```

```
 1        Q.   Are you also in school right now?

 2        A.   Yes.

 3        Q.   And what school are you in?

 4        A.   I'm at NIT.

 5        Q.   And where is that located?

 6        A.   It's --

 7        Q.   Let me wait a second until it settles

 8   down.  Thank you?

 9        A.   Okay.

10        Q.   What is NIT?

11        A.   It's a vocational school for like

12   businesses and dental assistants, MIBC, that's

13   what I'm taking up, medical insurance billing and

14   coding.

15        Q.   And how long have you been going to that

16   school?

17        A.   Going on six months now.

18        Q.   Let me ask you, are you currently charged

19   with any offenses?

20        A.   Yes.

21        Q.   And what are you charged with?

22        A.   I'm charged with three counts of

23   aggravated perjury.

24        Q.   And are they still pending right now?

25        A.   Yes, they are.
```

1     Q.   What are those charges a result of?

2     A.   Because I lied to the Grand Jury.

3     Q.   Were you subpoenaed to testify before the

4 Grand Jury back in April of 2003?

5     A.   Yes.

6     Q.   And was -- was there someone in the Grand

7 Jury who questioned you?

8     A.   Yes.

9     Q.   And who would that have been?

10     A.   You.

11     Q.   And also members of the Grand Jury?

12     A.   Yes, members of the Grand Jury.

13     Q.   And during that time, did you lie under

14 oath?

15     A.   Yes.

16     Q.   Did you lie to protect someone?

17     A.   Yes.

18     Q.   And who would that have been?

19     A.   Alfred Brown.

20     Q.   Let me talk to you a little bit about

21 your relationship with Alfred Brown.  Back in

22 April of 2003, what relationship did you have with

23 him?

24     A.   I was his girlfriend.

25     Q.   How long was he your boyfriend?

```
 1        A.    About six months.

 2        Q.    Were you living together?

 3        A.    Yes.

 4        Q.    Was he living with you, you living with

 5   him?  You had a place together?  What was it?

 6        A.    He was living with me.

 7        Q.    And your place -- where were you living

 8   at?

 9        A.    I was living in Plum Creek Apartments off

10   of South Loop.

11        Q.    Do you remember what your phone number

12   was there?

13        A.    No, sir, not offhand, no.

14        Q.    Do you -- did you know a person by the

15   name of Shon Glaspie?

16        A.    Yes.

17        Q.    And how long had you known him?

18        A.    Maybe a few months.  I knew him through

19   Alfred about a few months, yes.

20        Q.    Where did you know him from?

21        A.    The VA.  They call it the Villa Cana -- I

22   can't pronounce the name right.

23        Q.    Okay.  Villa Americana?

24        A.    Yes.

25        Q.    Did you used to hang out at The VA?
```

```
 1       A.    Sometimes, yes.

 2       Q.    And did you know Ghetto?

 3       A.    Yes.

 4       Q.    And how did you know Ghetto?

 5       A.    Through DeWayne, too.

 6       Q.    Now, did DeWayne -- at the time that you

 7  were going out with him, did he hang out with Shon

 8  Glaspie and Ghetto?

 9       A.    Yes.

10       Q.    Did he hang out with them on a regular

11  basis?

12       A.    Yes.

13       Q.    And did he hang out with them during a

14  period of time that you were going out or he was

15  living with you, I should say?

16       A.    Yes.

17       Q.    Up until the time that you were charged

18  with aggravated perjury -- and how many charges

19  did you get, by the way?

20       A.    Three.

21       Q.    Up until the time that you were charged

22  with aggravated perjury, had you ever been in

23  trouble before with the law?

24       A.    No, besides a traffic warrant.

25       Q.    Pardon me?
```

```
 1        A.    A traffic ticket.  That's all.

 2        Q.    Okay.  Now, when you lied to the Grand

 3   Jury -- in what way did you lie to the Grand Jury

 4   concerning this particular case?

 5        A.    I told them that DeWayne was at home.

 6        Q.    During the time when the offense

 7   occurred?

 8        A.    Yes, sir.

 9        Q.    Did the Grand Jury believe you?

10        A.    No.

11        Q.    Did they tell you they didn't believe

12   you?

13        A.    Yes, they did.

14        Q.    Did they give you a chance to correct

15   your lie?

16        A.    Yes.

17        Q.    How long -- how many hours were you in

18   the Grand Jury, approximately?

19        A.    I'm not sure.  A long time.  I'm not

20   sure, though.

21        Q.    And during this time, after you lied to

22   the Grand Jury, did you believe that they knew you

23   were lying?

24        A.    Yes.

25        Q.    And I'm talking about the Grand Jury?
```

1     A.   Yes.

2     Q.   After -- at some point -- at any time

3  during that day in the Grand Jury, did you ever

4  back up on your lies?

5     A.   Backwards and forward, yes.

6     Q.   Backwards and forward?

7     A.   Yes.

8     Q.   Did you continue to alibi the Defendant,

9  though?

10     A.   Yes.

11     Q.   Let me ask you, after you were indicted,

12  were you arrested?  Did you get arrested?

13     A.   Yes.  Yes.

14     Q.   Who arrested you?

15     A.   His name is Ted Bloyd and Robertson.   I

16  can't remember his first name.

17     Q.   Members of the Homicide Division?

18     A.   Yes.

19     Q.   And did they arrest you at your home or

20  your business?  Where did they arrest you?

21     A.   They arrested me at home.

22     Q.   When you went into jail, what were your

23  bonds placed at?

24     A.   5,000 apiece for each charge.

25     Q.   And did you make those bonds?

1      A.   No.

2      Q.   How long did you sit in jail?

3      A.   About four months.

4      Q.   And you were represented by counsel?

5      A.   Yes, I was.

6      Q.   And who was that?

7      A.   Arias Randal.

8      Q.   Randy Ayers?

9      A.   I'm sorry.  Randy Ayers.

10     Q.   And did you have time to consult with

11  him?  In other words, he visited with you, did he

12  talk to you and explain things to you?

13     A.   Yes.

14     Q.   And that would have been over the

15  four-month period that you spent in jail?

16     A.   Yes.

17     Q.   Now, about four months later, did you

18  tell anyone that you wanted to come clean on this?

19     A.   Yes.

20          MS. MULDROW:  I'm going to object to

21  the leading, Your Honor.

22          THE COURT:  Overruled to that

23  question.  Next question.

24     Q.   (By Mr. Rizzo)  And who did you tell?

25     A.   My lawyer.

```
 1        Q.   And that would have been Randy Ayers?

 2        A.   Yes.

 3        Q.   What did you tell him?

 4        A.   I wanted -- I told him that I wanted to

 5   tell him everything that was going on.

 6        Q.   Had you told your lawyer everything up to

 7   that point?

 8        A.   Not everything, no.

 9        Q.   And did you tell your lawyer that you

10   wanted to cut a deal?

11        A.   Yes.

12        Q.   And what did you want?

13        A.   I wanted to go home.  I wanted to tell

14   him everything that was going on and to go home.

15        Q.   Well, let me also ask you, at some point

16   did you -- after you talked to your lawyer, did

17   you meet with myself and members of the Homicide

18   Division?

19        A.   Yes.

20        Q.   And were you interrogated?  Were you

21   questioned?

22        A.   Yes.

23        Q.   And how long a period were you questioned

24   for initially?

25        A.   When I first got out, I was questioned --
```

24

```
 1   I don't know how long in between.  Maybe three
 2   times they talked to me.
 3       Q.   And did the State of Texas offer you a
 4   deal?
 5       A.   Yes.
 6       Q.   And could you tell the members of the
 7   jury what you will get if you fulfill your part of
 8   the contract?
 9       A.   I get probation.
10       Q.   Okay?
11       A.   If I tell the truth fully.
12       Q.   If what?
13       A.   If I tell the truth fully, yes.
14       Q.   If you tell the truth fully about what
15   happened?
16       A.   Yes.
17       Q.   All right.  Let me talk to you about this
18   particular -- the conditions that were placed on
19   you, also?
20       A.   Okay.
21       Q.   During the period of time that you have
22   been released from jail -- when was that, by the
23   way, that you got released?
24       A.   For me being released I have to wear an
25   anklet monitor.
```

1      Q.   Let me stop you for a moment.  What's an

2  ankle monitor?

3      A.   It's an electronic monitor they hook up

4  to your leg.

5      Q.   Okay.  Do you have it on now?

6      A.   Yes.  Do you want to --

7      Q.   Hold on a second.  I have to ask the

8  Judge?

9              MR. RIZZO:  May she show the jury.

10             THE COURT:  Yes.

11     Q.   (By Mr. Rizzo)  Would you step down and

12  stand over here?

13     A.   (Witness complies.)

14     Q.   Okay.  You can go.

15     A.   (Witness resumed witness stand.)

16     Q.   And that was the condition that the Court

17  put on you --

18     A.   Yes.

19     Q.   -- based on my recommendation?

20     A.   Yes.

21     Q.   Did you have any other -- oh, let me ask

22  you about that ankle monitor.  Does that monitor

23  your whereabouts?

24     A.   Yes, it does.

25     Q.   I'm sorry.  Go ahead?

1      A.   I'm sorry.

2      Q.   That's all right.  Does -- do you have

3  any time periods where you have to be located in

4  your home?

5      A.   Yes, between the hours of 5:00 a.m. to --

6  hold on.  Let me see.  From 5:00 a.m. to 10:00

7  o'clock at night I can be out.  Any hours after

8  that I have to be in the house.

9      Q.   You have to be -- you can be out during

10  the day?

11      A.   Yes.

12      Q.   Okay.  What time do you have to be back

13  in your house?

14      A.   By 10:00.

15      Q.   And if you're not in your house by 10:00,

16  what happens?

17      A.   I go back to jail.

18      Q.   Okay.  The monitor will pick that up?

19      A.   Yes, it will.

20      Q.   All right.  Any other conditions that

21  have been placed on you in terms of employment?

22      A.   I have to work.

23      Q.   I told you you had to have a job?

24      A.   Yes, sir, you did.

25      Q.   And in terms of -- let me ask you, were

27

```
 1   you a drug user?

 2        A.   Yes, I was.

 3        Q.   What kind of drugs did you take?

 4        A.   I took Ecstacy, I took Handle Bars.

 5        Q.   I'm sorry.  I can't hear you?

 6        A.   Handle Bars.

 7        Q.   Handle Bars?

 8        A.   Yes, Lovacel (sp.ph.).  I drank syrup.  I

 9   smoked weed.

10        Q.   Let me ask you this:  Were you stoned

11   when you were inside the Grand Jury?

12        A.   Yes.

13        Q.   Did I place -- did I recommend to the

14   Court to place any conditions concerning

15   monitoring you for drugs?

16        A.   Yes, I -- I take a drug test twice a

17   month.

18        Q.   Yes, ma'am.  And have you tested dirty at

19   all?  In other words, have you -- has it shown

20   that you've been using drugs or alcohol at any

21   time?

22        A.   No.

23        Q.   Did I also recommend to the Court any

24   conditions concerning contacting members of the

25   Houston Police Department Homicide Division?
```

28

```
 1        A.   Yes.  Once a week I call them.

 2        Q.   You have to actually call the Homicide

 3   detective once a week?

 4        A.   Yes, once a week.

 5        Q.   And have you been doing that?

 6        A.   Yes.

 7        Q.   And if you didn't do that, what was going

 8   to happen to you?

 9        A.   I go back to jail.

10        Q.   At the time that I recommended these

11   conditions as a condition of your bond, did you

12   think that these conditions were fair at the time?

13        A.   Yes.

14        Q.   And since this has occurred -- and I'm

15   talking about since you have been on an ankle

16   monitor, you've been required to work, you've had

17   drug testing twice a month and you've also had to

18   call the police department once a week, has your

19   life changed in any ways?

20        A.   Yes, it has.

21        Q.   In what way?

22        A.   I'm a better person.  I'm clean.  I'm

23   married.  I got my life together.  I'm changed.

24   I'm not the same person anymore.

25        Q.   Let me ask you about your testimony,
```

29

1   also.  In terms of is there anything that I told

2   you that you have to say in terms of testifying?

3        A.   The truth.

4        Q.   Okay.  And in terms of all the

5   information, where did I get the information from?

6        A.   Me.

7        Q.   Now, let me also ask you if you had to

8   agree to be interviewed at any time during the

9   period since you've been on bond?  In other words,

10  we were allowed to talk to you any time we want

11  about anything to do with this case?

12       A.   Yes, sir.

13       Q.   And did we talk to you an occasion?

14       A.   Yes.

15       Q.   And you agreed to that on each and every

16  occasion?

17       A.   Yes, sir.

18       Q.   There was one time you failed to call

19  Homicide, is that right, I guess?

20       A.   No, it was a miscommunication.

21       Q.   Okay.  But you almost got arrested for --

22       A.   Yes, I did.

23       Q.   And we got in touch with you the next

24  day?

25       A.   Yes.

1    Q.   All right.  Let me talk to you -- I want

2    to go back to April 3rd.  Let me direct your

3    attention back to April 3rd of 2003 during that

4    period of time when you were living with DeWayne

5    Brown.

6              I don't know if I asked you if you

7    could point to him and describe an article of

8    clothing he's wearing.  Could you point to him and

9    describe an article of clothing he's wearing if

10   he's in the courtroom.

11   A.   He's right there.

12             MR. RIZZO:  Your Honor, may the

13   record reflect this witness has identified the

14   Defendant.

15             THE COURT:  Yes.

16   Q.   (By Mr. Rizzo)  Okay.  Back in April of

17   2003, were you working back then?

18   A.   Yes, I was.

19   Q.   How many jobs were you working?

20   A.   Two.

21   Q.   Could you tell the jury what jobs you

22   were working back then?

23   A.   I was working home healthcare and I was

24   also working at Subway in the evenings.

25   Q.   And by home healthcare, what do you mean

1    by that?

2        A.   I go in the patient -- I go in patients'

3    homes and I take care of them.

4        Q.   Did you -- was the Defendant working back

5    then?

6        A.   No.

7        Q.   Did -- was he hanging out with these

8    defendants, these other two co-defendants, that

9    being Ghetto and Shon?

10       A.   Yes, he was.

11       Q.   Who was the person, the home healthcare

12   person that you were working with?

13       A.   Ms. Berry.

14       Q.   And is that Alma Berry?

15       A.   Yes.

16       Q.   Did you have any other people who were

17   working with you or living with you back then --

18       A.   Yes, my kids, my cousins, Reginald --

19       Q.   Who's your cousins?

20       A.   Reginald, Ruben, Richard, Terrence.

21       Q.   How old are they?

22       A.   Reginald is -- Reginald, I think, is 22

23   now.  Richard is 18, Terrence 17, Ruben is 17.

24       Q.   Were you supporting all those people,

25   too?

1      A.   Yes, I was.

2      Q.   And were you supporting the Defendant?

3      A.   Yes.

4      Q.   Did he have some money coming in, also,

5  though?

6      A.   Yes.

7           MS. MULDROW:   Speculation.   If she

8  knows -- unless she knows.   Excuse me.

9           THE COURT:   Do you know, ma'am?

10  From your own personal knowledge, did he have

11  money coming in.

12           THE WITNESS:   I remember a time that

13  he was -- he had some money, yes, and he also had

14  got an income tax while we was together also.

15      Q.   (By Mr. Rizzo)   Okay.   In terms of a real

16  job, he did not have money?

17      A.   No, he didn't.

18      Q.   All right.   Did he have his own car?

19      A.   No.

20      Q.   Did he drive your car?

21      A.   Yes, he did.

22      Q.   What kind of car did you have?

23      A.   I have a Malibu, cream colored Malibu.

24  It's a '99.

25      Q.   Did he drive anyone else's car?

33

```
 1        A.   His mother's car, a white Dodge Stratas.

 2   Shon's car, I think it was a white Grand Prix, if

 3   I'm not mistaken.

 4        Q.   Okay.  And let me ask you, also, did you

 5   know his mother?

 6        A.   Yes.

 7        Q.   And did you have contact with her on a

 8   regular basis?

 9        A.   Yes, sir, I did.

10        Q.   How did you have contact with her?

11        A.   We worked together in the evenings at

12   Subway.

13        Q.   Have you seen her down here at the

14   courthouse?

15        A.   Today or before.

16        Q.   Today?

17        A.   Yes.

18        Q.   Is she in the courtroom?

19        A.   Yes.  Yes, sir.

20        Q.   Which one is she?

21        A.   She's in the back right there

22   (indicating).

23        Q.   Okay.  And did she -- did you have an

24   okay relationship with her?

25        A.   Yes.
```

```
 1        Q.   Let me direct your attention actually to

 2   April 3rd of 2003, and ask you if you were working

 3   that day?

 4        A.   Yes, I was.

 5        Q.   And what time did you start working that

 6   day?

 7        A.   Could you repeat the question again?

 8        Q.   Well, actually, it's going to be the 2nd,

 9   April 2nd, the day before the killings?

10        A.   Okay.

11        Q.   Were you working that day?

12        A.   Yes.

13        Q.   And what time did you start working at

14   Subway?

15        A.   What time I started Subway?  I started

16   4:00 o'clock.

17        Q.   And what was your shift at Subway?  And

18   this would be the day before the killings?

19        A.   4:00 to 10:00.

20        Q.   And at the end of the day, that being

21   10:00 o'clock, did anybody pick you up?

22        A.   Yes, Alfred did.

23        Q.   The Defendant?

24        A.   Yes.

25        Q.   What kind of car did he pick you up in?
```

```
 1        A.    He picked me up in my car.

 2        Q.    Your car?

 3        A.    Uh-huh.

 4        Q.    What time did he get there?

 5        A.    I want to say about 10:45, something like

 6   that.

 7        Q.    And at about 11:00 o'clock, did he tell

 8   you that he was going to go anywhere?

 9              MS. MULDROW:   Objection to leading,

10   again, Your Honor.

11              THE COURT:   Sustained.  Do not lead

12   the witness.

13        Q.    (By Mr. Rizzo)  At about 11:00 o'clock,

14   did he talk to you?

15        A.    Yes.

16        Q.    And what did he say to you?

17        A.    He said he was going out.

18        Q.    And did he tell you who he was going out

19   with at that time?

20        A.    Yes.

21        Q.    Who did he tell you he was going out

22   with?

23        A.    He was -- he told me he was going to hang

24   out in The VA with Shon and Ghetto.

25        Q.    And what happened after he told you that?
```

36

```
 1        A.    We got into an argument.

 2        Q.    And why was that?

 3        A.    Because I felt like he didn't need to go

 4   out.

 5        Q.    Why was that?

 6        A.    At 11:00 o'clock at night I'm like,

 7   "You're not working.  Why are you going out" we

 8   was arguing back and forth.

 9        Q.    And was that a large argument or a small

10   argument?

11        A.    It was a big argument.

12        Q.    Did he continue to -- did he -- well, how

13   did the argument end?

14        A.    How did it end?  I told him I wanted him

15   to leave.

16        Q.    To leave your house?

17        A.    Yes.

18        Q.    Did you demand anything from him?

19        A.    My car keys, my house keys.

20        Q.    And what did you tell him?

21        A.    I told him he needed to pack his things

22   and leave.

23        Q.    And did he leave?

24        A.    No.

25        Q.    Did he leave the house?
```

37

```
 1        A.   Oh, yes, he left the house, yes.

 2        Q.   Now, at about 11:30 that day, did you

 3   have -- did you make any phone calls?

 4        A.   Yes, I made a phone call to his brother.

 5        Q.   And who was his brother?

 6        A.   Aaron Brown.

 7        Q.   Is that "AB"?

 8        A.   Yes, AB.

 9        Q.   Is AB somebody that also hung out at The

10   VA?

11        A.   Yes, he is.

12        Q.   Did AB hang out with the Defendant, also?

13        A.   Yes.

14        Q.   When you called AB, what did you tell AB?

15        A.   I asked him where was DeWayne.

16        Q.   You can't say what AB said?

17        A.   Oh, I'm sorry.

18        Q.   What did you say to him?

19        A.   I told him to tell his brother to come

20   get his stuff out of my house or come get his

21   brother -- I mean, come get his stuff out of my

22   house and did he know where he was.  He told me

23   no.

24        Q.   About 20 minutes later did anybody show

25   up at your house?
```

```
 1        A.    DeWayne.

 2        Q.    Was he with anybody else?

 3        A.    AB.  AB dropped him off.

 4        Q.    Did AB come in?

 5        A.    No, he didn't.

 6        Q.    Now, when the Defendant came into your

 7   home, did the argument continue?

 8        A.    Yes.

 9        Q.    And what did the argument continue

10   concerning?

11        A.    Why he was -- you know, why he wanted to

12   feel like he can hang out.  You know, it's 11:00

13   clock at night.  You need to be in the house.  We

14   argued back and --

15               MS. MULDROW:  Narrative, Your Honor.

16               THE COURT:  Overruled.  You may

17   finish, ma'am.

18        Q.    (By Mr. Rizzo)  You can finish that

19   statement?

20        A.    I forgot --

21        Q.    Let me ask you another question?

22        A.    Okay.

23        Q.    Did you -- did you make any comments to

24   him during this argument concerning Ghetto and

25   Shon?
```

1     A.   Yes.

2     Q.   Could you tell the jury what you told him

3 that night?

4     A.   I asked him why -- I asked him, "Why do

5 you hang out with them?  They -- they nothing but

6 trouble and they going to get you in trouble".

7     Q.   And did he agree to stop hanging out with

8 them?

9     A.   No.

10     Q.   And what did you tell him as a result of

11 him saying he would not hang out -- stop hanging

12 out with them?

13     A.   I told him he had to leave.  It was over.

14     Q.   The relationship was over?

15     A.   Yes, the relationship.

16     Q.   And what did you do then?

17     A.   I went to bed.

18     Q.   Now, the next day, that would be April

19 3rd of 2003 --

20     A.   Yes.

21     Q.   -- the day of the killing?

22     A.   Yes.

23     Q.   What time did you wake up, approximately?

24     A.   I woke up about -- between the hours of

25 5:00 and 6:00.

```
 1        Q.   Did you sleep well that night?

 2        A.   No, I didn't.

 3        Q.   Why is that?

 4        A.   My relationship was over.  You know, I

 5   had been arguing.  I was upset.

 6        Q.   Did you care about him while you were

 7   going out with him?

 8        A.   Yes, I did.

 9        Q.   A little bit, a lot, medium, at the time?

10        A.   Yes, I did.

11        Q.   Now, after you woke up, what did you do,

12   if anything?  What was the first thing you did?

13        A.   I got the girls up.

14        Q.   Those are your kids?

15        A.   Yes, those are my kids.

16        Q.   And what did you do with the girls when

17   you woke them up?

18        A.   I was combing hair, getting them ready

19   for school that morning.

20        Q.   Now, were you -- let me talk to you a

21   little bit about their school.  What time did they

22   have to be at school?

23        A.   They have to be there for 8:00 o'clock.

24        Q.   For 8:00?

25        A.   Yes, they have to be there for 8:00.
```

41

```
 1   Since they don't eat breakfast at home I was -- I
 2   was late.  I was rushing.  So I had to drive them.
 3   They normally ride a school bus.
 4        Q.   Let me stop for one second.  What time
 5   did they have to be there in order to get -- is it
 6   a free lunch at school or free breakfast at
 7   school?
 8        A.   Yes.
 9        Q.   What time did they have to be at the
10   school in order to get the free breakfast?
11        A.   They have to be there by 7:15.
12        Q.   And you said you were running late?
13        A.   Yes.
14        Q.   How far is the school from your house or
15   was it?
16        A.   Like a block, a block and a half -- like
17   about a block, a block and a half.
18        Q.   A couple of minutes drive?
19        A.   Yes, maybe two or three minutes.
20        Q.   Now, you also walked them to school on
21   occasion or did you, I should say, when you
22   weren't late?
23        A.   No, I walked them to the front of the
24   apartments where they ride a school bus.
25        Q.   Okay.  This morning, though, you were
```

42

1  driving them?

2     A.   Yes, I drove them that morning.

3     Q.   Now, as you were leaving, did you hear

4  anything unusual in terms of ringing?

5     A.   The phone.

6     Q.   Did you answer the phone?

7     A.   No.

8     Q.   Do you know if anybody answered the

9  phone?

10     A.   No, I don't know who answered the phone.

11     Q.   Was this a one-bedroom -- or I should

12  say, was this a one-story or a two-story place

13  that you were living?

14     A.   It was a town -- a town apartment.  It

15  was three bedrooms, two and a half bath.

16     Q.   And you were paying for the rent with the

17  money that you made?

18     A.   And also I was on housing.

19     Q.   On housing?

20     A.   Yes.

21     Q.   Now, when you -- is your bedrooms

22  upstairs or downstairs?

23     A.   The bedrooms are all upstairs.

24     Q.   When you came downstairs with your

25  daughters to go to school, were you still in a

43

```
 1  rush?

 2       A.   Yes, I was.

 3       Q.   Was it still before 7:15, though?

 4       A.   Yes, it was.

 5       Q.   When you walked downstairs, did you see

 6  anybody downstairs?

 7       A.   I saw DeWayne.

 8       Q.   And where was he at?

 9       A.   He was on the little sofa asleep.

10       Q.   In the living room?

11       A.   Yes.  Yes, sir.

12       Q.   Did you say something to him when you saw

13  him there?

14       A.   I tapped him on his shoulder and I asked

15  him what he was still doing here.

16       Q.   Did he say anything to you?

17       A.   No, he didn't.

18       Q.   What did he do?

19       A.   He looked at me, smiled, and rolled back

20  over.

21       Q.   And did -- was your cousins down there?

22       A.   Yes, Terrence was laying on the long

23  couch and Ruben was sitting up in the big chair

24  playing games.

25       Q.   All right.  Now, did your girls that
```

44

```
 1   morning get to school in time for the lunch at
 2   7:15?
 3        A.   Yes, they did.
 4        Q.   All right.  Did you -- after you dropped
 5   them off, did you come directly back to your
 6   house?
 7        A.   Yes, I did.
 8        Q.   Approximately how long of a time would it
 9   take you to get back, coming directly back,
10   approximately, in driving?
11        A.   About three, four minutes.  It's not that
12   far.
13        Q.   Right.  So when you got back to your
14   apartment -- and what did you come back to your
15   apartment for?
16        A.   My time sheets.  I left them.  I had to
17   turn them in so I could get paid.
18        Q.   And the time sheets were for which job?
19        A.   Alma Berry's.
20        Q.   When you came home, did you look to see
21   if the Defendant was in your home?
22        A.   Yes.
23        Q.   And was he in your home approximately
24   7:25?
25        A.   No.
```

45

1      Q.   And that would be 7:25 a.m. on April 3rd
2  of 2003?
3      A.   Yes.
4      Q.   Was his clothes still there?
5      A.   Yes, they were in the closet.
6      Q.   How do you know his clothes were there?
7      A.   I looked.
8      Q.   So you looked through your apartment?
9      A.   Yes.
10      Q.   He's gone, the clothes are there?
11      A.   He's gone, the clothes are there.
12      Q.   What time do you have to be at work on
13  that day?  On that day that you --
14      A.   What day was --
15      Q.   That would have been April 3rd?
16      A.   Like Monday, Tuesday or Wednesday?  What
17  day of the week would it be?
18      Q.   Well, let me ask it in a different way.
19           Did you get to work on time.
20      A.   Yes.
21      Q.   And where did you have to get -- where
22  did you go to work?
23      A.   Off of 59 and -- I can't remember the
24  street.
25      Q.   Was it -- was it Mrs. Berry's house?

1    A.   Yes, it was Ms. Berry's house.

2    Q.   Okay.  Did you have to be there sometime

3  between 8:00 and 9:00 o'clock?

4    A.   Yes, I did.

5    Q.   During the period of time when you got

6  home -- and I'm talking about from dropping your

7  girls off at 7:20, 7:25, approximately, a.m., and

8  then before you left after you got your time

9  sheets and looked for him and looked to see if his

10  clothes were still there, did he at any time come

11  back?

12    A.   No.

13    Q.   So when you left, he was still gone?

14    A.   He was still gone, yes.

15    Q.   Now, while you were at work at

16  Mrs. Berry's, I'm going to direct your attention

17  to approximately 10:00 a.m.?

18    A.   Okay.

19    Q.   Did anything always happen at 10:00 a.m.

20  when you were at Mrs. Berry's as a habit?

21    A.   Yes.  She loved to watch "The Price Is

22  Right".

23    Q.   And what time did that come on?

24    A.   10:00 o'clock.

25    Q.   I want to direct your attention then to

1  right after "The Price Is Right" or a few minutes

2  after "The Price Is Right" came on at 10:00

3  o'clock.  Did you hear anything that drew your

4  attention?

5       A.   The phone rang.

6       Q.   And did you pick up the phone or did

7  someone else pick up the phone?

8       A.   Ms. -- no, she -- she looked at the

9  Caller I.D.

10      Q.   Okay.  You can't go into what she said?

11      A.   Oh, I'm sorry.

12      Q.   Did the phone ring?

13      A.   Yes, the phone rang.

14      Q.   Did she pick up the phone or did you pick

15  up the phone?  Did she answer it or did you answer

16  it?

17      A.   I'm trying --

18      Q.   If you remember?

19      A.   I'm trying to remember.  I think I picked

20  it up, I think.

21      Q.   Are you sure or you don't know?

22      A.   I'm not sure.  I'm not sure.  I can't

23  remember.

24      Q.   Did you eventually talk on the phone?

25      A.   Yes, I did.

1     Q.    Who was on the phone?

2     A.    DeWayne.

3     Q.    The Defendant?

4     A.    Yes.

5     Q.    What did you say to him?

6     A.    We was arguing.

7     Q.    Did you ask him where he was at?

8     A.    Yes, I did.

9     Q.    And where did he say he was at?

10    A.    He said he was in The VA at Shondo's --

11  Shondo's house or something like that.

12    Q.    Who is Shondo?

13    A.    I don't know.  I don't know her.

14    Q.    Did he mention Shondo in reference to

15  Ghetto at all?

16    A.    He says Ghetto talked to her, messed with

17  her, fooled with her, something like that, yes.

18    Q.    Okay.  Now, did you have a conversation

19  with him on the phone?

20    A.    We was arguing.

21    Q.    Okay.  Were you arguing about the same

22  thing you had been arguing --

23    A.    Yes, everything.  Yes.

24    Q.    Did he try and make up with you or not in

25  any way on the phone?

```
1        A.   Yes.

2        Q.   What do you mean?

3        A.   I'm trying to remember.   All I remember

4   is we was arguing.   I can't remember that.

5        Q.   How did the argument end?   Did you say

6   anything to him, anything different than you had

7   already said?

8        A.   Just why you was hanging, why you over

9   there and --

10       Q.   Did you allow -- did you tell him he

11   could come back?

12       A.   No, I wanted him out my house.

13       Q.   All right.   Before he hung up, did he

14   tell you to do anything?

15       A.   Yes, he -- he told me to change the T.V.

16   I told him I can't change her T.V. like that.   I

17   can ask her.   So I asked Ms. Berry could she

18   change the T.V.

19       Q.   What did he mean?   Did he say anything

20   specifically about changing the T.V.?   What do you

21   mean change the T.V.?

22       A.   He said -- he said put it on Channel 26.

23   Something happened over there by the house.

24       Q.   Did you put it on -- did you ask Mrs.

25   Berry if she could put it on?
```

50

```
1        A.    Yes.

2        Q.    And did she put it on?

3        A.    Yes.

4        Q.    When you turned the channel to Channel

5   26, what were you watching?

6        A.    The news.

7        Q.    About what?

8        A.    About the robberies.

9        Q.    And the killings?

10       A.    Yes.

11       Q.    Did you ask him something -- when you saw

12   that the Defendant told you to turn on the news,

13   you said he was at The VA and he said turn on the

14   news and the killings were on.  Did you ask him

15   something?

16       A.    I asked him, I said, "Was that y'all".

17       Q.    "Was it y'all?"  Who were you meaning

18   "y'all"?

19       A.    Ghetto, Shon, him.

20       Q.    What did he say?

21       A.    "Nah, that ain't me, man.  Nah, dog,"

22   something like that.

23       Q.    He called you "dog"?

24       A.    Yes.

25       Q.    Is that just --
```

```
 1       A.    Slang.

 2       Q.    Street slang?

 3       A.    Yes.

 4       Q.    Did you hang up?

 5       A.    Yes.

 6       Q.    Had you ever been to that store before?

 7       A.    Yes.

 8       Q.    Had you ever seen Mrs. Jones before?

 9       A.    Yes.

10       Q.    Had you talked to her before?

11       A.    Yes, when I go in there and cash my

12  check, maybe once.

13       Q.    Did you make any phone calls to somebody

14  then?

15       A.    I called Ghetto.

16       Q.    Why were you calling Ghetto?

17       A.    I wanted him to come get DeWayne out my

18  house.

19       Q.    And did -- was there an answer there?

20       A.    No.

21       Q.    I'm going to direct your attention to

22  approximately 1:00 o'clock that same day and ask

23  if you had an occasion to leave and go home?

24       A.    Yes, I went home for the day.

25       Q.    And when you got home and walked into
```

52

1    your house, did you see anybody in there?

2         A.   DeWayne.  He was standing on the stairs.

3         Q.   About what time was that when you saw him

4    inside your house standing on the stairs?

5         A.   I want to say about -- about 1:30.

6         Q.   And did he tell you anything at that

7    point downstairs?

8         A.   He asked me could we talk.

9         Q.   And where did you go?

10        A.   Upstairs in a room.

11        Q.   Now, when you went upstairs, did you

12   notice him acting unusual in any way, if you could

13   tell the jury?

14        A.   He said he was sick.  He didn't feel

15   good.

16        Q.   And did you notice anything unusual about

17   his demeanor?  Do you know what I'm saying by

18   that?  How he was acting?

19        A.   He looked -- he looked like he didn't

20   feel good or he looked sick.  Nervous, you know.

21        Q.   Was he doing anything -- was he doing

22   anything else unusual when he was telling you?

23        A.   He was, like, moaning, crying.

24        Q.   He was crying?

25        A.   Moaning, crying, something like that,

1    yes.

2         Q.    Had you ever seen him moaning and crying

3    when he didn't feel good before?

4         A.    No.

5         Q.    Was that unusual?

6         A.    Yes.

7         Q.    Did he tell you whether or not he was

8    having any kind of stomach problem?

9         A.    He told me his stomach was bothering him.

10   He had an upset stomach or a virus or something

11   like that.

12        Q.    Did you feel to see whether he had a

13   temperature or if he felt warm?

14        A.    Yes.

15        Q.    And did he feel warm to you?

16        A.    No, he didn't.

17        Q.    What did y'all do at this point?

18        A.    We laid down and went to sleep.

19        Q.    You went to sleep?

20        A.    Yes.

21        Q.    He went to sleep?

22        A.    Yes.

23        Q.    Did you have another job you still had to

24   go to that day?

25        A.    Yes.

```
 1      Q.   What time approximately did you wake up?

 2      A.   I woke up about 3:30.

 3      Q.   Was he still there?

 4      A.   Yes.

 5      Q.   Did you go to work then?

 6      A.   Yes, I did.

 7      Q.   What time did you have to be at work that

 8 day?

 9      A.   I had to be to work for 4:00 o'clock.

10      Q.   Did he tell you anything before he left?

11 Did he tell you to bring anything --

12              MS. MULDROW:  Objection to leading,

13 Your Honor.

14              THE COURT:  Sustained.

15              MS. MULDROW:  Instruct the

16 Prosecutor to refrain.  This is at least the

17 fourth time.

18              MR. RIZZO:  Your Honor, I'm going to

19 object to sidebar comments.

20              THE COURT:  Counsel, both counsels,

21 I know my job.  You know your job.  Don't lead the

22 witness.  Let's go.

23      Q.   (By Mr. Rizzo)  Did he -- did he make any

24 comments to you before you left for work?

25      A.   Yes, he asked me to bring him something
```

1    for his stomach, some Pepto-Bismol.

2         Q.   Did you talk to him at all once you got

3    to work on the phone?

4         A.   Yes, I called home.

5         Q.   Was he still there?

6         A.   Yes.

7         Q.   And this is after you told him he had to

8    leave?

9         A.   Yes.

10        Q.   What time did you close the store?

11        A.   I think it was about 10:00.  I think it

12   was 10:00.

13        Q.   When you got home, was the Defendant

14   still there?

15        A.   Yes.

16        Q.   Now let me direct your attention to the

17   next day, that will be the 4th?

18        A.   Yes.

19        Q.   Did you go to work that day?

20        A.   Yes.

21        Q.   And where did you go to work?

22        A.   I went to my first job, Ms. Berry's.

23        Q.   When you left, was he still there?

24        A.   Yes.

25        Q.   What time did you get home?

1      A.   The same time I always did, about 1:30.

2      Q.   Was the Defendant still at your house?

3      A.   Yes, he was still there.

4      Q.   Now, in the afternoon, did you receive

5  any phone calls from any persons?  You can't go

6  into what was said?

7      A.   Okay.  The first phone call was --

8               MS. MULDROW:  Nonresponsive, Your

9  Honor.

10              THE COURT:  Ma'am, it's a yes or no

11  question.

12     A.   Yes.

13     Q.   (By Mr. Rizzo)  It has to be a yes or a

14  no?

15     A.   The phone calls?

16     Q.   Did you get phone calls?

17     A.   Yes.

18     Q.   Okay.  And who were the phone calls from,

19  without saying what they said?

20     A.   His little girl's mom.

21     Q.   That would be Sharhonda?

22     A.   Yes.

23     Q.   Anybody else?

24     A.   His sister, Constance.  His brother, AB.

25     Q.   AB.  And after getting these phone calls,

57

```
 1   did you tell him to do anything?
 2        A.   I told him to get up and I asked him
 3   what's going on.
 4        Q.   And what did he say?
 5        A.   He -- he told me he didn't know.
 6        Q.   Now, did you go to work later that day,
 7   also?
 8        A.   Yes, I went to work.
 9        Q.   And where was that at?
10        A.   It was at Subway.
11        Q.   I can't hear you?
12        A.   It was at Subway.  I'm sorry.
13        Q.   Did anybody show up at your work?  Did
14   you see AB any time that day?
15        A.   Yes, I did.
16        Q.   Where did you see him at?
17        A.   At Subway.
18        Q.   Do you know when the Defendant was
19   arrested, what day?
20        A.   I think it was the 4th.
21        Q.   Was it that day that you're talking
22   about?
23        A.   Yes.
24        Q.   All right.  Did the police contact you?
25        A.   Yes, they told me to -- they called me at
```

 1    Subway.  They told me to come home and I said

 2    okay.

 3         Q.   And did you give a statement to the

 4    police?

 5         A.   Yes.

 6         Q.   Did you alibi him then?

 7         A.   No.

 8         Q.   Now, about a week later, did you have an

 9    occasion to see the Defendant again?

10         A.   Yes, I saw --

11         Q.   Where was that at?

12         A.   In jail.

13         Q.   Who was there with you?

14         A.   AB.

15         Q.   So you and AB went to see him in the

16    jail?

17         A.   Yes.

18         Q.   Did you have an occasion at that time

19    when AB was there to talk to him about --

20         A.   No, I didn't.

21         Q.   Why was that?  You have to answer.

22         A.   I didn't have enough time to ask him and

23    talk to him.

24         Q.   All right.  Well, a couple days later,

25    did you go by yourself to see him?

```
 1       A.   Yes.

 2       Q.   Did you ask him anything?

 3       A.   Yes.   I asked him --

 4       Q.   What?

 5       A.   I asked him did he do it, did he shoot

 6  the lady, did he shoot the cop.

 7       Q.   What did he say?

 8       A.   He told me no.

 9       Q.   How many times did you go see him?

10       A.   About every day.

11       Q.   Until when?

12       A.   Until about mid July.

13       Q.   So from the time he went into jail until

14  mid July, you were still going to see him almost

15  every day?

16       A.   Yes.

17       Q.   You'd wait in line at the jail and go see

18  him?

19       A.   Yes.

20       Q.   And how long a period of time did they

21  allow you to see him in the jail?

22       A.   Once a day about 15 minutes.

23       Q.   Fifteen minutes?

24       A.   Uh-huh.

25       Q.   How long a period of time would you have
```

60

1  to wait in line to get in to see him at times?

2       A.   Sometimes an hour.

3       Q.   And this is -- were you still working

4  your two jobs?

5       A.   No, I got fired from Alma Berry's.

6       Q.   You got fired from Alma Berry's?

7       A.   Yes.

8       Q.   Why?

9       A.   Because of what was going on.

10      Q.   Now, sometime in mid April, did you get

11  subpoenaed to the Grand Jury?

12      A.   Yes.

13      Q.   And before you testified before the Grand

14  Jury, did you have an occasion to see the

15  Defendant again?

16            Do you understand my question.

17      A.   No, I didn't.

18      Q.   Before you went into the Grand Jury, did

19  you go see the Defendant?

20      A.   Yes, I did.

21      Q.   And did the Defendant tell you to do

22  anything?

23      A.   He told me to tell the Grand Jury that he

24  was home about -- about 8:30.

25      Q.   And did he tell you to tell the Grand

61

```
 1   Jury where he was at home?
 2        A.   When we was living together?
 3        Q.   No.   Well, let me go into that
 4   conversation.
 5             Was there a glass between you two.
 6        A.   Yes.
 7        Q.   And how would you describe his demeanor,
 8   you know, his attitude as he was telling you to
 9   lie in the Grand Jury?
10        A.   He yelled it.
11        Q.   What do you mean he yelled?
12        A.   He was, like, "Just tell them I was at
13   home," you know.   He yelled it, you know, like you
14   yell at somebody.
15        Q.   Did he normally yell at you?
16        A.   No.
17        Q.   All right.   So this -- would this have
18   been -- how soon before you went into the Grand
19   Jury was this?
20        A.   The day before.
21        Q.   So the next day you went into the Grand
22   Jury and you testified already you lied?
23        A.   Yes.
24        Q.   What was the reasons that you lied, if
25   you have any?
```

62

```
 1          A.    I started getting phone calls.

 2          Q.    Well, you can't say --

 3                MS. MULDROW:   Approach the bench,

 4     Your Honor.

 5                THE COURT:   All right.

 6                (Bench conference:)

 7                MS. MULDROW:   Unless there is direct

 8     evidence that the phone calls had came from

 9     Mr. Brown, Alfred Brown, I believe that evidence

10     is far too prejudicial and absolutely no probative

11     value, in addition to being irrelevant.

12                The information I read in the

13     State's file said she was unaware what the sources

14     was.   In other words, who the caller was.   She has

15     no idea who it was, just that she was getting

16     phone calls and threats.

17                MR. MORROW:   Won't be able to

18     confront the person who allegedly made the threats

19     so we object on all those bases.   We would at

20     least ask for a hearing outside the presence of

21     the jury.   This is dynamite stuff.   If it gets

22     out, then it's too late.

23                (Proceedings continued:)

24                THE COURT:   Please retire to the

25     jury room.
```

63

```
 1                  THE BAILIFF:  All rise.

 2                  (Jury retired.)

 3                  THE COURT:  All right.  Be seated.

 4                  Mr. Rizzo, why don't you go ahead

 5      and ask the questions in question and answer and

 6      then we'll go from there.

 7                  MR. RIZZO:  Yes.

 8                        EXAMINATION

 9      BY MR. RIZZO:

10          Q.   What we're doing is we're having a

11      hearing, so you understand, to talk about some of

12      the evidence.  So I'm going to ask you a few

13      questions specifically about any threats or any

14      supposed phone calls that you got.  Okay?

15          A.   Uh-huh.

16          Q.   That's all we're going to talk about

17      right now?

18          A.   Uh-huh.

19          Q.   Did you -- before you went into the Grand

20      Jury, did you have some -- were you getting some

21      phone calls?

22          A.   Yes.

23          Q.   If you could for the record, could you

24      tell us what they were?

25          A.   One night my daughter answered the phone.
```

64

 1  The baby girl, Carlissia.  She picked up the phone

 2  and she said, "Mommy, it's for you."  So I

 3  answered the phone.  I picked it up.  And it was

 4  like, "Bitch" I'm like, "What?  Who is this?"  And

 5  I'm looking at the Caller I.D. because at the time

 6  it was, you know, you can look at it.

 7           I'm looking at the Caller I.D.  it

 8  was like, "Bitch, snitches get stitches" and I'm

 9  like, "Who is this," you know, and then I just

10  hung up the phone.

11      Q.   Okay.  Is that the only call that you got

12  concerning a threat?

13      A.   I got so many phone calls I turned the

14  phone off.

15      Q.   Were there other threats that you got?

16      A.   Yes.

17      Q.   What did they say?

18      A.   Me and his brother had got in --

19      Q.   I can't hear you?

20      A.   I'm sorry.  Me and his brother had got

21  into a big argument.

22      Q.   You and AB?

23      A.   Yes.

24      Q.   And what -- and this is before you

25  testified to the Grand Jury?

65

```
 1        A.   No, this was after.

 2        Q.   Before you testified to the Grand Jury,

 3   we're looking to see if you got anymore phone

 4   calls, any other threats?

 5        A.   Yes, I just -- if it didn't have a name

 6   or it say "out of area," I just didn't answer the

 7   phone.

 8        Q.   What I'm asking you specifically, though,

 9   is did you get -- did you talk to any other person

10   after that first threat?

11        A.   Did I talk to anybody else?

12        Q.   No.  Did you get anymore threats orally

13   by somebody after you got the first threat on the

14   phone?

15        A.   No.  No, sir.

16        Q.   Before you went into the Grand Jury?

17        A.   No, sir.  Just that one.  Just that one.

18        Q.   Now, you got some threats after you

19   testified to the Grand Jury?

20        A.   Yes.

21        Q.   And before you testified here?

22        A.   Yes.

23        Q.   All right.  And those threats were from

24   whom, do you know?

25        A.   No.
```

66

1      Q.   And were they on the phone?

2      A.   They was on the phone.  They said "out of

3  area" or they say -- what was the other one?

4      Q.   Did they say "restricted"?

5      A.   Restricted, something like that, yes.

6      Q.   And what did they -- what were the

7  threats?

8      A.   Just cussing me out and --

9      Q.   Anything about testifying is basically

10 what we're asking?

11     A.   Just basically, "Bitches -- snitches get

12 stitches, Bitch," and I was like --

13     Q.   Okay.  So you got -- you've had several

14 of those?

15     A.   Yes.

16     Q.   You had one before you testified to the

17 Grand Jury and you've had several of those since

18 then?

19     A.   Yes.

20              MR. RIZZO:  Pass the witness.

21              THE COURT:  Ms. Muldrow, do you have

22 any questions on this?

23                    EXAMINATION

24 BY MS. MULDROW:

25     Q.   Not a clue of who it was, though, ma'am?

```
 1        A.   No, ma'am.

 2               MS. MULDROW:   That's all I have,

 3   Your Honor.   I reurge my objections.

 4               THE COURT:   Argument.

 5               MR. RIZZO:   Judge, we don't believe

 6   it's hearsay to start with, because we're not

 7   offering it for the truth that "snitches were

 8   going to get stitches."  But for the effect on the

 9   hearer, this went clearly to part of the reason

10   that she testified untruthfully in the Grand Jury.

11               I believe that in terms of the

12   testimony that's been developed throughout this

13   trial, there are several -- there were two other

14   co-defendants that it could have come from.  There

15   are other people that were friends and associates

16   of these three people, as well as other

17   associates.  And those things could be developed

18   on cross.  But the effect on the hearer, which

19   would be the purposes that we're offering it for,

20   would be important and relevant to show the

21   reason -- one of the reasons that she testified

22   falsely.  And the effect on the hearer knowing

23   that she was -- she felt in some danger.  And

24   that's the reason we're offering it.

25               THE COURT:   Okay.  Let's take 15
```

1    minutes and then I'll rule on it.

2                    (Short recess.)

3                    THE COURT:  State's Exhibit 400 is

4    admitted for the record.

5                    (State's Exhibit No. 400 offered and

6    admitted.)

7                    THE COURT:  My ruling is that

8    Ms. Dockery can be asked if she received

9    threatening phone calls.  She can be asked the

10   timing of those phone calls.  She cannot be asked

11   the specific language of the phone calls.

12                   MR. RIZZO:  The words.

13                   THE COURT:  The words.

14                   MR. RIZZO:  Yes, sir.

15                   THE COURT:  That's my ruling.

16                   MR. MORROW:  Judge, just for the

17   record, I know we were kind of leaning and

18   whispering and I just want to make sure that all

19   of our objections are clear.  May I do that very

20   briefly.

21                   THE COURT:  Sure.

22                   MR. MORROW:  Judge, we object on the

23   basis of confrontation as we mentioned to the

24   Court earlier.

25                   And also, Judge, we believe that

1   this is in the nature of an extraneous offense

2   which the Prosecution is attempting to tie to

3   Mr. Brown, either that he made the calls or caused

4   them to be made, whatever the theory is, and that

5   they can't be the very first predicate of offering

6   an extraneous offense which is that they show that

7   the Defendant committed the offense beyond a

8   reasonable doubt.

9              So on that basis we object as well,

10  Your Honor.

11             THE COURT:  And that's overruled.  I

12  am not admitting it as an extraneous nor do I

13  believe there's any evidence to tie the threats to

14  the Defendant.  It's being admitted to show the

15  context of the testimony of the witness during the

16  Grand Jury process and during this process.

17             So it is not -- will not be argued,

18  will not be intimated, alleged, theorized or

19  however you want to put it, in giving

20  responsibility to Mr. Brown for the threatening

21  phone calls.  Okay.

22             So she can testify that she received

23  threatening phone calls that the threatening phone

24  calls had to do with being a witness and the

25  timing of the phone calls.  That's what she can

1  testify about.

2              MR. RIZZO:  Can I explain that to

3  her briefly.

4              THE COURT:  Sure.

5              MR. MORROW:  May we just have a

6  running objection, Judge, so we don't have to

7  object again.

8              THE COURT:  Yes.

9              MR. MORROW:  Thank you, sir.

10             (Brief pause.)

11             THE BAILIFF:  All rise.

12             (Jury seated.)

13             THE COURT:  All right.  Please be

14 seated.

15             Mr. Rizzo, you may continue.

16             MR. RIZZO:  Thank you, Your Honor.

17            DIRECT EXAMINATION CONTINUED

18 BY MR. RIZZO:

19     Q.   Just, Ms. Dockery -- and for purposes of

20 the record, you're the same Ericka Dockery who was

21 testifying before the break; is that correct?

22     A.   Yes.

23     Q.   Ms. Dockery, I'm just going to back up

24 just a couple of questions to put in context where

25 we're at.

```
 1                    You testified, I believe, that the

 2    day before you went into the Grand Jury you had a

 3    conversation with the Defendant --

 4         A.   Yes.

 5         Q.   -- in the jail where he told you to lie?

 6         A.   Yes.

 7         Q.   After that you said that you -- that

 8    evening you received some phone calls?

 9         A.   One.

10         Q.   One phone call?

11         A.   Just one.

12         Q.   Without going into what was said to you,

13    what was the substance of the phone call?  In

14    other words, what kind of phone call was it?

15         A.   A threat.

16                    MR. RIZZO:  I don't know if she

17    understands the Court's order, Your Honor.

18                    THE COURT:  Mr. Rizzo, you may lead

19    the witness on this particular subject.

20                    MR. RIZZO:  Thank you, Your Honor.

21         Q.   (By Mr. Rizzo)  Did you receive any

22    threatening phone calls before you testified in

23    the Grand Jury?

24         A.   Yes.

25         Q.   And was that threatening phone call given
```

1  to you after the Defendant told you to lie and

2  before you testified in the Grand Jury?

3      A.   Yes.

4      Q.   And in terms of the Caller I.D., did you

5  look at the Caller I.D. as it came in?

6      A.   Yes.

7      Q.   And what did the Caller I.D. say?

8      A.   It say, like, "out of area,"

9  "restricted," some --

10     Q.   It did not give a number?

11     A.   It didn't give a number at all, number or

12 name.

13     Q.   Did you receive other phone calls that

14 day before you testified in the Grand Jury that

15 you did not answer?

16          Do you understand.

17     A.   No, I'm not understanding.

18          MR. RIZZO:  May I lead the question,

19 Your Honor.

20          THE COURT:  Yes.

21          MS. MULDROW:  Your Honor, may I

22 object because, again, I think it's the form of

23 his question as well.

24          THE COURT:  Overruled.

25     Q.   (By Mr. Rizzo)  I'm going to try and ask

1  you a specific question.  If you don't understand

2  me, just --

3      A.   Say I don't understand?

4      Q.   Yes.  And if you don't understand the

5  Court's orders, just before you say anything ask

6  me.  Okay?

7      A.   Okay.

8      Q.   All right.  Did you -- after you got the

9  threatening phone call, did you get more phone

10 calls that you didn't answer?

11     A.   That day or another day?

12     Q.   Before the Grand Jury?

13     A.   No, I just got that one.

14     Q.   Okay.  After you lied in the Grand Jury

15 and while you were -- and during the period of

16 time, obviously, when you were out in the free

17 world, you weren't in jail, did you -- but before

18 you came here to testify, have you gotten

19 additional threats on the phone?

20     A.   Are you talking about recently, now in

21 the present.

22     Q.   No.  Before you testified but after the

23 Grand Jury?  In other words, you lied in the Grand

24 Jury here?

25     A.   Yes.

74

1      Q.   Then there was a period of time you were

2 out?

3      A.   Okay.  Now I understand.

4      Q.    And then there was a period of time you

5 were in jail?

6      A.   Yes.

7      Q.   And there was -- and then you got out on

8 bond?

9      A.   Yes.

10     Q.   Sometime during that period before you

11 testified, did you get anymore threats?

12     A.   Yes.

13     Q.   Okay.  Would it be more than one?

14

15     A.   I'm trying to remember.  Yes.

16     Q.   Okay.  And you can't go into the

17 substance of it, but were those threats in

18 reference to testifying against this Defendant?

19     A.   Yes.

20     Q.   Okay.  Now, after you went in and you

21 lied in the Grand Jury, ma'am, did you have an

22 occasion to see the Defendant again?  Do you

23 understand the time period?

24     A.   Are you talking about after the Grand

25 Jury.

1     Q.    After the Grand Jury?

2     A.    Yes.

3     Q.    How did you see him again?

4     A.    In jail.

5     Q.    Did you go see him?

6     A.    Yes.

7     Q.    Did you tell him what happened in the

8  Grand Jury?

9     A.    Yes.

10     Q.    What did you tell him?

11     A.    I told him that I did it, but they don't

12  believe me.

13     Q.    You did what?

14     A.    I lied.  I lied and told them that he was

15  at home, but they didn't believe me.

16     Q.    And did you tell him any concerns of

17  yours?

18     A.    That I was going to jail.

19     Q.    Did you know that that was going to

20  happen?

21     A.    Yes.

22     Q.    Did you -- without going into what

23  someone else said, but did you have any

24  conversations with AB after you testified in the

25  Grand Jury?

1       A.   Yes, sir.

2       Q.   Now I'm going to direct your attention to

3  mid July, and you said that you were seeing the

4  Defendant almost every day?

5       A.   Yes.

6       Q.   The last day that you saw the Defendant

7  in jail, could you describe any conversations you

8  had with him?

9       A.   I went and saw him -- I'm trying to

10  understand the question.

11       Q.   Okay.

12            MS. MULDROW:  Your Honor, may we

13  approach.

14            THE COURT:  Yes.

15            (Bench conference:)

16            MS. MULDROW:  Your Honor, at this

17  time I'm going to request a proffer from the

18  Prosecutor as to what the mid July conversation

19  was about because I don't recall ever seeing

20  anything about that in his reports.

21            MR. RIZZO:  It's in there, Judge.

22  She's seen it.  It has to do with him saying that

23  he was there.

24            MS. MULDROW:  Is that mid July.

25            MR. RIZZO:  Yeah, the last time she

1    saw him was -- yeah.

2                    MS. MULDROW:   Okay.

3                    (Proceedings continued:)

4                    THE COURT:   You may proceed,

5    Mr. Rizzo.

6                    MR. RIZZO:   Thank you, Your Honor.

7                DIRECT EXAMINATION CONTINUED

8    BY MR. RIZZO:

9        Q.   Back to the last day that you saw the

10   Defendant.  Did you have a conversation with him

11   in jail?

12       A.   Yes.

13       Q.   Did you ask him or demand anything of him

14   in your conversation?

15       A.   Yes.

16       Q.   Could you tell the jury what you said to

17   him?

18       A.   I said, "DeWayne" --

19       Q.   And I don't want -- and let me stop you.

20   I don't want you to say anything that somebody

21   else had told you.

22                    Do you understand that.

23       A.   Okay.

24       Q.   All right.  You can go ahead.  What did

25   you say to him?

1      A.   I told him, I said, "DeWayne, I need -- I

2   want to know the truth.  Did you do this".

3      Q.   How many times did you say that to him?

4      A.   Over and over.  I said, "DeWayne, I want

5   to know.  Did you kill the lady?  Did you shoot

6   the policeman?  I need to know.  Did you do it?"

7      Q.   And you had asked him these questions in

8   the past --

9      A.   In the past over and over, just about

10  almost every day.

11     Q.   And had he ever admitted it in the past?

12     A.   No.

13     Q.   On this day when you said, "Tell me the

14  truth," what did he tell you?

15     A.   He told me, he looked at me, put his head

16  down and looked at me, "I was there.  I was

17  there."

18     Q.   After the Defendant told you he was

19  there, how did you take that?  What did you take

20  that to mean?

21             MS. MULDROW:  Speculation, Your

22  Honor.

23             THE COURT:  Sustained.

24     Q.   (By Mr. Rizzo)  After he told you that,

25  did you ever talk to the Defendant again?

79

```
 1      A.   No.
 2      Q.   And what's the reason that you never
 3 talked to him again?
 4              MS. MULDROW:   Irrelevant, Your
 5 Honor.
 6              MR. RIZZO:   It goes to their
 7 relationship, Your Honor.
 8              THE COURT:   Overruled.  You may
 9 answer the question.
10      A.   Could you ask me again?
11      Q.   (By Mr. Rizzo)  Yes.  What's the reason
12 that you never went to see the Defendant again?
13      A.   Because in the beginning if he would have
14 told me the truth from the beginning, that was my
15 choice to stick by him.  But since he held it,
16 didn't tell me, I had -- I had to leave him alone
17 because it was my choice to stick by him if I
18 wanted to and he didn't give me that choice.
19              MR. RIZZO:   Pass the witness.
20              THE COURT:   Ms. Muldrow.
21                  CROSS-EXAMINATION
22 BY MS. MULDROW:
23      Q.   Good morning, ma'am.  My name is Loretta
24 Muldrow?
25      A.   Good morning.
```

1    Q.   You gave a statement to the police on --

2    was it April the 4th, when Mr. Brown was arrested,

3    you were asked to leave your job at Subway; is

4    that correct?

5    A.   Yes.

6    Q.   Okay.  And did you give any additional

7    statements to the police?

8    A.   On that day?

9    Q.   No, ma'am.  Just in general.

10   A.   No.  That's the only one.

11   Q.   Did you ever -- after you got arrested,

12   did you ever submit any statements or have someone

13   write any letters on your behalf?

14   A.   Yes, I wrote a letter to the Judge.

15   Q.   Okay.  Did you have any oral -- did you

16   have any conversations that a police officer may

17   have taken notes about after you were placed in

18   jail and before you were released on bond?

19   A.   I'm --

20   Q.   When you met with Mr. Rizzo, were there

21   any police officers present?

22   A.   Which -- I don't understand because I

23   don't know which time are you talking about.

24   Q.   How many times did you meet with

25   Mr. Rizzo?

```
 1        A.   I think each time I went to court.
 2        Q.   Okay.  And how many times -- well, let's
 3   go back.
 4                  You were placed in jail in August of
 5   2003.
 6        A.   August 22nd, yes, ma'am.
 7        Q.   And you were released on bail on what
 8   day?
 9        A.   I want to say December 14th.  I'm not
10   sure, though, of the date.
11        Q.   It was around -- before Christmas?
12        A.   Yes, ma'am.
13        Q.   Before Christmas in 2003?
14        A.   Yes.
15        Q.   120 days pretty much?
16        A.   Yes, ma'am.
17                  MS. MULDROW:  May I see the
18   statements.
19        Q.   (By Ms. Muldrow)  Ms. Dockery, while
20   Mr. Rizzo is looking at that --
21                  MR. RIZZO:  For purposes of the
22   record, I'm tendering to Defense counsel four
23   statements, one dated 12/18 of '03 at 9:17 a.m.;
24   4/4 of '03 at 7:35 p.m.; two that were dated 1/6
25   of '04, one at 8:52 a.m. and one at 11:07 a.m.
```

82

```
 1                THE COURT:  All right.

 2       Q.  (By Ms. Muldrow)  The statement -- excuse

 3  me.  The letter that you wrote -- excuse me -- was

 4  it something that you wrote or was it something

 5  that a fellow inmate had written for you?

 6       A.   I had her write it for me, but I was

 7  saying the words.

 8       Q.   Okay.  You told her what to write for

 9  you?

10       A.   Yes, ma'am.

11       Q.   All right?

12                MR. RIZZO:  For purposes of the

13  record, I'm tendering a copy, which is actually I

14  believe in the Court's file, a letter to the

15  Honorable Court of the 351st.

16                THE COURT:  Okay.

17                MS. MULDROW:  May I have a moment,

18  Your Honor.

19                THE COURT:  Okay.

20                MS. MULDROW:  Thank you.

21       Q.  (By Ms. Muldrow)  Describe what it was

22  like in jail?

23       A.   Awful.

24       Q.   Tell me about it.

25       A.   Fights.  Nasty.
```

83

```
 1        Q.   What do you mean by "nasty"?
 2        A.   Unclean women.  A place I wouldn't want
 3   to be.
 4        Q.   What -- what was one day like in jail?
 5        A.   Wake up at 7:00, do a head count.
 6        Q.   Who does the head count?
 7        A.   I don't know what you call them.  They
 8   sit in the -- I guess they officers.
 9        Q.   Jailers?
10        A.   The jailers, yes.  And --
11        Q.   How many women were in your particular
12   cell block?
13        A.   The whole pod?
14        Q.   Uh-huh.
15        A.   A lot.  I don't know how many, but it was
16   a lot.
17        Q.   Like more than eight?  More than ten?
18        A.   It was a bunch.  It was over 30 something
19   women.  Yes, ma'am.  Some slept on the floor.  It
20   was like -- it's eight bunks in there, but they
21   put two more people in there to make it ten.  They
22   can catch one in the front on the floor or one in
23   the back on the floor.  So it was full.
24        Q.   All right.  So you're up at 7:00 for your
25   head count.  Then what else happens?
```

84

```
 1        A.    You go back and lay down.  That's it.

 2        Q.    That's it?

 3        A.    That's it, ma'am.

 4        Q.    Baths?

 5        A.    You can take your bath any time you get

 6   ready.  You can watch T.V. if you want, but you

 7   couldn't watch T.V. because it was so noisy in

 8   there.

 9        Q.    You say noisy.  Did you ever hear it as

10   quiet as it is in this courtroom right now?

11        A.    Never.  Only when you're sleeping.

12        Q.    Floors are clean?  Toilets are clean?

13        A.    I wouldn't bet my life on that, no.

14        Q.    Were they -- the toilets private or were

15   they open?

16        A.    All of them are open.

17        Q.    So you got a cot to sleep on?

18        A.    Yes, I had a bunk.

19        Q.    So you didn't have to sleep on the floor?

20        A.    No, ma'am.

21        Q.    You got three meals?

22        A.    Yes, ma'am.

23        Q.    Did you get to see the babies while you

24   were there?

25        A.    Yes, ma'am.
```

```
 1        Q.    Who were keeping your babies?

 2        A.    My sister.

 3        Q.    What's her name?

 4        A.    Jeanette Gross.

 5        Q.    Does she have kids?

 6        A.    Yes.

 7        Q.    Was she working?

 8        A.    Yes.

 9        Q.    How many kids does she have?

10        A.    Three.

11        Q.    What were their ages?

12        A.    Nannette, Guinisha and Carlisha.

13        Q.    Her daughter is named Carlisha, too?

14        A.    It's Carlissia and Carlisha.

15        Q.    Okay.  Were they school age, also?

16        A.    Yes, ma'am.

17        Q.    So she tackled three more kids, makes it

18  six.  And your cousins, they were minors, also,

19  right, Ruben and Reginald and Terrence at the

20  time?

21        A.    Yes.  Not Reginald.  I think Reginald was

22  18, if I'm not mistaken.

23        Q.    Now, you were taking care of them, too?

24        A.    Yes.

25        Q.    Their mother was killed?
```

86

```
 1        A.    No, they -- their little sister was

 2  killed.

 3        Q.    Their sister was killed?

 4        A.    (Nods head.)

 5        Q.    And you were taking care of them?

 6        A.    Yes.

 7        Q.    So did Jeanette have to take care of the

 8  cousins, also?

 9        A.    No.

10        Q.    What happened to them?

11        A.    They went home.

12        Q.    They went home?

13        A.    They went to their mom's, yes.  And --

14        Q.    You were working two jobs.  One was --

15  before you got arrested, you were working two

16  jobs?

17        A.    Yes, ma'am.

18        Q.    One is home healthcare for Ms. Berry?

19        A.    Yes, ma'am.

20        Q.    The other one was at the Subway where

21  Catherine Brown worked?

22        A.    Yes.

23        Q.    Okay.  Describe what you do in home

24  healthcare?

25        A.    I bathe them, clean them, wash their
```

87

```
 1   clothes -- excuse me -- clean, vacuum, take them
 2   shopping, take them to their doctor's
 3   appointments, just basically being company.
 4       Q.   You don't have to administer drugs or
 5   anything?
 6       A.   No, ma'am.
 7       Q.   Okay.  Tell me about those drugs you were
 8   taking?
 9       A.   What you want to know?
10       Q.   Yeah.  What were you taking, again?
11       A.   A drink called syrup.
12       Q.   What is syrup?
13       A.   It's called -- it's codeine.
14       Q.   Okay.
15       A.   Lovacel, Ecstacy, smoking weed.
16       Q.   Okay.  Tell me what Lovacel is?
17       A.   It's like a muscle relaxer.
18       Q.   Ecstacy, right?
19       A.   Yes, ma'am.
20       Q.   And what does Ecstacy do for you?
21       A.   Make you high.
22       Q.   So syrup, Lovacel, Ecstacy and weed?
23       A.   Handle Bars.
24       Q.   Handle Bars?
25       A.   Yes, ma'am.
```

88

1     Q.   That's Xanax, right?  Or do you know the

2  name?

3     A.   I don't know the name.

4     Q.   Okay.  So syrup is codeine.  Lovacel is a

5  muscle relaxer.  Ecstasy makes you high.

6               Handle Bars, what does that do for

7  you.

8     A.   Puts you to sleep.

9     Q.   And what else?  Weed?

10     A.   Weed, yes, ma'am.

11     Q.   Would you dip it, sprinkle it or you just

12  smoked it?

13     A.   No, I just smoked it.  No, I didn't do no

14  dipping.

15     Q.   So, how often were you using the codeine?

16     A.   I used all the drugs almost every day.

17     Q.   What did you do?  Make a cocktail with

18  this, Ms. Dockery, or what?

19     A.   No, ma'am, I didn't make no cocktail.

20     Q.   How did you do this?

21     A.   I just popped pills every day.  That's

22  how I made my day.

23     Q.   So you popped the pills every day?

24     A.   Uh-huh.

25     Q.   You drank the syrup almost every day and

89

1  you smoked the weed?

2       A.   Yes, ma'am.

3       Q.   When were you doing this?

4       A.   Excuse me.

5       Q.   When were you doing this?

6       A.   In the morning when I got off from work.

7       Q.   You had to get your babies off to school.

8  Did you do this before you got your children off

9  to school?

10      A.   No, ma'am, afterwards.

11      Q.   After you got them off?

12      A.   Yes.

13      Q.   When did you go to work?

14      A.   When did I go to work.

15      Q.   Yeah.  In the morning, didn't you go to

16 Ms. Berry's in the morning?

17      A.   Yes, ma'am.  It ain't nothing to pop a

18 pill.  Just put it in your mouth, drink some water

19 and keep on stepping.

20      Q.   How about the weed?  You have to smoke

21 the weed?

22      A.   That was in the evening when I get home

23 and relax in the evening.

24      Q.   And the codeine, when did you drink that?

25      A.   In the evening, too, because it basically

```
 1   puts you to sleep.
 2        Q.   So you used the codeine -- you were able
 3   to wake up?
 4        A.   Yes, I was.
 5        Q.   Because when you left Ms. Berry's, you
 6   were home around, what, 1:30 or so?
 7        A.   Yes, ma'am.
 8        Q.   And then you got ready within a couple of
 9   hours to report over to Subway.  Is it off of
10   Cullen?
11        A.   Yes, ma'am.
12        Q.   And you had to drive your car over there,
13   right?
14        A.   Yes, ma'am.
15        Q.   What were you doing over at Subway?
16        A.   Cashiering, make sandwiches, cleaning.
17        Q.   So you were doing it all?
18        A.   Uh-huh.
19        Q.   You said that Ecstacy made you high.
20                  When did you take the Ecstacy during
21   your day.
22        A.   I didn't take that every day.  I mainly
23   take those when I go out -- going out like to the
24   club or something like that.
25        Q.   Go partying?
```

```
 1        A.   Yes, ma'am.

 2        Q.   And the Lovacel, the muscle relaxer, what

 3   did it do for you?

 4        A.   It relaxes you.

 5        Q.   You took that -- on April the 2nd and

 6   April the 3rd, also, you took these drugs?

 7        A.   Yes, ma'am.

 8        Q.   So, you woke up that morning, you know,

 9   with your normal routine --

10        A.   Yes, ma'am.

11        Q.   -- and took your drugs?

12        A.   Yes, ma'am.

13        Q.   Okay.  And I'm sorry.  When did you say

14   you stopped taking the drugs?

15        A.   When I went to jail.

16        Q.   In mid July, 2003?

17        A.   Yes, ma'am.  No.  No, August.

18        Q.   August 22nd --

19        A.   Yes, ma'am.

20        Q.   -- 2003?  Okay.

21             So the jail, in other words, was

22   like a mandatory detox for you.

23        A.   Basically, yes.

24        Q.   And despite the drugs that you were --

25   did you take drugs first thing that morning on
```

92

 1  April the 3rd?

 2        A.   Yes, ma'am.

 3        Q.   Did you take drugs the night before to

 4  help you sleep?

 5        A.   Yes, ma'am.

 6        Q.   And you were still unable to sleep?

 7        A.   No, ma'am.  I wasn't.

 8        Q.   How much drugs do you normally take to

 9  help you cool out and go to sleep at night?

10        A.   Over a period of time if you use them so

11  much, it don't really have an effect on the body.

12        Q.   So you have to take more?

13        A.   Yes, ma'am.

14        Q.   Okay.  Is that what you started doing?

15        A.   No, not really.

16        Q.   You heard the phone ring when you got up

17  that morning.  About what time did you say you got

18  up?

19        A.   I said about -- about 5:00 or 6:00.

20        Q.   Okay.  And you heard the phone ring?

21        A.   Once.

22        Q.   One time.  Do you know who answered it?

23        A.   No, ma'am, I don't.

24        Q.   Were your cousins up?

25        A.   I'm not sure.  I'm still upstairs.

```
 1        Q.   Okay.  Now, tell me the sleeping

 2   arrangements in the home at the time that

 3   Mr. Brown was staying with you?

 4        A.   We didn't have no sleeping arrangements.

 5        Q.   Who was sleeping -- oh, you didn't?

 6   Gotcha.  So, the boys, meaning your cousins --

 7        A.   They slept downstairs.

 8        Q.   Okay?

 9        A.   The girls, they had their own rooms.

10        Q.   And you said that Ruben when you left was

11   playing on the computer or something?

12        A.   Playing video games.

13        Q.   Okay.  I'm -- I'm video illiterate.

14   Okay.  Was that like the Nintendo stuff on T.V.?

15        A.   I'm video illiterate, too.  I'm not even

16   sure.  All I know it's handheld.  It goes to the

17   T.V. and he was playing it.

18        Q.   Okay.  And how old is Ruben?

19        A.   Now he's 17.

20        Q.   So he would have been -- if he was born

21   in '87?

22        A.   Fifteen.  It was two years ago, about 15.

23        Q.   Fifteen or 16?

24        A.   Yeah, about 15 or 16.

25        Q.   Okay.  Now, he was on probation at the
```

94

1   time for robbery, wasn't he, Ruben?

2        A.   I don't know.  I'm not sure.

3        Q.   If that's what the records would reflect,

4   you wouldn't argue with that, would you?

5        A.   No, ma'am, I couldn't argue with it.

6        Q.   Okay.  You dropped your -- your kids off

7   at the elementary school so they could get their

8   breakfast?

9        A.   Yes, ma'am.

10       Q.   Okay.  And when you left, you said

11  Mr. Brown -- DeWayne, you called him DeWayne?

12       A.   Yes, ma'am.

13       Q.   Okay.  He was on the couch?

14       A.   Yes, ma'am.

15       Q.   Do you have a -- any patio or porch area

16  at your townhouse -- at that apartment?

17       A.   Yes, ma'am.

18       Q.   Okay.  Is it a front porch or a back

19  porch?

20       A.   We had a front door and a back door.

21       Q.   Okay.  When you came back, did you check

22  the back porch or any area to see if Mr. Brown was

23  out there?

24       A.   No, ma'am.

25       Q.   Okay.  But his clothes were still there?

1    A.   Yes, ma'am.

2    Q.   And you got to Ms. Berry's house

3  somewhere between 8:30 and 9:00, I believe, is

4  what you told Mr. Rizzo?

5    A.   I think so, yes.

6    Q.   And everybody knows "The Price Is Right"

7  is on at 10:00 o'clock, right?

8    A.   Yes, ma'am.

9    Q.   Okay.  The phone rang and Ms. Berry

10  looked at the Caller I.D. and said, "It's your

11  house"?

12    A.   Yes, ma'am.

13    Q.   And she gave you the phone and it was

14  DeWayne?

15    A.   Yes, ma'am.

16    Q.   And you got upset with him during the

17  conversation?

18    A.   Yes, ma'am.

19    Q.   And then you wanted to call Ghetto and

20  tell Ghetto to get DeWayne out of your house?

21    A.   Yes.

22    Q.   Suffice it to say, when you were -- and

23  I think you've already told the jury when you were

24  put in jail, your thoughts, as any mother's would

25  be, were for your children?

 1        A.   Yes, ma'am.

 2        Q.   You really needed to get back to your

 3   babies, right?

 4        A.   Yes, ma'am.

 5        Q.   And, by the way, Ms. Dockery, you don't

 6   know who made those calls to you?

 7        A.   No, ma'am, I don't.

 8        Q.   And after you went before the Grand Jury,

 9   you were still visiting Mr. Brown?

10        A.   Yes.

11        Q.   And I believe there were occasions where

12   AB would even take you to work; is that correct?

13        A.   Yes.

14        Q.   That was after the Grand Jury appearance;

15   isn't that correct?  Is that a yes?

16        A.   Give me one minute.

17        Q.   Okay?

18        A.   I only can recall one time AB taking me

19   to work.

20        Q.   Okay.  But he took you to work?

21        A.   Yes, ma'am.

22        Q.   All right.  And I believe you told

23   Mr. Rizzo that both of you went to see Mr. Brown

24   together one time, at least one time?

25        A.   We went a couple of times together.

97

```
 1        Q.   Together?

 2        A.   Yes.

 3        Q.   You have been wearing the ankle monitor

 4   now for -- well, since you got out.   When was

 5   this?

 6        A.   In December.

 7        Q.   Of 2003?

 8        A.   Yes, ma'am.

 9        Q.   Okay.   Now, you haven't had any drugs

10   since you got out in December of 2003?

11        A.   No, ma'am.

12        Q.   Okay.   And this statement, the statement

13   you made after 2003, like the January 6th, 2004

14   statement, would be while you were clean and

15   sober?

16        A.   Yes, ma'am.

17        Q.   Okay.   And it's in that statement where

18   you mention your daily routine and "The Price Is

19   Right" and Ms. Berry checking the Caller I.D. and

20   saying it was your house?

21        A.   Yes, ma'am.

22        Q.   Okay?

23             MS. MULDROW:   May I have a moment,

24   Your Honor?

25             THE COURT:   All right.
```

98

1      Q.   (By Ms. Muldrow)  Did you ever have -- on

2  the morning of April 3 -- April the 3rd of 2003,

3  was any other woman staying at your apartment,

4  mother or grandmother staying there?

5      A.   No, ma'am.

6      Q.   Okay.  And you were separated from your

7  babies for 120 days and it sounds like a hell hole

8  over at the jail; is that correct?

9      A.   Yes, ma'am.

10     Q.   All right.  You essentially was begging

11 the Court to let you out, is that fair to say,

12 through the letter that Ms. Alfred wrote for you

13 asking to be released, you've learned your ways,

14 you want to get out?

15     A.   Yes, ma'am.

16     Q.   Okay.  And you got the services of

17 Mr. Ayers, your attorney, to represent you?

18     A.   Yes, ma'am.

19     Q.   Okay.  Of course, you know he would have

20 met with Mr. Rizzo?

21     A.   (No audible response.)

22     Q.   He met with you and counseled with you;

23 is that correct?

24     A.   Yes, ma'am.

25     Q.   And, of course, he told you what --

```
 1                    MR. RIZZO:  I'm going to object to
 2     anything Mr. Ayers said without bringing him in.
 3                    THE COURT:  Sustained.
 4          Q.   (By Ms. Muldrow)  I believe Mr. Rizzo
 5     told you that you had the benefit of the services
 6     of your attorney --
 7          A.   Yes, ma'am.
 8          Q.   -- correct?
 9          A.   Yes, ma'am.
10          Q.   And through the benefit of your
11     services -- of his services, arrangements were
12     made for you to meet with Mr. Rizzo and
13     investigators; isn't that correct?  Police people?
14          A.   Yes, ma'am.
15          Q.   Okay.  And you knew what you had to do --
16          A.   Yes, ma'am.
17          Q.   -- correct?
18               Those arrangements were made, right.
19          A.   Yes, ma'am.
20          Q.   And conditions of bond for you to get out
21     and be with your children were set for you and you
22     understood those conditions?
23          A.   Yes, ma'am.
24          Q.   And you're wearing one of them?
25          A.   Yes, ma'am.
```

1      Q.   You're really attached to the State

2  because of that monitor, wouldn't you say?

3      A.   Yes, ma'am, I am.

4      Q.   You really can't do much, can you?

5      A.   I can't do anything.

6      Q.   You're 30 years old and you've got a

7  10:00 o'clock curfew?

8      A.   Yes, ma'am.

9      Q.   So if your babies had a sleepover, you

10  couldn't even go out and check, could you?

11      A.   They have to tell me in advance and I

12  have to call my Pretrial Officer and she'll ask

13  the Judge.  And usually it's granted.

14      Q.   But you've got to get permission if your

15  babies wanted to have a sleepover?

16      A.   Yes, ma'am.

17      Q.   Okay.  Have you ever received calls from

18  the jail before?

19      A.   When?

20      Q.   Just in general.  Has anybody from the

21  jail ever called you before?

22      A.   When, now or --

23      Q.   No.  No.  No.  Just any time.  Have you

24  ever gotten calls from the jail?

25      A.   Yes.

1    Q.   You know they have to be collect calls,

2  right?

3    A.   Yes, ma'am.

4    Q.   Okay.  Do you feel like you fulfilled

5  your duty to Mr. Rizzo such that you can finally

6  be free from that ankle cuff?

7    A.   It has nothing to do with Mr. Rizzo.

8    Q.   Do you feel like you fulfilled the

9  conditions of your agreement that you can finally

10  be released from that ankle cuff?

11    A.   Yes, ma'am.

12    Q.   All right?

13          MS. MULDROW:  Pass the witness, Your

14  Honor.  Thank you, Ms. Dockery.

15          MR. RIZZO:  Nothing further, Your

16  Honor.

17          THE COURT:  You may step down,

18  ma'am.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right.  Ladies and

21  gentlemen, let's go to lunch.  Please retire to

22  the jury room.

23          THE BAILIFF:  All rise.

24          (Jury retired.)

25          (Noon recess.)