# EXHIBIT 2

**C.A. No. 4:-17-CV-01749;**
***Alfred Dewayne Brown v. City of Houston, et al.***

1                    REPORTER'S RECORD

2                  Volume 30 of 41 Volumes

3                  Trial Court No. 1035159

4               Court of Appeals No. AP-75,294

5

  THE STATE OF TEXAS      :   IN THE DISTRICT COURT OF

6                          :

  VS.                      :   HARRIS COUNTY, T E X A S

7                          :

  ALFRED DeWAYNE BROWN     :   351ST JUDICIAL DISTRICT

8

9

10         _____

11                       JURY TRIAL

12         _____

13         On the 12th day of October, 2005, the

14  following proceedings came on to be heard in the

15  above-entitled and numbered cause before the

16  Honorable Mark Kent Ellis, Judge presiding, held

17  in Houston, Harris County, Texas.

18         Proceedings reported by computerized

19  stenotype machine.

20

21

22

                TONI GOUBEAUD, CSR NO. 5774

23  Official Court Reporter - 351st Judicial District
                1201 Franklin, 14th Floor

24                   Houston, Texas
                    (713) 755-5620

25

```
 1                    (Short recess.)

 2                    THE BAILIFF:  All rise.

 3                    (Jury seated.)

 4                    THE COURT:  All right.  Please, be

 5     seated.

 6                    Mr. Rizzo.

 7                    MR. RIZZO:  State calls Sharhonda

 8     Simon, Your Honor.

 9                    THE COURT:  All right.  You may

10     proceed.

11                      SHARHONDA SIMON,

12     having been first duly sworn, testified as

13     follows:

14                    DIRECT EXAMINATION

15     BY MR. RIZZO:

16          Q.   Could you state your name, please?

17          A.   Sharhonda Simon.

18          Q.   And, Ms. Simon, how old are you, please?

19          A.   Twenty-six.

20          Q.   And are you single or married?

21          A.   Single.

22          Q.   Do you -- do you have any children?

23          A.   Yes.

24          Q.   And how many children do you have?

25          A.   Five.
```

1       Q.   How old were you when you had your first

2  child?

3       A.   Eighteen.

4       Q.   And so you've been having kids ever since

5  and you have five now?

6       A.   Yes.

7       Q.   Okay.  Are you from Houston?

8       A.   Yes, sir.

9       Q.   And where did you go to school?  Where

10 did you go to school, high school?

11      A.   Jack Yates.

12      Q.   Okay.  How long did you go to school, to

13 high school?

14      A.   Until the 11th grade.

15      Q.   Are you working now?

16      A.   No, sir.

17      Q.   Are you attending school?

18      A.   Yes, sir.

19      Q.   And where are you going to school?

20      A.   HCC.

21      Q.   And is there any specific study that

22 you're doing right now?

23      A.   Right now I'm trying to attend -- get my

24 GED.

25      Q.   Your GED?

67

```
 1        A.    Uh-huh.

 2        Q.    Let me also ask you, have you ever picked

 3   up a shoplifting case before?

 4        A.    Yes, sir.

 5        Q.    And how long ago was that?

 6        A.    It happened in the year 2002.

 7        Q.    Did you pay a fine on that?

 8        A.    Yes, sir.

 9        Q.    Other than that have you ever been

10   convicted of a felony or a crime of moral

11   turpitude?

12        A.    No, sir.

13        Q.    Do you know Alfred DeWayne Brown?

14        A.    Yes, sir.

15        Q.    And do you see him in the courtroom here

16   today?

17        A.    Yes, sir.

18        Q.    Could you point to him and describe an

19   article of clothing that he's wearing?

20        A.    He's sitting right there.  He has on a

21   blue shirt, gray suit.

22              MR. RIZZO:  Your Honor, may the

23   record reflect this witness has identified the

24   Defendant.

25              THE COURT:  Yes.
```

```
 1       Q.    (By Mr. Rizzo)  And how do you know him?

 2       A.    He's the father of my child.

 3       Q.    He's the father of which child?

 4       A.    Of my five-year-old.

 5       Q.    Of your five-year-old.  Okay?

 6             And do you have any other children

 7   by him.

 8       A.    No, sir.

 9       Q.    How -- were you dating him or living with

10   him at any time?

11       A.    I was dating him.

12       Q.    You were dating him when you got pregnant

13   by him?

14       A.    Yes, sir.

15       Q.    How long did you date the Defendant?

16       A.    About a year.

17       Q.    And how long ago was it or what year was

18   it, do you remember?

19       A.    That was in, like, the end of '97 through

20   '98.

21       Q.    All right.  Were you dating him in April

22   of 2003?

23       A.    No, sir.

24       Q.    Did you have contact with him?

25       A.    Yes, sir.
```

```
 1        Q.   Did he also visit his child?

 2        A.   Yes, sir.

 3        Q.   All right.  Do you know Shon Glaspie?

 4        A.   Yes, sir.

 5        Q.   And how about Ghetto?

 6        A.   Yes, sir.

 7        Q.   I'm going to show you what's been marked

 8   State's Exhibit No. 147.  Do you know all three of

 9   them?

10        A.   Yes, sir.

11        Q.   Do you know them as Ghetto or do you know

12   them as -- do you know Ghetto as Ghetto the name

13   or do you know him as Elijah Joubert?

14        A.   I know him by his nickname.

15        Q.   And what about this Defendant, what did

16   you know him as?

17        A.   I know him as DeWayne.

18        Q.   DeWayne.  Okay.  Did you call him Doby at

19   all, or no?

20        A.   No, sir.

21        Q.   And what about Glaspie, what did you call

22   him?

23        A.   Shon.

24        Q.   Shon.

25                  Do you live in The VA now.
```

```
 1        A.   Yes, I do.

 2        Q.   And how long have you lived at The VA?

 3        A.   I've lived there since '99.

 4        Q.   So that's approximately five, six years?

 5        A.   Yes, sir.

 6        Q.   All right.  Let me -- let me direct your

 7   attention to April 3rd of 2003.  You know which

 8   day I'm talking about, don't you?  The day when --

 9        A.   Yes, sir.

10        Q.   Do you remember hearing about the

11   killings at the check cashing store?

12        A.   Yes, sir.

13        Q.   And, Ms. Simon, is that a store that some

14   of the people at The VA actually went to on

15   occasion?  Do you know?

16        A.   I don't know.

17        Q.   Is The VA considered -- would you say

18   that's a high crime area?

19        A.   Yes, sir.

20        Q.   Is it as rough now as it was in 2003?

21        A.   It's rougher.

22        Q.   It's rougher?

23        A.   Yes, sir.

24        Q.   Are there -- by rougher, what do you

25   mean?
```

```
 1        A.   It's very bad.

 2        Q.   Very bad?

 3        A.   Yes.

 4        Q.   Do you know the Defendant's brother, AB?

 5        A.   Yes, sir.

 6        Q.   Do you know -- do you know most of the

 7   folks in that place, I guess, or the people that

 8   hang there?

 9        A.   Almost.

10        Q.   Now, let me direct your attention to

11   approximately 10:30 in the morning.  That would be

12   the day of the killings.  Okay?

13        A.   Uh-huh.

14        Q.   And I'm going to ask you if you had an

15   occasion to see those three defendants, that's

16   going to be Shon Glaspie, Elijah Joubert, also

17   known as Ghetto, and this Defendant, DeWayne,

18   together at any time that morning?

19        A.   Yes, sir.

20        Q.   How was it that you saw them?

21        A.    I stepped outside of my door and I looked

22   down the pathway where everyone hung out at and I

23   seen a lot of people standing out there.

24        Q.   Okay.  There was a lot of people.  Was

25   Ju-Ju out there, too, or do you know?
```

1    A.   He could have been.

2    Q.   He could have been.  Okay?

3         Well, what we want you to do is not

4  guess, though.

5    A.   Okay.

6    Q.   Do you know whether or not he was there

7  or you don't know?

8    A.   I don't know.

9    Q.   How far were you from there?

10    A.   As far as me standing right here --

11    Q.   Yeah.

12    A.   -- to that wall (indicating).

13    Q.   So you were standing about -- you could

14  see them about this far or farther

15  (demonstrating)?

16    A.   Farther.  All the way to that wall.

17    Q.   All right.

18    A.   Yes, sir.

19    Q.   Do you have any problems with your eyes

20  at all, Ms. Simon?

21    A.   No, sir, I don't.

22    Q.   Okay.  And you've seen them, obviously,

23  on a regular basis up until April of 2003; is that

24  right?

25    A.   Yes, sir.

1      Q.   All right.  Did you see them in or around

2  any type of vehicle?

3      A.   Yes, sir, I did.

4      Q.   And what kind of vehicle was it?

5      A.   A white Grand Am.

6      Q.   Now, have you ever seen that white Grand

7  Am before?

8      A.   Yes.

9      Q.   Okay.  I'm going to --

10              MR. RIZZO:  May I approach this

11  witness, Your Honor.

12              THE COURT:  Yes.

13      Q.   (By Mr. Rizzo)  I'm going to hand you

14  what's marked State's Exhibit No. 159?

15      A.   Yes, sir.

16      Q.   And what is that?

17      A.   A white Grand Am.

18      Q.   Okay.  Does this look like the Grand Am

19  that you saw them around?

20      A.   Yes, sir.

21      Q.   Do you know whose Grand Am that is,

22  Ms. Simon?

23      A.   I've seen Shon in it.

24      Q.   And when you say you saw him in it, does

25  that mean driving or as a passenger or both?

1       A.   Driving.

2       Q.   Okay.  Have you seen Shon in any other

3   vehicles back in April or sometime before that,

4   just this Grand Am?

5       A.   No, sir.

6       Q.   Just the Grand Am?

7       A.   Uh-huh.

8       Q.   All right?

9       A.   Yes, sir.

10      Q.   Now, was Shon -- when you looked down the

11  way and you saw these three guys, was -- was Shon

12  inside the car?

13      A.   No, sir.

14      Q.   Was Shon outside the car?

15      A.   Yes, sir.

16      Q.   Do you remember if Shon was standing near

17  the driver's side, the passenger's side, front or

18  back, or do you remember?

19      A.   The driver's side.

20      Q.   Shon was standing near the driver's side.

21  What about Ghetto, where was he at?

22      A.   Outside, like in front of the vehicle.

23      Q.   In front of the vehicle.

24           And then the Defendant, where was he

25  at.

75

```
 1       A.    Sitting on the passenger's side.

 2       Q.    Inside the car?

 3       A.    Inside.

 4       Q.    Was the door opened or was the door

 5  closed, ma'am?

 6       A.    Opened.

 7       Q.    Could you -- did you have anything

 8  obstructing your view at the time that you saw the

 9  Defendant in that Grand Am with the other two

10  co-defendants?  In other words, was there anything

11  blocking you from seeing DeWayne and them?

12       A.    No, sir.

13       Q.    All right.  After you saw them, what did

14  you do?

15       A.    I walked back in my house.

16       Q.    Why was that?

17              MS. MULDROW:  Irrelevant, Your

18  Honor.

19              THE COURT:  Overruled.  You may

20  answer.

21       A.    I just walked back in my house.

22       Q.    (By Mr. Rizzo)  Okay.  Now, the next day,

23  did you have an occasion to talk to the police?

24       A.    Yes.

25       Q.    And did you cooperate with the police?
```

1        A.   Yes, I did.

2        Q.   Did the police ask if they could search

3   your house?

4        A.   Yes, they did.

5        Q.   And did you allow them to do that?

6        A.    I told them that they could before they

7   asked me.

8        Q.   Okay.  And did they search your house?

9        A.   Yes, sir, they did.

10        Q.   All right.  Did you also give a

11   statement?

12        A.   Yes, sir, I did.

13        Q.    And in your statement, did you tell the

14   police basically what you're saying here today?

15        A.   Yes, sir.

16        Q.   Did you -- did you downplay anything in

17   your statement?  In other words, did you -- in

18   terms of identifying this Defendant sitting in the

19   Grand Am, did you tell them that you were sure it

20   was him?

21        A.   I said it looked like him.

22        Q.   Was that 100 percent true?

23        A.   Yes, sir, it was.

24        Q.   All right.  You know what I'm saying?

25        A.   Oh, as telling the truth.

77

```
 1       Q.   Yeah.  Was that the truth?

 2       A.   No, sir, because I saw him.

 3       Q.   Okay.  Explain to the jury what you mean?

 4       A.   I told them that it looked like I seen

 5  Mr. Brown, but really I did see Mr. Brown.  I just

 6  didn't want to have anything to do with this case.

 7       Q.   And why is that, Ms. Simon?

 8       A.   Because I don't know anything.

 9       Q.   Other than what you've testified here

10  today to?

11       A.   Other than that.

12       Q.    Were you trying to protect him because

13  you are --

14            MS. MULDROW:  Objection.  He's

15  leading the witness.

16            THE COURT:  Overruled.

17       Q.   (By Mr. Rizzo)  Were you trying to

18  protect him because you're his baby's mama?

19       A.   No.  No, sir.

20       Q.   Then what would be the reason that you

21  kind of downplayed your I.D. of him?

22       A.   Because I don't want to have anything

23  involved -- to do involved in this case.

24       Q.   And did you want to come down here and

25  testify today?
```

1       A.   No, sir.

2       Q.   Why are you here then?

3       A.   For the love of my children and because I

4  was subpoenaed.

5            MR. RIZZO:   Pass the witness, Your

6  Honor.

7            THE COURT:   Ms. Muldrow

8               CROSS-EXAMINATION

9  BY MS. MULDROW:

10      Q.   Good morning, ma'am.   You did give a

11  statement?

12      A.   Yes, ma'am.

13      Q.   And you also spoke with my investigator,

14  which is Harry Johnson?

15      A.   Yes, ma'am.

16           MR. RIZZO:   For purposes of the

17  record, I'm tendering to Defense counsel a copy of

18  the statement.

19           THE COURT:   All right.

20      Q.   (By Ms. Muldrow)  And on the morning of

21  the ACE robbery, you mentioned you went to pay

22  your rent between 9:30 and 10:00 a.m.

23

24           Did you get a chance to read your

25  statement, Ms. Simon?  I'm sorry.  Did you get a

1    chance to read it.

2         A.   Yes, ma'am, I did.  I went in the

3      office for paperwork, to do paperwork

4      around that time.

5         Q.   All right.  And then you went back to

6    your apartment?

7         A.   Not all the way back to my apartment.  I

8    went somewhere else, then I went back to my

9    apartment.

10        Q.   Fair enough.  We don't need to know --

11        A.   Okay.

12        Q.   Between around 10:30 and 11:30 is when

13   you saw Shon walking down the sidewalk?

14        A.   Yes, I did.

15        Q.   Does that sound right?

16        A.   Yes, because I did see him walking down

17   the sidewalk.

18        Q.   All right.  And then you walked out about

19   20 minutes later?

20        A.   Yes.

21        Q.   So, that would be closer to noon,

22   correct?

23        A.   Correct.  I was just guessing times.  I

24   don't know exactly which time.

25        Q.   Fair enough.  And I'm not going to hold

1    you to noon.

2         A.   Okay.

3         Q.   I'm just trying to for the jury's sake

4    what you said in your statement?

5         A.   Yes, ma'am.

6         Q.   And you gave your statement on the 8th

7    day of April.  So this is essentially two and a

8    half years later, so you understand?

9         A.   Yes, ma'am.

10        Q.   All right.  So it would have been closer

11   to noon when you walked out and looked down the

12   parking lot where a (inaudible) --

13                  THE REPORTER:  Where what.

14                  MS. MULDROW:  A manhole cover.

15        Q.   (By Ms. Muldrow)  And you saw who you

16   thought was Shon, Ghetto T and DeWayne by a new

17   model Grand Am.  Does that make sense?

18        A.   I saw them.  Yes, that makes sense.  Yes,

19   ma'am.

20        Q.   A new model Grand Am?

21        A.   Yes, ma'am.

22        Q.   And it was around noon, closer to noon?

23        A.   Around that time, yes, ma'am.

24        Q.   And the -- and it looked like Alfred was

25   sitting in the front passenger seat?

81

```
 1          A.   Yes, ma'am.

 2          Q.    Because that door was opened, right?

 3          A.   Yes, ma'am.

 4          Q.   You didn't see Mr. Brown get out of the

 5     car?

 6          A.   No, ma'am.

 7          Q.   So you don't know if, in fact, he had

 8     ever been riding in the car?

 9          A.   No, ma'am.

10          Q.   And you're not about to tell Mr. Rizzo or

11     anybody else in this courtroom that you saw him

12     arriving in the car?

13          A.   No, ma'am.

14          Q.   Or that he was even driving the car?

15          A.   No, ma'am.

16          Q.   So there were lots of other people around

17     the car as well?

18          A.   Yes, ma'am.

19          Q.   And do you ever recall telling

20     Mr. Johnson -- and give me one moment -- that you

21     saw Ju-Ju and several other men and women kind of

22     milling around the car with them?

23          A.   Yes, ma'am.  Yes, ma'am.

24          Q.   So there's nothing unusual about people

25     milling around out there at The VA?
```

82

```
 1        A.   No, ma'am.

 2        Q.   Including around Shon and Ghetto and

 3   around that car?

 4        A.   No, ma'am.

 5        Q.   Nothing about that at all?

 6        A.   No, ma'am.

 7        Q.   Nothing criminal about that either, is

 8   there?

 9        A.   No, ma'am.

10             MS. MULDROW:  Pass the witness.

11             MR. RIZZO:  Just one question.

12                REDIRECT EXAMINATION

13   BY MR. RIZZO:

14        Q.   In terms of the times you obviously did

15   not look at your watch and you can tell us it was

16   in the morning, can you not?

17        A.   It was in the morning.

18             MR. RIZZO:  Pass the witness.

19             THE COURT:  Ms. Muldrow.

20                RECROSS-EXAMINATION

21   BY MS. MULDROW:

22        Q.   Based on your statement, it was 20

23   minutes or so after 11:30 a.m., which would still

24   make it the morning, but closer to noon; is that

25   correct?
```

```
 1      A.   Correct.

 2                MS. MULDROW:  That's all I have.

 3   Thank you, ma'am.

 4                THE COURT:  You may step down,

 5   ma'am.

 6                Call your next witness.

 7                MR. RIZZO:  Can this witness be

 8   excused, Your Honor.

 9                THE COURT:  Yes.

10                MR. RIZZO:  State calls Rayfael

11   Viverette.  He's in custody, Your Honor.

12                THE COURT:  All right.

13                Mr. Rizzo.

14                MR. RIZZO:  Thank you, Your Honor.

15                   RAYFAEL VIVERETTE,

16   having been first duly sworn, testified as

17   follows:

18                  DIRECT EXAMINATION

19   BY MR. RIZZO:

20      Q.   Would you state your name, please?

21      A.   Rayfael Viverette.

22      Q.   Thank you, Mr. Viverette?

23                Could you pull the mike down just a

24   little bit.

25      A.   (Witness complies.)
```