# EXHIBIT 3

**C.A. No. 4:-17-CV-01749;**
*Alfred Dewayne Brown v. City of Houston, et al.*

```
 1                    REPORTER'S RECORD
 2                  Volume 30 of 41 Volumes
 3                  Trial Court No. 1035159
 4              Court of Appeals No. AP-75,294
 5
    THE STATE OF TEXAS        :  IN THE DISTRICT COURT OF
 6                            :
    VS.                       :  HARRIS COUNTY, T E X A S
 7                            :
    ALFRED DeWAYNE BROWN      :  351ST JUDICIAL DISTRICT
 8
 9
10           _____
11                         JURY TRIAL
             _____
12
13          On the 12th day of October, 2005, the
14   following proceedings came on to be heard in the
15   above-entitled and numbered cause before the
16   Honorable Mark Kent Ellis, Judge presiding, held
17   in Houston, Harris County, Texas.
18           Proceedings reported by computerized
19   stenotype machine.
20
21
22
                  TONI GOUBEAUD, CSR NO. 5774
23   Official Court Reporter - 351st Judicial District
                    1201 Franklin, 14th Floor
24                      Houston, Texas
                        (713) 755-5620
25
```

```
1       A.   Go pick his little girl up.
2       Q.   Do you know a guy named Cowboy Will?
3       A.   No.
4       Q.   Wilbert Green, you don't know him?
5       A.   No.
6       Q.   You never heard of the name Cowboy Will?
7       A.   No.
8       Q.   That's fair.
9              MS. MULDROW:  Thank you, sir.
10             THE WITNESS:  You're welcome.
11             THE COURT:  All right.  Anything
12   else, Mr. Rizzo.
13             MR. RIZZO:  No, Your Honor.
14             THE COURT:  You may step down, sir.
15             Call your next witness.
16             MR. RIZZO:  State calls Alma Berry,
17   Your Honor.  Judge, she has a disability.
18             THE COURT:  Okay.
19             You may proceed.
20             MR. RIZZO:  Thank you, Your Honor.
21
22
23
24
25
```

```
 1                      ALMA BERRY,
 2   having been first duly sworn, testified as
 3   follows:
 4                  DIRECT EXAMINATION
 5   BY MR. RIZZO:
 6        Q.   Hello, Ms. Berry?
 7        A.   Hi.
 8        Q.   Could you state your name, please, for
 9   the record?
10        A.   My name is Alma Berry.
11        Q.   Okay.  And, Ms. Berry, where are you from
12   originally?
13        A.   My home place or where I stay now.
14        Q.   Pardon me?
15        A.   My home place, where I'm originally from.
16        Q.   Yes, ma'am?
17        A.   Louisiana.
18        Q.   Louisiana?
19        A.   Uh-huh.
20        Q.   Whereabouts in Louisiana?
21        A.   Logansport.
22        Q.   When did you move to Houston?
23        A.   In 1965, of May.
24        Q.   And how old were you when you moved here?
25        A.   Seventeen.
```

```
 1        Q.   Do you have any children?
 2        A.   Yes.
 3        Q.   And how many?
 4        A.   One.
 5        Q.   How old is your child?
 6        A.   Thirty-nine.
 7        Q.   Are you -- you are obviously disabled?
 8        A.   Yes.
 9        Q.   And what -- what is your disability?
10        A.   I have a heart problem.  I'm a diabetic
11   and I have an amputation below the knee.
12        Q.   And how was it that you lost your leg?
13        A.   From being a diabetic and I got an
14   infection in the leg.
15        Q.   Now, do you -- do you know Ericka
16   Dockery?
17        A.   Yes.
18        Q.   And could you tell us who Ericka Dockery
19   is or was?
20        A.   She was my caregiver at the -- around
21   April.
22        Q.   April of 2003?
23        A.   Four.
24        Q.   2004?
25        A.   Uh-huh.
```

1      Q.   Well, let me ask you this:  She stopped
2   being your caregiver after something occurred, did
3   she not?
4      A.   Yes.
5      Q.   And what would that have been?  Would
6   that have been those murders?
7      A.   Yes.  But I heard it on the news.
8      Q.   Yes?
9      A.   And --
10              MS. MULDROW:  Asked and answered,
11  Your Honor.
12     A.   -- I kind of thought about --
13              THE COURT:  Overruled.
14              MS. MULDROW:  Narrative, Your Honor.
15              THE COURT:  Overruled.  You may
16  finish your answer, ma'am.
17     A.   After I heard about it, I thought about
18  it and by the time -- she was a nice person, but
19  the people --
20              MS. MULDROW:  Your Honor, again,
21  nonresponsive.
22              THE COURT:  Sustained.
23     Q.   (By Mr. Rizzo)  What I'm trying to do is
24  figure out the year?
25     A.   It was in 2000 -- 2003.

```
 1        Q.    Okay.
 2        A.    Uh-huh.
 3        Q.    All right.  Now, back in April of 2003 --
 4        A.    Uh-huh.
 5        Q.    -- she was working for you.  What time
 6   did she get there in the morning?
 7        A.    9:00.  9:00 a.m.
 8        Q.    How long would she stay there with you,
 9   ma'am?
10        A.    Three days she'd stay five hours and two
11   days she'll stay four hours.
12        Q.    Okay.  But she'd always get there about
13   9:00?
14        A.    9:00 a.m.
15        Q.    And had you ever met a person by the name
16   of DeWayne or I guess you knew him as DeWayne or
17   Alfred Brown?
18        A.    Yeah.
19        Q.    Do you see him in the courtroom or can
20   you remember?
21        A.    I don't see him.  Oh, yeah.  Yeah.
22        Q.    Which one is he?
23        A.    The one with the gray suit on.
24        Q.    To the right or to the left?  The
25   gentleman to the right or to the left?
```

```
 1        A.   To the right.
 2             MR. RIZZO:  Okay.  Your Honor, may
 3   the record reflect this witness has identified the
 4   Defendant.
 5             THE COURT:  Yes.
 6        Q.   (By Mr. Rizzo)  And how many times had
 7   you met him?
 8        A.   Twice.
 9        Q.   And had you talked to him on the phone, also?
10        A.   I didn't really talk to him.  I spoke to
11   him on the phone.
12        Q.   Okay.  Well, did you know his voice, in
13   other words?
14        A.   Yes.
15        Q.   I'm going to direct your attention to the
16   day of the killings.  Okay?
17        A.   Uh-huh.
18        Q.   And that has been identified as April
19   3rd, 2003.
20             And I'm going to ask you:  Do you
21   remember what time "The Price Is Right" came on.
22        A.   At 10:00 o'clock a.m.
23        Q.   Okay.  Did you -- is that a show you
24   watch every day?
25        A.   Every day.
```

```
 1      Q.   Do you still watch it?
 2      A.   Yes, I do.
 3      Q.   Okay.  Had "The Price Is Right" just come
 4 on T.V.?
 5      A.   Yes, about --
 6              MS. MULDROW:  I'm going to ask that
 7 he not lead the witness, Your Honor.
 8              THE COURT:  Hang on, ma'am.  Do not
 9 lead the witness.
10      A.   It had been on about 15 minutes.
11      Q.   (By Mr. Rizzo)  It had been on about 15
12 minutes?
13      A.   Uh-huh.
14      Q.   All right.  After it had been on about 15
15 minutes, did you get a phone call?
16      A.   Yes.
17      Q.   Did you answer it or did Ericka answer it?
18      A.   I answered.
19      Q.   And when you picked up the phone, who was
20 on the other line calling?
21      A.   DeWayne.  I called him DeWayne.
22      Q.   Are you talking about this Defendant?
23      A.   Yes.
24      Q.   Are you sure it was him?
25      A.   Uh-huh.
```

1    Q.   How did you know it was him?
2    A.   The voice.
3    Q.   And you were positive it was him?
4    A.   Yes.  Uh-huh.
5    Q.   Did he ask for her or did he --
6    A.   He spoke and then he asked for Ericka.
7    Q.   Did you give her the phone?
8    A.   Yes, I did.
9    Q.   Did you hear Ericka talking to this
10   Defendant?  Obviously you couldn't hear what he
11   was saying?
12   A.   No, I couldn't hear what he said.
13   Q.   While she was talking to this Defendant,
14   did Ericka tell you to do anything?
15   A.   Yes.
16   Q.   What did she say?
17   A.   She told me turn on Channel 26.
18   Q.   When you turned on Channel 26, what was on?
19   A.   It was showing that a robbery had taken
20   place and a police had got killed and this lady
21   that was in the cashing part, she had got killed,
22   too.
23   Q.   So when you turned on Channel 26 after
24   the phone call and the request by Ericka, that was
25   on T.V.?

1    A.   Yes.
2    Q.   All right.  And now I want to ask you
3 about Friday night, which would be another night.
4 Did you -- when did you learn that DeWayne had
5 been charged with a capital murder?
6    A.   I didn't see it until Friday night on the
7 news.
8    Q.   Yes, ma'am?
9    A.   Well, I seen his picture came up.  I
10 had --
11         MS. MULDROW:  Nonresponsive and
12 narrative.
13         THE COURT:  Ma'am, hang on for the
14 next question.  Go ahead.
15         MR. RIZZO:  Thank you.
16    Q.   (By Mr. Rizzo)  Was it that night that
17 you saw it on T.V.?
18    A.   Yes.
19    Q.   And then a couple days later did you let
20 Ericka go?
21    A.   Yes.
22    Q.   Okay.
23         MR. RIZZO:  I'll pass the witness.
24         THE COURT:  Ms. Muldrow.
25         MS. MULDROW:  Thank you, Your Honor.

```
 1                    CROSS-EXAMINATION
 2   BY MS. MULDROW:
 3        Q.   Good afternoon, ma'am?
 4        A.   Good afternoon.
 5        Q.   My name is Loretta Muldrow.  When you got
 6   the phone call, did you say anything to Ericka?
 7        A.   I told her, "Telephone".
 8        Q.   Do you remember saying, "It's your
 9   house"?
10        A.   No.
11        Q.   You don't remember that?
12        A.   I didn't say that.
13             MS. MULDROW:  That's all I have.
14   Pass the witness.
15             THE COURT:  Anything else.
16             MR. RIZZO:  Nothing further, Your
17   Honor.
18             May she be excused, Your Honor?
19             THE COURT:  Yes.
20             All right.  Ladies and gentlemen,
21   that concludes the testimony for today.  I visited
22   with the lawyers during one of the breaks and I
23   believe -- I think this is pretty accurate -- that
24   we will finish the guilt/innocence testimony on
25   Friday.
```