# EXHIBIT 5

**C.A. No. 4:-17-CV-01749;**
*Alfred Dewayne Brown v. City of Houston, et al.*

```
 1                     REPORTER'S RECORD

 2                  Volume 29 of 41 Volumes

 3                  Trial Court No. 1035159

 4               Court of Appeals No. AP-75,294

 5
   THE STATE OF TEXAS      :  IN THE DISTRICT COURT OF
 6                         :
   VS.                     :  HARRIS COUNTY, T E X A S
 7                         :
   ALFRED DeWAYNE BROWN    :  351ST JUDICIAL DISTRICT
 8

 9

10        _____

11                      JURY TRIAL

12        _____

13        On the 11th day of October, 2005, the

14  following proceedings came on to be heard in the

15  above-entitled and numbered cause before the

16  Honorable Mark Kent Ellis, Judge presiding, held

17  in Houston, Harris County, Texas.

18            Proceedings reported by computerized

19  stenotype machine.

20

21

22
              TONI GOUBEAUD, CSR NO. 5774
23   Official Court Reporter - 351st Judicial District
                1201 Franklin, 14th Floor
24                   Houston, Texas
                    (713) 755-5620
25
```

```
 1                    MR. RIZZO:  Okay.  Thank you.
 2                    MS. MULDROW:  That's all I have,
 3   Judge.
 4                    THE COURT:  Okay.
 5                    You may step down, Mr. Wheat.
 6                    Call your next witness.
 7                    MR. RIZZO:  May he be excused, Your
 8   Honor.
 9                    MS. MULDROW:  Of course.  Good luck,
10   sir.
11                    MR. RIZZO:  State calls Lisa
12   Hubbard.
13                    She has not been sworn, Your Honor.
14                    THE BAILIFF:  The witness needs to
15   be sworn in.
16                    THE COURT:  All right.
17                    (Witness sworn.)
18                    THE COURT:  All right.  Go ahead.
19                    MR. RIZZO:  Thank you.
20                     ALISHA RENEE HUBBARD,
21   having been first duly sworn, testified as
22   follows:
23                      DIRECT EXAMINATION
24   BY MR. RIZZO:
25        Q.  Would you state your name, please?
```

```
 1        A.    Alisha Renee Hubbard.

 2        Q.    And what do you go as?

 3        A.    Lisa.

 4        Q.    Lisa.   And how old are you, ma'am?

 5        A.    Thirty-eight.

 6        Q.    Are you single or are you married?

 7        A.    I'm married.

 8        Q.    And could you pull the microphone just a

 9   little bit down?

10        A.    (Witness complies.)

11        Q.    There you go.   Thank you so much.

12              How long have you been married.

13        A.    Eight years.

14        Q.    And do you have any children?

15        A.    One.

16        Q.    How old is your child?

17        A.    He's three.

18        Q.    Are you working right now?

19        A.    No.

20        Q.    And do you have any health problems?

21        A.    Yes.

22        Q.    Would you tell the jury a list of some of

23   your health problems?

24        A.    I have a tumor on the left side of my

25   brain, cancer, diabetic, high blood pressure.
```

68

```
 1       Q.   Okay.  And are you also scheduled for
 2  surgery on your brain --
 3       A.   Yes.
 4       Q.   -- as soon as this trial is over?
 5       A.   Yes.
 6       Q.   How far did you go in school?
 7       A.   Twelve.
 8       Q.   And where did you go to school?
 9       A.   Ross Sterling.
10       Q.   I'm sorry, ma'am?
11       A.   Ross Sterling.
12       Q.   Sterling.  Where do you live?
13       A.   5901 Selinsky.
14       Q.   And is that commonly referred to as The
15  VA?
16       A.   Yes, sir.
17       Q.   And you've been there for how many years?
18       A.   Four years now.
19       Q.   And did you -- what is The VA -- the
20  initials of the VA, what does that stand for?
21       A.   Villa Americana.
22       Q.   Okay.  So it's an apartment complex?
23       A.   Yes.
24       Q.   Does it go by any other names over there
25  at The VA?
```

1      A.   Used to call them vicious animals.

2      Q.   Vicious animals?

3      A.   Uh-huh.

4      Q.   Anything else?

5      A.   Not that I know of.

6      Q.   Dead End?

7      A.   Oh, yeah, Dead End.

8      Q.   Why are some of these terms used for that

9 apartment complex, ma'am?

10     A.   I guess because it was so rough back in

11 the days.

12     Q.   Has it cleaned up some actually since

13 this offense?

14     A.   A little.

15     Q.   A little bit.  Is it still pretty rough?

16     A.   A little.

17     Q.   A little bit?

18     A.   Uh-huh.

19     Q.   Have they also put in some cameras to try

20 to clean it up?

21     A.   Yes, sir.

22     Q.   Let me ask you if you were living there

23 back on April 3rd, 2003?

24     A.   Yes, sir.

25     Q.   About 8:00 o'clock in the morning,

1    approximately, did you see -- oh, let me ask you,

2    do you know somebody by the name of Doby?

3        A.   Yes.

4        Q.   Do you see him in the court today?

5        A.   Yes.

6        Q.   Could you point to him and describe an

7    article of clothing?

8        A.   Right there with the gray striped

9    shirt -- I mean, jacket with the light -- I assume

10   it's light blue.  I'm partially blind in my left

11   eye.

12       Q.   Pardon me?

13       A.   I'm partially blind in my left eye so I

14   can't really see the color.

15       Q.   Okay.  From the two men there, would it

16   be the right or left?

17       A.   That would be my left.

18       Q.   I'll stand behind.  You tell me which one

19   he is.  Is this Doby?

20       A.   No.

21       Q.   Is this Doby?

22       A.   Uh-huh.

23            MR. RIZZO:  Your Honor, may the

24   record reflect this witness has identified the

25   Defendant in this case.

1          THE COURT:  All right.

2      Q.  (By Mr. Rizzo)  Do you know him as Doby

3  or DeWayne or what do you know him as?

4      A.  Doby.

5      Q.  And do you know -- do you know somebody

6  by the name of Shon?

7      A.  Yes.

8      Q.  And is that Shon Glaspie?

9      A.  Yes.

10      Q.  And did you know Ghetto?

11      A.  Yes.

12      Q.  And that is Elijah Joubert?

13      A.  Yes.

14          MR. RIZZO:  May I approach this

15  witness, Your Honor?

16          THE COURT:  Yes.

17      Q.  (By Mr. Rizzo)  I'm going to show you

18  what's marked State's Exhibit No. 147.  You've

19  seen this before, have you not?

20      A.  Yes, sir.

21      Q.  And does this fairly and accurately

22  depict all three of the people we just named?

23      A.  Yes.

24          MR. RIZZO:  Your Honor, after

25  tendering to Defense counsel, State will offer

72

 1   State's Exhibit No. 147 into evidence.

 2                MS. MULDROW:  May I approach, Your Honor.

 3                THE COURT:  Okay.

 4                (Bench conference:)

 5                MS. MULDROW:  Two things.  I believe

 6   it goes back to the I.D. hearing, but secondly,

 7   more importantly, I'm going to have to reserve my

 8   cross because we asked Mr. Rizzo who would be

 9   testifying and I specifically asked him if the

10   Hubbard sisters would be testifying.  He did not

11   list them as witnesses and he specifically told me

12   no.  So I won't be ready to pursue the cross that

13   I would have been ready for had I been given

14   notice.

15                MR. RIZZO:  The only thing I can say

16   is I'm doing the best bringing as many people as

17   we can.  We put through four -- three or four on

18   fast this morning.  So I don't even know how

19   many -- I did tell you that we thought we would

20   put the gun people on.

21                MS. MULDROW:  Right.

22                MR. RIZZO:  That is true.  That is

23   true.

24                MR. LAFON:  For the record, it was

25   intended that we were going to call the Medical

1  Examiner today.

2              MR. RIZZO:  She's sick.

3              MR. LAFON:  She's sick and was not

4  able to come in.

5              THE COURT:  That doesn't last that

6  long.  It's not that complicated.

7              MR. RIZZO:  I guess I should put on

8  the record, though, that there is an -- I mean,

9  it's not a total surprise.  As a courtesy, of

10 course, I would not try to blind side Defense

11 counsel and tell which one was coming and which

12 one wasn't, but we just -- we moved faster than we

13 could.  And also there's no M.E.  so what she's

14 saying is correct.

15             MS. MULDROW:  I'll do what I can,

16 but if I have to reserve, I'm letting the Court

17 know I won't be able to complete it if I get

18 there.  If I see that I get there, I'm just

19 letting you know that's the reason why.

20             THE COURT:  What have you not done.

21             MS. MULDROW:  She gave three

22 different statements.  She gave me the names of

23 six witnesses.  I worked on looking at Grand Jury,

24 former testimony, police reports as well as any

25 written or oral statements that they made last

74

```
 1  night.  I would have done that for this witness.
 2              THE COURT:  Except for the Grand
 3  Jury testimony, you've had for two years.
 4              MS. MULDROW:  No.  The Grand Jury
 5  testimony was released.
 6              THE COURT:  I said all but the Grand
 7  Jury testimony you've had for two years.
 8              MS. MULDROW:  I understand, Judge,
 9  I'm just letting you know that.  That's all I'm
10  saying.  We'll proceed.
11              (Proceedings continued:)
12              THE COURT:  Okay.  Do you have any
13  objection to 147.
14              MS. MULDROW:  Other than previously
15  mentioned, Your Honor, regarding I.D.
16              THE COURT:  Overruled.  147 is admitted.
17              (State's Exhibit No. 147 offered and
18  admitted.)
19            DIRECT EXAMINATION CONTINUED
20  BY MR. RIZZO:
21      Q.  Let me talk to you -- how long have you
22  known, first of all, the Defendant in this case,
23  Doby?
24      A.  I don't really know Doby.  I know of
25  Doby.
```

     1      Q.   Have you ever spoke to him before at The

     2 VA?

     3      A.   As far as speaking, hi, bye.

     4      Q.   So you know him by face?  You know him by

     5 name?

     6      A.   Uh-huh.

     7      Q.   And then how about Ghetto?

     8      A.   Yes, I know Ghetto.

     9      Q.   And how is it -- how long did you know

    10 Ghetto?

    11      A.   Ever since '96.

    12      Q.   Okay.  And how was it that you first met

    13 Ghetto?

    14      A.   Me and him got into a confrontation.

    15      Q.   You got into a confrontation?

    16      A.   Yes.

    17      Q.   Okay.  Did you win or lose?

    18      A.   I don't know.

    19      Q.   All right.  And did you also -- how long

    20 have you known Shon?

    21      A.   Since '90 -- I'll say '96, too.

    22      Q.   '96, also?

    23      A.   Uh-huh.

    24      Q.   And these are all three you've known from

    25 The VA?

1     A.   Uh-huh.  Yes, sir.

2     Q.   Okay.  And how many of them actually

3  lived in The VA?  Did Ghetto live in The VA or he

4  would just hang there?

5     A.   I think Ghetto just hung in The VA.  I

6  don't know if he actually lived in there.  I know

7  Shon's mother used to live there.

8     Q.   Shon's mom?

9     A.   Yes.

10    Q.   And then how often did you see these

11 guys -- before this offense, of course, how often

12 would you see them at The VA?

13    A.   Shon and Ghetto I would see them every

14 other day.

15    Q.   Okay.  And Doby?

16    A.   I barely seen Doby over there.

17    Q.   Okay.  Were these all three friends?

18    A.   Yes.

19    Q.   Let me ask you, also, on April 3rd of

20 2003, at about 8:00 in the morning, did you see

21 all three of them out there in the parking lot?

22    A.   Yes.

23    Q.   And where -- where were they located when

24 you first saw them?

25    A.   It was -- well, the car was parked in the

77

```
 1   parking lot, but they was standing behind the car
 2   like up on the sidewalk slab.
 3        Q.   Okay.   Who -- what kind -- which car was
 4   it?
 5        A.   I think it was the Lumina that was out
 6   there, the Lumina.   I don't remember.
 7        Q.   How many cars did Shon drive back then?
 8        A.   Shon, I was always see him in two cars.
 9        Q.   What cars would they have been?
10        A.   The Lumina and the Grand Am.
11        Q.   And the Grand Am --
12             MR. RIZZO:   May I approach this witness.
13             THE COURT:   Yes.
14        Q.   (By Mr. Rizzo)   I'm showing you what's
15   marked State's 159.   Is that Shon -- does that
16   look like Shon's Grand Am?
17        A.   Yes.
18        Q.   Okay.   And he also had a white -- or
19   drove another white Lumina?
20        A.   Yes, sir.
21        Q.   All three, were they standing behind the
22   vehicles?
23        A.   When I came out the door, Ghetto was
24   standing behind it.   Doby was standing behind the
25   car, but like up -- farther up by the slab.   Shon
```

```
 1   was on the side of the car on the driver's side.
 2        Q.   Okay.  And were they talking?
 3        A.   Shon and Ghetto was talking.
 4        Q.   And Doby was standing up at the car, but
 5   on the other side of it?
 6        A.   Uh-huh.
 7        Q.   All right.  And you have to answer yes or
 8   no?
 9        A.   Yes, sir.
10        Q.   What was Shon saying?
11        A.   Shon was looking over to Ghetto and he
12   asked Ghetto was we -- no, Ghetto asked Shon, "Are
13   you ready to go do this".
14        Q.   Okay?
15        A.   And when I walked clearly close by Shon,
16   they all spoke and I just went into my godsister's
17   house.
18        Q.   They spoke to you?
19        A.   Uh-huh.
20        Q.   You have to answer yes or no?
21        A.   Oh, yes, sir.
22        Q.   All right?
23        A.   My apologies.
24        Q.   Now, when you -- you said was it Shon or
25   was it Ghetto that made the thing -- the comment,
```

79

```
 1    "Are you getting ready to go do this"?

 2         A.   Ghetto.

 3         Q.   Ghetto.  Did either -- any of these three

 4    have a job?

 5         A.   Not that I knew of.

 6         Q.   Did you ever know of them ever having a job?

 7         A.   No.

 8         Q.   And was it typical -- did you know

 9    whether it was typical to see them up that early

10    in the morning?

11         A.   No, it wasn't.

12         Q.   Now, did Ghetto answer Shon are you --

13    when he said -- when Shon said, "Are you ready to

14    go do this"?

15         A.   I don't remember if he did or not.

16         Q.   Did -- you can't remember if Ghetto made

17    any comments?

18         A.   No, I can't remember that.

19         Q.   Okay.  Do you remember -- when you heard

20    them making that comment, did you have an opinion

21    as to what they were saying?

22         A.   Yeah.

23         Q.   What was it?

24              MS. MULDROW:  Relevance, Your Honor.

25              THE COURT:  Overruled.
```

1      A.   I knew they was about to go do something

2  they didn't have any business doing.

3      Q.   Something illegal?

4           MS. MULDROW:   Speculation, Your

5  Honor.

6           THE COURT:   Sustained.

7      Q.   (By Mr. Rizzo)   What did you mean

8  something that they had no business doing?   What

9  specifically were you -- did you think -- was in

10 your mind?

11          MS. MULDROW:   Reurge it.

12          THE COURT:   Sustained as to

13 speculation.

14     Q.   (By Mr. Rizzo)   Okay.   You said that you

15 thought they were going to be doing something they

16 shouldn't be doing.   What did you do after you

17 heard this and where did you go?

18     A.   I went into my godsister's house, Tonya

19 Barnes (sp.ph.)  and we sat in there, we cooked

20 breakfast and we was watching T.V.

21     Q.   All right.   Now, after -- did you see

22 these three guys again at that -- within the next

23 few minutes or is that the last you saw them at

24 that point?

25     A.   When I came back outside of my door --

```
 1  outside of Tonya Barnes' door, that was about, I'd
 2  say, about 30 minutes after going in the door
 3  because I had to go back and get something from my
 4  house, I seen Shon by the driver door and he was
 5  loading his clips in a gun.
 6       Q.   Did you ever see his gun before?
 7       A.   Yeah.
 8       Q.   Could you describe the gun that Shon
 9  carried?
10       A.   Shon had a -- I think it was a .45
11  or .357.  It looked like one of them.  It was
12  silver with, like, a black handle.
13       Q.   Do you remember him -- did he carry it in
14  anything?
15       A.   In a silver briefcase.
16            MR. RIZZO:  May I approach this
17  witness?
18            THE COURT:  Yes.
19       Q.   (By Mr. Rizzo)  I'm going to hand you
20  what's marked State's Exhibit 189 and ask if you
21  can identify this?
22       A.   Yes.
23       Q.   What is this?
24       A.   This is the briefcase where they put,
25  like, Jordan shoes in or something.
```

```
 1      Q.   Okay.  Does this look like the briefcase
 2  that Shon carried?
 3      A.   Yes.
 4      Q.   Do you know what he kept inside this
 5  briefcase?
 6      A.   His gun.
 7      Q.   And the gun you're referring to, did it
 8  have anything unusual on it?
 9      A.   If it did, I didn't really pay attention
10  to it.
11      Q.   I'm sorry, ma'am.  I can't hear you?
12      A.   No, I didn't really pay attention to it.
13           MR. RIZZO:  May I approach this
14  witness.
15           THE COURT:  Yes.
16           (Bailiff checking weapon.)
17           THE BAILIFF:  It's clear, Judge.
18           THE COURT:  All right.
19      Q.   (By Mr. Rizzo)  I'm going to hand you
20  what's marked State's 215, and ask if you
21  recognize that?
22      A.   Yes.
23      Q.   And what is that?
24      A.   That's a .45.
25      Q.   Does this look like Shon's gun?
```

83

1        A.    The built-in infrared -- yes.

2        Q.    And does it have something unusual that

3   you would recognize as to be Shon's gun?

4        A.    With the built-in infrared beam on it.

5        Q.    Okay.  So you said that you saw him with

6   the gun?

7        A.    Yes.

8        Q.    And what was he doing?

9        A.    He had already loaded one clip and he put

10   it in the gun.  He load up the second clip and he

11   put it back -- the second clip in the briefcase.

12        Q.    Are you referring to (indicating)?

13        A.    Yes.

14        Q.    He put bullets in the clip?

15        A.    Yes.

16        Q.    And then he put the clip in

17   (demonstrating with weapon)?

18        A.    Yes.

19        Q.    And then what did he do with that second

20   clip?

21        A.    The second clip, he took the bullets out

22   the briefcase, he load them up.  When he load the

23   second clip up, he put it back in the briefcase.

24        Q.    Okay.  Approximately noon did you talk to

25   someone?  Did you have an occasion to talk to

84

1    Ju-Ju?

2         A.   Yes.

3         Q.   And after you spoke with Ju-Ju -- who's

4    Ju-Ju by the way?

5         A.   Ju-Ju is the guy that hangs around in The

6    VA.

7         Q.   And Ju-Ju, is he outside waiting to

8    testify?

9         A.   Yes.

10        Q.   Ju-Ju has a -- how do I describe this?

11   Ju-Ju's got an alcohol problem?

12        A.   I guess, yes.

13        Q.   Does he -- do you see him not drunk very

14   often?

15        A.   Yes.

16        Q.   Oh, you do.  Okay.  Early morning?

17        A.   In the evening time.

18        Q.   Okay.  Now, after you talked to Ju-Ju,

19   where did you go?

20        A.   After I talked to Ju-Ju, I went down the

21   driveway to a meat truck.

22        Q.   Yes?

23        A.   And I was getting some meat off the

24   truck.

25        Q.   After you got the meat, where did you go?

85

1      A.   I went back in my house, combed my hair.

2  And at that time my sister pulled up -- no, she

3  called me.  And we was talking on the phone.

4      Q.   Now, what time would that have been,

5  approximately?  Would it have been morning?

6  Afternoon?

7      A.   No, my sister called me.  It was

8  approximately about 1:00, 1:30.

9      Q.   And did your sister -- is that LaTonya?

10     A.   Yes.

11     Q.   Did she and Letisha ever show up at The

12  VA?

13     A.   Yes.

14     Q.   And did you talk to them?

15     A.   Yes.

16     Q.   What did you talk about?

17     A.   The shooting at the -- at the check

18  cashing place.

19     Q.   And was the shooting that occurred that

20  day at the check cashing place, was that big news

21  at The VA?

22     A.   Yes.

23     Q.   Was The VA -- by midafternoon was that

24  place buzzing with police officers or not yet?

25     A.   I don't think not yet.  I don't remember.

1      Q.    Okay.  Was there a lot of talk about it,

2  though?

3      A.    Yes.

4      Q.    And without saying what they said, what

5  were you talking about?

6      A.    I told my sister that I had seen them out

7  there that morning.  I told her what I had

8  overheard and I told her that Ju-Ju had came up to

9  me after I got out the shower and told me about

10  that they really went and did it.  And that was

11  basically it.

12      Q.    And so you talked to your sister about

13  that.  And what did you want to do?

14      A.    I told her I was going downtown to let

15  them know.

16      Q.    Turn them in?

17      A.    Uh-huh.

18      Q.    Did you -- why were you going to turn

19  them in?

20      A.    Because I knew of her.  I didn't know

21  her, but I knew of her from my old neighborhood

22  round by Crestmont and Belfort and Martin Luther

23  King.  We all grew up in the same neighborhood.

24  And she had just had a baby.

25      Q.    You're talking about Ms. Jones?

87

```
 1        A.   Yes.

 2        Q.   And that was the reason you wanted to

 3   turn them in?

 4        A.   Yes.

 5        Q.   Okay.  Now, did you ever call HPD?

 6        A.   Yes, I did.

 7        Q.   And who did you talk to?

 8        A.   I think it was Sergeant Kennedy.

 9        Q.   Did you -- when you first called, did you

10   give the names of three people?

11        A.   Yes, I did.

12        Q.   And what three people did you give when

13   you first called?

14        A.   Shon, Ghetto and the first one was Deuce.

15        Q.   Okay.  Now, Deuce, that's not this guy,

16   Doby, is it?

17        A.   No.

18        Q.   And why did you give them Deuce's name?

19        A.   This picture on the T.V. that they were

20   showing it looked like Deuce, but it wasn't Deuce.

21        Q.   It wasn't Deuce?

22        A.   No.

23        Q.   Okay.  You were not at the scene of the

24   offense itself?

25        A.   No.
```

1    Q.   Now, you had seen all three of them

2  together that morning at a time when they were

3  loading up or at least Shon was loading up his

4  gun?

5    A.   Yes.

6    Q.   And there was talk about going to do

7  something --

8              MS. MULDROW:  Leading, Your Honor.

9              THE COURT:  Sustained.  Do not lead

10 your witness.

11   Q.   (By Mr. Rizzo)  The question I had was

12 why would you give Deuce's name when you saw those

13 three guys together?

14   A.   Because Deuce was out there that morning.

15 I just didn't remember where he went or whereabout

16 he was.  But he was out there talking with Shon.

17 What about, I don't know.

18   Q.   Okay.  Was he at the car when they were

19 loading up the gun, though?

20   A.   No, I didn't see him at the car then.

21   Q.   Was he at the car when they were talking

22 about making that statement?

23   A.   No.

24   Q.   Did you give a statement to the police?

25   A.   Yes, I did.

89

```
 1        Q.   And then did you go home?

 2        A.   Yes.

 3        Q.   Did you -- after that did you try and

 4   help the police in locating the guns that were

 5   used in the offense?

 6        A.   Yes.

 7        Q.   And who did you talk to concerning that?

 8        A.   Sergeant Kennedy.

 9        Q.   Okay.  About two weeks later did you get

10   some kind of a reward for doing it?

11        A.   Yes, but it wasn't two weeks later.

12        Q.   How long later was it?

13        A.   I think it was like a month later.

14        Q.   What did you get?

15        A.   $10,000.

16        Q.   10,000 from where?

17        A.   From CrimeStopper's.

18        Q.   And did you -- did you know at the time

19   you gave the statement that you were going to get

20   a reward?

21        A.   No.

22        Q.   Was it in your mind at all?

23        A.   No.

24             MR. RIZZO:  Pass the witness.

25             THE COURT:  Ms. Muldrow.
```

90

```
 1                    CROSS-EXAMINATION
 2  BY MS. MULDROW:
 3       Q.   Good morning, ma'am?
 4       A.   Good morning.
 5       Q.   And you gave a written statement at 3:30
 6  p.m. on the day of the ACE robbery --
 7       A.   Yes, ma'am.
 8       Q.   -- when Ms. Jones was killed?
 9            And you then gave a statement the
10  day you saw a lineup and for the first time saw
11  Mr. Doby in the lineup.
12       A.   Yes, ma'am.
13       Q.   You didn't testify before the Grand Jury,
14  did you?
15       A.   No, ma'am.
16       Q.   But you have testified previously?
17       A.   Yes, ma'am.
18       Q.   Give me a moment.  I'm going to pull out
19  your statements?
20            MR. RIZZO:  For purposes of the
21  record, I'm handing Defense counsel a copy of a
22  written statement that was given on 4/3 at 3:30 as
23  well as prior testimony, a transcript.
24            THE COURT:  All right.
25       Q.   (By Ms. Muldrow)  Ms. Hubbard, did you
```

91

```
 1   have an opportunity to review your original
 2   statement, the statement you gave on the day the
 3   ACE robbery occurred?
 4        A.   You mean the first statement?
 5        Q.   The very first statement, ma'am?
 6        A.   Yes, ma'am.
 7        Q.   You've had a chance to read it before you
 8   testified today?  Did Mr. Rizzo cover your first
 9   statement at all before you took the stand today?
10        A.   He called me in his office, yes.
11        Q.   And did you have an opportunity to read
12   your statement?
13        A.   Yes, I did.
14        Q.   Okay.  And you definitely saw Deuce that
15   morning out there talking with Shon?
16        A.   Uh-huh.
17        Q.   Is that a yes?
18        A.   Oh, yes, ma'am.
19        Q.   All right.  And I believe you told
20   Mr. Rizzo you don't know what he was talking with
21   Shon about?
22        A.   Yes, ma'am.
23        Q.   You described Deuce as being about
24   five-seven; is that correct?
25        A.   Yes, ma'am.
```

92

1     Q.   Weighs about 225?

2     A.   Yes, ma'am.

3          MR. RIZZO:  For purposes of the

4     record, Your Honor, I'm tendering to Defense

5     counsel the third statement.

6          THE COURT:  Okay.

7     Q.   (By Ms. Muldrow)  And I believe on your

8     statement on April the 3rd, you told the police

9     that Ju-Ju came by your apartment earlier that

10    morning around 11:15 while you were watching

11    "Family Feud"?

12    A.   No, I told them it was 12:00 -- that

13    noon.  That's what time "Family Feud" come on.

14    Q.   I wouldn't know so I'm just going to

15    tender your statement.

16         Why don't you read right there

17    (indicating)?  And if you need to reread the whole

18    statement, Ms. Hubbard, feel free to do so, to

19    yourself.

20    A.   (Witness reviewing document.)  This is

21    not correct (indicating).

22    Q.   That particular part.  Okay.  I'll ask

23    about it.  Everything else -- read the next line?

24         MR. RIZZO:  I'm sorry.  I can't

25    hear.

93

```
 1              MS. MULDROW:  Well, I was going to
 2    ask her about it, but I don't want to mark on the
 3    statement.
 4         A.   (Witness reviewing document.)
 5         Q.   (By Ms. Muldrow)  And you can use these
 6    stickies -- thank goodness for Post-it's -- any
 7    place where you want me to ask you about something
 8    that you don't agree with.
 9         A.   (Witness continued reviewing document.)
10    Did you want me to go ahead and read this whole
11    page, too?
12         Q.   Yes.  Go ahead and finish reading the
13    whole thing.
14         A.   (Witness continued reviewing document.)
15         Q.   Is that it?
16         A.   Uh-huh.
17         Q.   So was it noon or 11:15 or do you know?
18         A.   It was noon, at 12:00.
19         Q.   So if you told the police officer on that
20    very day that it was at 11:15 in the morning, that
21    was off by about 45 minutes?
22         A.   Yes, ma'am.
23         Q.   All right.  But at any rate, Ju-Ju -- and
24    you don't know his real name, but Ju-Ju came over
25    to talk to you?
```

94

```
 1       A.   Yes, ma'am.

 2       Q.   Ju-Ju asked you if you knew Shon --

 3            MR. RIZZO:  Objection, hearsay.

 4            THE COURT:  Sustained.

 5       Q.   (By Ms. Muldrow)  You got your

 6  information from Ju-Ju?

 7            MR. RIZZO:  Objection, hearsay, Your

 8  Honor.

 9            THE COURT:  Sustained.

10       Q.   (By Ms. Muldrow)  And the reason why you

11  picked Deuce was based on a conversation you had

12  with Ju-Ju?

13       A.   No, not just based on the conversation I

14  had with Ju-Ju, because I had seen him out there

15  that morning and then after I talked to Ju-Ju.

16       Q.   Precisely.  Okay.  In fact, you told the

17  police in addition to Ju-Ju's height -- give me

18  one moment -- that you saw Deuce and Ghetto get

19  into the Grand Am -- into the Grand Am that Shon

20  was in?

21       A.   No.

22       Q.   You didn't?  Excuse me.  Shon was in the

23  Lumina?

24       A.   Uh-huh.  Yes, ma'am.

25       Q.   And Deuce and Ghetto got into the Grand
```

 1    Am and Deuce was driving?

 2         A.   No, ma'am.

 3         Q.   I want you to read this paragraph

 4    starting "when" and then stop at "morning."

 5         A.   Okay.  (Witness reviewing document.)

 6              No, ma'am.  I did not give that

 7    statement.

 8         Q.   Do you know what a notary public is?

 9         A.   Yes.

10         Q.   Okay.  That's somebody that puts a stamp

11    on it and you swear that you're the same person

12    who appeared and signed a particular sheet of

13    paper?

14         A.   (Nods head.)

15         Q.   All right.  I want you to look at this

16    exhibit.  Okay?

17              MS. MULDROW:  And for purposes of

18    the record it will be a Defense exhibit.

19              (Defendant's Exhibit No. 2 marked.)

20         Q.   (By Ms. Muldrow)  Do you remember seeing

21    Defendant's Exhibit No. 2, this witness statement?

22    Do you remember looking at this?

23         A.   Yes, ma'am, but I didn't read it.  I just

24    signed it.  We was at the police station to about

25    8:00, 8:30 at night and I was tired.  I signed it

96

1  and notarized it.  I assumed they would put down

2  what I gave them.

3       Q.   All right.  And do you remember starting

4  around 3:30?

5       A.   Yes.

6       Q.   Okay.  Do you remember signing each

7  sheet?

8       A.   Yes.

9       Q.   They didn't give you an opportunity to

10 read?

11      A.   I didn't read it.  I just signed it and

12 that was it.

13      Q.   They didn't give you an opportunity?

14      A.   Yes, they gave me an opportunity to read

15 it, but I did not read it.  I chose not to.  I was

16 hurting.  I was tired.  I was ready to go home.

17      Q.   Okay.  So you didn't know if he had typed

18 it incorrectly?

19      A.   No, I didn't.

20      Q.   And you would agree with me if you -- if

21 there was a statement in there about you watching

22 as Deuce and Ghetto got into -- getting into a

23 Grand Am and Deuce driving, that's something that

24 you would have recognized as being --

25      A.   Yes ma'am.

97

1      Q.    -- truthful or not true, correct?

2      A.    Yes, ma'am.

3      Q.    Okay.  And you didn't correct -- you

4  didn't correct this on this form, did you?

5      A.    What you mean?

6      Q.    You didn't line it out as being untrue?

7      A.    No, ma'am.

8      Q.    You signed it?  You signed this page?

9      A.    I signed it.

10      Q.    You signed each page, didn't you?

11      A.    Yes, ma'am.

12      Q.    And it appears that there's a notary

13  public's signature --

14      A.    Yes, ma'am.

15      Q.    -- on each page underneath your

16  signature, isn't there?

17      A.    Yes, ma'am.

18      Q.    And at the very end you swore you were

19  told about the offense of perjury?

20      A.    Yes, ma'am.

21      Q.    And you were told that a person commits

22  the offense of perjury if with the intent to

23  deceive -- that means to lie --

24      A.    Uh-huh.

25      Q.    -- and with knowledge of the

98

1    statements -- meaning you make a false statement

2    under oath that you swear to be truth of a false

3    statement previously made.  You understand that?

4        A.   Yes.

5        Q.   And you signed your name?

6        A.   Yes.

7        Q.   And it was sworn to by this notary

8    public?

9        A.   Yes.

10       Q.   Okay.  And you signed your name on it,

11   correct?

12       A.   Didn't I say yes?

13       Q.   Did you sign your name on it?

14       A.   Yes.

15            MS. MULDROW:  I'm going to offer

16   Defendant's Exhibit No. 2, Your Honor.

17            MR. RIZZO:  Can we approach the

18   bench, Your Honor.

19            THE COURT:  Yes.

20            (Bench conference:)

21            MR. RIZZO:  Your Honor, it's a

22   sleazy trick Defense counsel is doing by

23   attempting to offer something she knows is

24   inadmissible, she knows is hearsay in front of

25   this jury and requiring me to object to it in

1   front of the jury.  I object to not only the

2   introduction of that evidence, but also Defense

3   counsel offering something that she knows is

4   inadmissible forcing the State to be -- to object

5   to it in front of the jury.  First year law

6   students know that's not admissible.

7                  THE COURT:  I sustain the objection.

8                  (Proceedings continued:)

9                  THE COURT:  Please retire to the

10  jury room.

11                 THE BAILIFF:  All rise.

12                 (Jury retired.)

13                 THE COURT:  Be seated.  Approach the

14  bench.

15                 (Bench conference:)

16                 THE COURT:  Okay.  What's your

17  objection.

18                 MR. RIZZO:  The objection is

19  hearsay.

20                 THE COURT:  Sustained.

21                 You know better than that.  Anybody

22  knows better than that.  No witness statements are

23  admissible.  They're hearsay.

24                 MS. MULDROW:  May I proceed?

25                 THE COURT:  Sure.

```
 1                    (Short recess.)

 2                    THE BAILIFF:  All rise.

 3                    (Jury seated.)

 4                    THE COURT:  Ms. Muldrow.

 5                    MS. MULDROW:  Thank you.

 6                 CROSS-EXAMINATION CONTINUED

 7  BY MS. MULDROW:

 8       Q.   I believe you mentioned that Ghetto,

 9  Deuce and Shon all three hang around Nikki's

10  apartment at -- I think her apartment is 250.  Do

11  you remember saying that?

12       A.   253.

13       Q.   253.  The statement has 250?

14       A.   253.

15       Q.   All right.  But did you say that?

16       A.   253.

17       Q.   I'm sorry, ma'am.  Did you say that all

18  three of them, Deuce, Ghetto and Shon, hang around

19  Nikki's apartment?

20       A.   Yes, ma'am.

21       Q.   Do you recall also saying that when you

22  saw the three of those guys on that morning, that

23  Shon had his .45 lying on the hood of the Lumina?

24       A.   Yes.

25       Q.   Did you ever know Deuce to have a gun?
```

```
 1        A.    If he did, I didn't see it.

 2        Q.    Not on that day.  Have you ever known him

 3   to handle a gun, Deuce?

 4        A.    Have I ever known him to handle one or

 5   have one?

 6        Q.    Both.

 7        A.    Yes.

 8        Q.    Any particular kind you've ever seen him

 9   with?

10        A.    No, ma'am.

11        Q.    All right.  In fact, in your statement

12   you stated that you know that Deuce has a gun, do

13   you remember saying that, but you didn't know what

14   kind?

15        A.    I don't remember if I said that or not.

16        Q.    All right.  Let me show it to you, ma'am.

17   Right here (indicating)?

18        A.    (Witness reviewing document.)

19        Q.    Do you remember saying that now, ma'am?

20        A.    Yes, ma'am.

21        Q.    And when you saw Shon with his .45, you

22   said that you saw him loading clips with bullets?

23        A.    Yes, ma'am.

24        Q.    Okay.  And Deuce and Ghetto were near by?

25        A.    Well, Shon was loading the clip.  Ghetto
```

```
 1  was right there.  Deuce was not out there.

 2       Q.   Where was Deuce?

 3       A.   I assume he left.

 4       Q.   So, if your statement says that Deuce and

 5  Ghetto got into the Grand Am together --

 6       A.   Nope.  No, I did not make that statement.

 7       Q.   It's just in here?

 8       A.   Thank you.  Because I did not make it.

 9       Q.   And the part about Shon getting into the

10  Lumina, do you remember saying that?

11       A.   Yes.

12       Q.   Do you remember also saying that Deuce

13  drove off with Shon following him?

14       A.   No.

15       Q.   You don't remember that part?

16       A.   No.

17       Q.   That would be something critical to

18  remember, wouldn't you agree?

19       A.   Yes, ma'am.

20       Q.   Okay.  And that this was shortly after

21  8:00 a.m. on this morning, meaning April the 3rd,

22  when they -- they drove off?

23       A.   Yes, ma'am.

24       Q.   Okay.  And you specifically remember

25  saying that?
```

1    A.   Saying which part?

2    Q.   With reference to the statement that you

3  gave on the morning -- excuse me -- the afternoon

4  of April the 3rd of 2003, "this was shortly after

5  8:00 a.m. this morning when they drove off"?

6    A.   Drove off.  "They" wasn't meaning Deuce.

7    Q.   You just meant?

8    A.   "They," Shon and Ghetto.

9    Q.   So this part about Deuce mentioned three

10  times in that paragraph doesn't stand out for you?

11   A.   No, ma'am.

12   Q.   In fact, there are essentially three

13  pages of your conversations with this police

14  officer; is that correct?

15   A.   Yes, ma'am.

16   Q.   Sergeant Kennedy?

17   A.   Yes, ma'am.

18   Q.   All right.  And let's look on Page 1.

19  Let's see the number of times you mention the word

20  "Deuce" in this statement?

21   A.   Uh-huh.

22   Q.   Two times on Page 1, would you agree --

23   A.   Uh-huh.

24   Q.   -- Deuce's name is brought up?

25        And there's at least one time where

```
 1   you mention you knowing all three of these guys

 2   from the apartment complex.

 3        A.   Yes.

 4        Q.   Okay.  And all three of them do certain

 5   illegal activity?

 6        A.   Two for sure.

 7        Q.   Okay.  I'm talking about what's on your

 8   statement --

 9        A.   Uh-huh.  I know.

10        Q.   -- it says all three, doesn't it?

11        A.   Uh-huh.

12        Q.   So that's two times that you mention the

13   word "three," correct?

14        A.   Yes.

15        Q.   Okay.  And on Page 2 you mention the

16   description of Shon, six-three, skinny, loves --

17   carries both a .45 and an Uzi?

18        A.   Not an Uzi.  A .45.

19        Q.   Okay.  Read this (indicating).

20        A.   .45.  The Uzi, no.

21        Q.   But it's in your statement?

22        A.   Yes.

23        Q.   And you also -- in your statement both

24   guns are always kept in the briefcase?

25        A.   Yes.
```

1     Q.   You mentioned that Ghetto carries a .45

2  and a .357.  That's in your statement?

3     A.   Yes.

4     Q.   Okay.  Go to Page 2 -- I mean, excuse me,

5  Page 3.  Let's count Deuce.  Five times Deuce's

6  name is mentioned on Page 3; is that correct?

7     A.   Yes.

8     Q.   Zero times for Alfred Brown or Doby;

9  isn't that correct?

10     A.   Yes.

11     Q.   In fact, it wasn't until you went to a

12  lineup two days later and you saw Mr. Brown in the

13  lineup that you remembered that he was out there;

14  isn't that correct?

15     A.   Yes.

16     Q.   And you also remembered that Ju-Ju came

17  by and talked to you later on after he first told

18  you about this ACE --

19     A.   Yes.

20     Q.   -- with Shon, Ghetto and Deuce; is that

21  correct?

22     A.   Did you say "with Shon, Ghetto and

23  Deuce".

24     Q.   With Shon, Ghetto -- in other words, the

25  story about Shon, Ghetto and Deuce at the ACE?

1       A.   Oh, yes, ma'am.

2       Q.   So the only reason why you named Deuce in

3  your statement was not based on something you saw,

4  but what Ju-Ju told you?

5       A.   The only reason why what now?

6       Q.   You named Deuce in your first

7  conversation on the very day that Ms. Jones was

8  murdered.  Okay?

9       A.   Uh-huh.

10       Q.   The only reason why you named Deuce was

11  because of something Ju-Ju told you?

12       A.   I seen him out there that morning, but

13  the only reason why I thought he done it was after

14  Ju-Ju mentioned his name.

15       Q.   Okay.  And it didn't occur to you to

16  mention everybody else who was out there when it

17  first happened?

18       A.   When it first happened.

19       Q.   When you first saw it, all of them

20  together.  Is that what you're saying?

21       A.   Yes.

22       Q.   It didn't occur to you to mention

23  everybody?

24       A.   In my first statement it should have been

25  in there.  I did mention Doby before I seen him in

1    the lineup.  But he did not get in the car, so

2    that's why I didn't put it in the statement.  But

3    I did mention his name.

4         Q.   Who did you mention it to?

5         A.   Sergeant Kennedy.

6         Q.   So that's something else that you didn't

7    see in your first statement and you didn't think

8    to bring out?

9         A.   (Shakes head.)

10        Q.   So in your second statement when you

11   mentioned that, "When I saw "D" in the lineup I

12   remembered that he was out there, too," is that

13   true or false?

14        A.   That's true.

15        Q.   Okay.  So you had forgotten in your first

16   statement?

17        A.    No, I hadn't forgotten in the first

18   statement.  I said I remembered he was out there.

19   I mean, they didn't put that in my first

20   statement.  That's what me and Sergeant Kennedy

21   was talking about.

22        Q.   Okay?

23             MS. MULDROW:  Pass the witness.

24             THE COURT:  Mr. Rizzo.

25             MR. RIZZO:  Just a couple of

1   questions.

2                    REDIRECT EXAMINATION

3   BY MR. RIZZO:

4       Q.   Just so we can be clear about a couple of

5   things.  You gave two statements.  You gave an

6   initial statement after you called the police the

7   first time; is that right?

8       A.   Yes.

9       Q.   And I believe you just testified that you

10  named Deuce because of something that Ju-Ju had

11  told you?

12      A.   Yes.

13      Q.   All right.  You had another

14  conversation -- a conversation with Ju-Ju, is that

15  correct, after that?

16      A.   Yes.

17      Q.   And he cleared some things up concerning

18  Deuce's involvement, did he not?

19      A.   Yes.

20      Q.   And after that, you no longer thought it

21  was Deuce, did you?

22      A.   No, sir.

23              MS. MULDROW:  Leading, Your Honor.

24              THE COURT:  Overruled.  You may

25  answer the question.

```
 1              THE WITNESS:  Excuse me.

 2              THE COURT:  You may answer that

 3  question.

 4      A.   I forgot the question he just gave me.

 5      Q.  (By Mr. Rizzo)  I'll ask it again.  You

 6  had a second conversation with Deuce -- I'm

 7  sorry -- with Ju-Ju.  And when you had that

 8  conversation, your opinion changed as to who -- I

 9  believe you testified as to who the third person

10  was, did it not?

11      A.   Yes.

12      Q.   Okay.  Did you call and tell the police

13  that?

14      A.   Yes.

15      Q.   And did you put that in your second

16  statement?

17              MR. RIZZO:  If I may approach this

18  witness.

19              THE COURT:  Yes.

20      Q.  (By Mr. Rizzo)  (Indicating.)

21      A.   Yes.

22      Q.   So you did clear it up with them and did

23  clear up your first statement?

24      A.   Yes.

25      Q.   All right.  The other thing I was going
```

1  to ask you has to do -- and by clearing up, I'm

2  asking, did you -- did you name Doby as a third

3  party?

4      A.   Yes.

5      Q.   Okay.  Did you also -- just as a matter

6  of clarification.  At the time that person -- you

7  said that you saw Deuce out there at some point at

8  The VA that morning, I recall you saying?

9      A.   Yes.

10      Q.   At the time that -- at the time that Shon

11  was seen loading this gun and at the time that

12  Ghetto and Shon had made comments about getting

13  ready to go do something, was Deuce near that car?

14      A.   No.

15      Q.   Was this Defendant near that car?

16      A.   He was near it, but not right by it.  He

17  was behind it.  I'll say about two or three inches

18  from it.  He was all the way up on the slab.  They

19  was parked in the driveway.  He was like up that

20  way by the slab.

21      Q.   In front of the car or behind the car?

22      A.   No, behind the car.

23      Q.   Was the car backed in?

24      A.   Yes.

25      Q.   So he was standing right by the trunk on

1   the sidewalk there?

2        A.   No.   He -- this is the car backed up

3   right here (indicating).   He was, like, on the

4   sidewalk, on the slab, like, going to the sidewalk

5   by the mailbox, up that way.

6        Q.   Was Deuce anyplace around there at the

7   time that that comment was made?

8        A.   No.

9                MR. RIZZO:   Pass the witness.

10               THE COURT:   Ms. Muldrow.

11                   RECROSS EXAMINATION

12   BY MS. MULDROW:

13        Q.   And, of course, we're in agreement that

14   Doby's name is not mentioned at all in Defendant's

15   2, your first statement?

16        A.   No.

17        Q.   Correct?

18               MS. MULDROW:   Ma'am, will you mark

19   this as Defendant's 3?

20               (Defendant's Exhibit No. 3 marked.)

21        Q.   (By Ms. Muldrow)   I'm going to ask you,

22   ma'am, if you will read where I have it marked in

23   blue, that sentence, and the first two sentences

24   ending in "too," t-o-o.   So that one and then

25   these first two (indicating)?

1        A.    To right here (indicating)?

2        Q.    Yes, ma'am.

3        A.    (Witness complies.)

4        Q.    Now, this was on the day of the lineup

5    where you saw Mr. Brown whom you recognize as Doby

6    in the lineup; is that correct?

7        A.    Yes.

8        Q.    And this was in the afternoon.  This was

9    after the lineup that you gave this statement --

10       A.    Yes.

11       Q.    -- correct?

12             And the same placement of

13   signatures, meaning your name was signed on each

14   page and it looks like a notary by the name of Ted

15   Bloyd was signed underneath your signature; is

16   that correct.

17       A.    Yes.

18       Q.    And the information about perjury is on

19   the statement also; is that correct?

20       A.    Yes.

21       Q.    And the date and you swore to it?

22       A.    Yes.

23       Q.    And it appears that when you gave this

24   statement, you indicated that you saw the lineup

25   and you recognized "D," "D" being Doby; is that

1  correct?

2      A.   Yes.

3      Q.   And you indicated when you saw him in the

4  lineup, you realized that you saw him on the

5  morning of the incident at the check cashing

6  place; is that correct?

7      A.   Yes.

8      Q.   And that in your earlier statement when

9  you mentioned that you had seen Shon, Ghetto and

10  Deuce standing by the white Lumina when Shon took

11  out a .45 and loaded it, it's in this statement,

12  correct, you just read it, didn't you?

13      A.   Yes.

14      Q.   Okay.  It has your name on it, correct?

15      A.   Yes.

16      Q.   Not lined out at all as being incorrect,

17  is it?

18      A.   Yes.

19      Q.   Yes, it is or, no, it is not lined out?

20      A.   Yes, it's in there.  It's lined up.  I

21  signed it.

22      Q.   Okay.  And that when I saw "D" in the

23  lineup, I remembered that he was out there.  That

24  was only after you saw the lineup and you realized

25  that he was in the lineup; is that correct?

1        A.   No, ma'am.  I just told you earlier I

2   told them in my first statement about him, but

3   when I mentioned that he did not get in the car, I

4   guess they did not put my statement in my first

5   statement.

6        Q.   Okay.  And just like in the first

7   statement, you didn't line out the part about

8   Deuce getting in the Grand Am with Ghetto and Shon

9   following the Grand Am?

10       A.   No, I did not mention it.

11       Q.   Okay.  But it just happens to be there;

12   is that correct?

13       A.   If you say so.

14       Q.   Well, it's your signature?

15       A.   Okay.

16       Q.   Isn't that your signature on there?

17       A.   Yes, it is.

18       Q.   Okay.

19            MS. MULDROW:  Pass the witness.

20            THE COURT:  Mr. Rizzo.

21            MR. RIZZO:  Just one quick question.

22            FURTHER REDIRECT EXAMINATION

23   BY MR. RIZZO:

24       Q.   Your corrected statement was actually

25   made just a day later, was it not?  You can look

```
 1   on the date?

 2        A.   A day later what?

 3        Q.   It was a day later.  It was on the 5th of

 4   April; is that right?

 5        A.   If that's what it happened to be on the

 6   date, the 5th of April.

 7        Q.   Okay.  Let me see if I could, the first

 8   one was actually on the 3rd, so it was two days

 9   later.  So within a very short period of time?

10             If you could look through and it was

11   just a -- this is the one where you explained why

12   you named -- incorrectly named Deuce and you

13   correctly named Doby.  If you look through this,

14   in this little page and a half statement you name

15   this Defendant approximately ten times in just a

16   page and a half, don't you?

17             You can go through and count it if

18   you want.

19        A.   Yes.

20        Q.   Okay.

21             MR. RIZZO:  Nothing further, Your

22   Honor.

23             THE COURT:  Ms. Muldrow.

24             FURTHER RECROSS-EXAMINATION

25   BY MS. MULDROW:
```

```
 1        Q.   And eight times before the lineup it was
 2   Deuce, correct?
 3                  MR. RIZZO:   Objection.   Asked and
 4   answered.
 5                  THE COURT:   Sustained.
 6        Q.   (By Ms. Muldrow)   And $10,000 after the
 7   lineup; isn't that correct?
 8        A.   When was the lineup.
 9        Q.   $10,000 of CrimeStopper's money one
10   month -- anywhere from three weeks to one month
11   after the lineup; isn't that correct?
12        A.   Yes.
13                  MS. MULDROW:   Pass the witness, Your
14   Honor.
15                  MR. RIZZO:   Nothing further.
16                  THE COURT:   You may step down,
17   ma'am.
18                  THE WITNESS:   Thank you.
19                  THE COURT:   All right.   Let's go to
20   lunch.
21                  Please retire to the jury room.
22                  THE BAILIFF:   All rise.
23                  (Jury retired.)
24                  (Noon recess.)
25                     AFTERNOON SESSION
```