# EXHIBIT 6

**C.A. No. 4:-17-CV-01749;**
*Alfred Dewayne Brown v. City of Houston, et al.*

1                  REPORTER'S RECORD

2              Volume 39 of 41 Volumes

3            Trial Court No. 1035159

4         Court of Appeals No. AP-75,294

5

   THE STATE OF TEXAS     :  IN THE DISTRICT COURT OF

6                    :

   VS.               :  HARRIS COUNTY, T E X A S

7                    :

   ALFRED DeWAYNE BROWN   :  351ST JUDICIAL DISTRICT

8

9

10       _____

11             MOTION FOR NEW TRIAL

          _____

12

13

14        On the 4th day of January, 2006, the

15  following proceedings came on to be heard in the

16  above-entitled and numbered cause before the

17  Honorable Mark Kent Ellis, Judge presiding, held

18  in Houston, Harris County, Texas.

19        Proceedings reported by computerized

20  stenotype machine.

21

22

23          TONI GOUBEAUD, CSR NO. 5774
   Official Court Reporter - 351st Judicial District

24         1201 Franklin, 14th Floor
            Houston, Texas

25          (713) 755-5620

```
 1                 A P P E A R A N C E S

 2

 3   Attorney for the State:

 4        Mr. Daniel J. Rizzo
          SBOT No. 16965400
 5        Assistant District Attorney
          1201 Franklin
 6        Houston, Texas 77002
          Phone:  713-755-5800
 7

 8   Attorney for the Defendant:

 9        Mr. Charles Hinton
          SBOT No. 09709800
10        Attorney At Law
          P. O. Box 53719
11        Houston, Texas 77052-3719
          Phone:  832-603-1330
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          CHRONOLOGICAL INDEX

 2

 3   January 4, 2006                        Volume 39

 4        (Reporter's Note concerning September 2017 reprint:
          Please note that due to software and formatting changes
 5        since the original printing of record in 2006, page numbers
          on all indexes are approximate and may not line up exactly
 6        with re-print of record.)
                                                    Page
 7
     STATE'S WITNESSES:
 8
     BRIAN MICHAEL WEINER:
 9
          Direct Examination by Mr. Rizzo          12
10        Examination by The Court                 21
          Redirect Examination by Mr. Rizzo        35
11        Further Examination by The Court         36
          Further Redirect Examination
12             by Mr. Rizzo                        37
          Further Examination by The Court         38
13
     Witness sworn                                 41
14
     DASHAN GLASPIE:
15
          Direct Examination by Mr. Rizzo          41
16        Examination by The Court                 49

17   Witness sworn                                 52

18   PATRICK SMITH:

19        direct Examination by Mr. Rizzo          52

20   Court's ruling                                69
     Reporter's certificate                        70
21   Keyword Index

22

23

24

25
```

```
 1                    ALPHABETICAL INDEX

 2   January 4, 2006                    Volume 39

 3                                      Page

 4   GLASPIE, DASHAN:

 5        Direct Examination by Mr. Rizzo        41
          Examination by The Court               49
 6

 7   SMITH, PATRICK:

 8        direct Examination by Mr. Rizzo        52

 9
     WEINER, BRIAN MICHAEL:
10
          Direct Examination by Mr. Rizzo        12
11        Examination by The Court               21
          Redirect Examination by Mr. Rizzo      35
12        Further Examination by The Court       36
          Further Redirect Examination
13             by Mr. Rizzo                      37
          Further Examination by The Court       38
14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                    January 4, 2006

3               THE COURT:  We're here on 1035159,

4    the State of Texas versus Alfred DeWayne Brown.

5               For purposes of this hearing I'm

6    going to take judicial notice of all the documents

7    contained in the clerk's file in that cause number.

8               Back on October the 25th of 2005,

9    Mr. Brown was convicted by a jury of the offense

10   of capital murder alleged to have occurred on

11   April the 3rd of 2003.  Subsequent to that, at a

12   punishment hearing, the jury set the punishment at

13   the death penalty for Mr. Brown.

14               His case was appealed automatically

15   pursuant to Texas law.  The Court appointed two

16   lawyers to represent Mr. Brown, Mr. Hinton on the

17   direct appeal and Mr. Rosen on the Writ of Habeas Corpus.

18               In any event, the reason we're here

19   today is for a hearing on a Motion for New Trial.

20   The motion speaks for itself, but basically

21   alleges that the testifying co-defendant, Dashan

22   Glaspie, told an inmate at the Harris County Jail

23   that he was the actual shooter of the complainant

24   in the case upon which Mr. Brown was convicted.

25   And so the Motion for New Trial was filed.

1                 The State -- both sides have been

2     given an opportunity to prepare for the hearing

3     and so that's why we're here today.

4                 Defense ready to proceed?

5                 MR. HINTON:  The Defense is ready,

6     Judge.

7                 Two things.  One, I have a hearing

8     device in my right ear.  I don't think it's going

9     to affect anything, but occasionally if I look at

10    you, that means I didn't hear correctly.

11                THE COURT:  I apologize.

12                MR. HINTON:  The other thing is that

13    the Court has described accurately the situation

14    as I understand it.

15                We are ready to proceed.

16                As a preliminary note, you and I and

17    Mr. Rizzo have had some in-chamber discussions as

18    to how we might proceed at this hearing.  And part

19    of that discussion was that the Court will very

20    well be the one who would ask questions of

21    Mr.  Weiner.  I have no objection to that.

22                You've let me tell you of any questions I

23    might have and I don't mind proceeding in that manner.

24                THE COURT:  All right.  And for

25    purposes of the record, to make clear, when the

5

1   motion was filed, both Mr. Hinton and Mr. Rizzo,

2   on behalf of the State, and the Court had a

3   discussion as to how to proceed.

4            One of the things that was -- the

5   Court was informed of by Mr. Rizzo was that there

6   was an additional episode that happened at the

7   Federal Detention Center whereby another person,

8   whose name I don't know off the top of my head,

9   had made a statement or allegedly made a statement

10  that he was involved in the capital murder and may

11  have been the shooter of the complainant who

12  Mr. Brown has been convicted of killing.

13           So, the procedure that we talked

14  about and what we're going to do today is to

15  certainly address the issues in the Motion for New Trial.

16           Mr. Weiner is here available to

17  testify.  There is contained within the Motion for

18  New Trial a -- an affidavit from a Paul Purcell in

19  addition to the statements made by Mr. Hinton in

20  the Motion for New Trial setting forth what their

21  assessment of the events were.

22           And so what I proposed to both sides

23  was to not only address the Motion for New Trial,

24  but address the issue that happened at the Federal

25  Detention Center.

1              For you guys and gals on the Court

2   of Criminal Appeals or whoever else might read

3   this transcript at some future date, the State

4   made -- or gave a description of the events at the

5   Federal Detention Center to Mr. Hinton and myself

6   and gave us sufficient information for Mr. Hinton

7   to respond or to address that if he so chooses to do so.

8              And so I wanted it to be clear for

9   the record that we will not only be addressing the

10  Motion for New Trial, but we will be addressing

11  the additional issue of what happened at the

12  Federal Detention Center.

13              Now, that is the Court's idea -- I

14  want to make sure that's clear for the record --

15  to do both of these in one hearing, basically to

16  make a record of those events, both the Motion for

17  New Trial event and the Federal Detention Center

18  event, for future reference should those matters

19  be raised either on appeal or in a Writ of Habeas

20  Corpus, whether in State or Federal Court.

21              I want the witnesses who we have

22  available to present and to be examined and

23  cross-examined or examined by the Court that they

24  are here while the matters are still fresh and can

25  be given an opportunity to state their peace as to

1   what happened and, therefore, that information available

2   to any future court that may want to look at that.

3            So, it was my desire to get the witnesses

4   here to put the matters on the record under oath

5   and to give the Court the opportunity to examine

6   how the witnesses testify, both under examination

7   and cross-examination, and by questions from the

8   Court so that I could adequately assess their

9   credibility and assess the allegations both in the

10  Motion for New Trial and the incident at the

11  Federal detention facility.

12           So this was the scenario that I

13  explained to both the State and the Defense.  I

14  hope I got everything in there, but, Mr. Hinton,

15  does that accurately portray what we talked about.

16           MR. HINTON:  It certainly does, Judge.  If I

17  might just have a comment at this time.

18           THE COURT:  Sure.

19           MR. HINTON:  Concerning the Federal

20  detention witness issues, Mr. Rizzo had made

21  available to me the report and I read it

22  concerning their investigation of that incident.

23  And here's how I would like to proceed on that.

24           I do not intend to make that an

25  issue, the Federal detention witness situation, of

1   this Motion for New Trial.  In my professional

2   judgment this would not be the appropriate time

3   and the beneficial time for Mr. Brown to do that.

4              I think it more of an issue that

5   Mr. Rosen, who you appointed on the Writ, might

6   look into.  But I have seen the information.  I

7   feel that Mr. Rizzo has given me everything that

8   he has and they have let me read their report as

9   long as I wanted to and take notes.

10             So what I'm saying is that I think we can

11  cut that issue loose from this Motion for New Trial if

12  it's all right with Mr. Rizzo and the Court.

13             THE COURT:  Okay.  So we can do the

14  Motion for New Trial and then do that as a

15  separate presentation.

16             MR. RIZZO:  Judge, what I had

17  intended to do was the Motion for New Trial by

18  Defense counsel would refer to Mr. Weiner or

19  Weiner, however his name is pronounced, his

20  allegation that he said that Glaspie, who was a

21  witness in our case, a co-defendant, made a statement

22  that he was the officer shooter and not this Defendant.

23             That is the one separate thing and

24  we wanted to address that.  I did intend to put on

25  Pat Smith, who is an investigator with the Harris

9

1  County District Attorney's Office and did work

2  also on the case of the State of Texas versus

3  Alfred Brown where he received the death penalty

4  throughout the -- prior to the trial and also

5  throughout the trial.  He did two investigations.

6  And I was going to put him on the stand to

7  describe generally his findings concerning who he

8  talked to, the information that was received to us

9  and also to confirm on the record and under oath

10  that he conveyed this, of course, at least a

11  couple of weeks ago, approximately, to Defense

12  counsel to give them adequate time to prepare if

13  they saw fit as to anything for this hearing.

14              THE COURT:  Well, I guess another

15  thing, again, just to make clear.  One of the

16  allegations in the Motion for New Trial is

17  basically failure of the trial counsel to

18  ascertain the information alleged in the Motion

19  for New Trial and that that would be something

20  that would cause a different result in the trial.

21              And, you know, however we proceed, I

22  mean, I think the information about the Federal

23  detention situation may go to that issue

24  specifically as well.  But as a practical matter,

25  it doesn't matter to me whether we do it all at

 1   once or we separate them, it doesn't matter to me

 2   at all.  But it might be relevant as to that.

 3                    MR. HINTON:  Judge, if I might

 4   address that.  I would have no objection if the

 5   State offers a copy of their investigative report

 6   concerning the Defense -- the Detention Center

 7   into the record.  It would then be in the record.

 8                    The other thing is I hear what the

 9   Court is saying about failure of trial counsel,

10   but I think what my motion actually says is that

11   that evidence could not have been available for

12   the trial.  I don't think I was commenting on

13   trial counselors' failure to find it out, just

14   that it wasn't available and couldn't have been

15   found out.  At least that's how I was trying to

16   phrase it.

17                    THE COURT:  I understand.  I think I

18   may have overstated in my recitation.  I think

19   Mr. Hinton is correct with a better reading of the

20   motion.

21                    One more thing I want to also make

22   clear for the record.  Obviously, I'm not in any

23   way trying to preempt or stop anyone from having a

24   future hearing on these issues.  Obviously that

25   could occur or may occur in the Writ process.  I

11

1   am going to direct the court reporter once this

2   process is complete to make a transcript of the

3   Motion for New Trial available to Mr. Rosen who is

4   doing the Writ -- the State Writ on Mr. Brown's

5   case.  And certainly would be available to any

6   future attorneys who represent Mr. Brown, whether

7   it be in State or Federal court.

8                All I'm trying to do is to get out

9   the information that is available at this point in

10  time, to have it aired in court, have it subject

11  to examination.  So that if, for instance, some of

12  these witnesses become unavailable at some future

13  date there is a record of what they had to say or

14  on the other hand, if there is a future hearing on

15  these matters, they are down on the record as to

16  what they believe the events are at this point in

17  time so that can be compared and contrasted with

18  whatever they may say at a future date, should

19  that be any different.

20               So it's my desire as with any case

21  but especially in a case of this import, to try as

22  best I can to make all of the facts available

23  to -- for future consideration of any Court of

24  Appeals.  And so that's why we're doing this and

25  the way we're doing this.

12

1          Okay.  Mr. Hinton, do you have any

2  additional testimony as to the Motion for New

3  Trial other than the affidavit and information

4  contained in the motion itself.

5          MR. HINTON:  Judge, I do not.

6          THE COURT:  All right.  What does

7  the State say.

8          MR. RIZZO:  State would like to call

9  Brian Warner -- or Weiner.

10          THE COURT:  All right.

11          All right.  Mr. Rizzo.

12          BRIAN MICHAEL WEINER,

13  having been first duly sworn, testified as

14  follows:

15          DIRECT EXAMINATION

16  BY MR. RIZZO:

17     Q.  Could you state your name, please?

18     A.  Brian Michael Weiner.

19     Q.  And you are currently housed in the

20  Harris County Jail; is that right?

21     A.  Yes, sir.

22     Q.  And what are you -- what are you charged

23  with?

24     A.  Murder.

25     Q.  You have -- are you due to be sentenced

1    on your case sometime in the near future?

2         A.   Yes, sir.

3         Q.   And just for purpose of the record,

4    you -- you testified against your co-defendants in

5    this case?

6         A.   Yes, sir.

7         Q.   How many times did you testify against

8    co-defendants?

9         A.   Twice.

10        Q.   Twice.  And two different co-defendants?

11        A.   Yes, sir.

12        Q.   And as a result of that, what did they

13   receive?

14        A.   Life sentences.

15        Q.   Both of them got life?

16        A.   Yes, sir.

17        Q.   And you are testifying in exchange for a

18   lesser sentence, I assume?

19        A.   Yes, sir.

20        Q.   And do you know what your sentence is

21   going to be?

22        A.   It ranges from five to 40 years.

23        Q.   Five to 40?

24        A.   Yes, sir.

25        Q.   So they put a cap on how much you would

14

1  get?

2       A.   Yes, sir.

3       Q.   You were housed in the Harris County Jail

4  in an area where -- at one time where Dashan

5  Glaspie was housed; is that right?

6       A.   Yes, sir.

7       Q.   You were also housed in an area sometime

8  after that where Alfred Brown was housed, is that

9  correct, or you came in contact with him?

10      A.   I came in contact with him.

11      Q.   While you're in the Harris County Jail?

12      A.   Yes, sir.

13      Q.   It was not at the same time that you came

14  in contact with Mr. Glaspie, was it?

15      A.   No, sir.

16      Q.   Do you see Mr. Brown in the courtroom

17  here today?

18      A.   Yes, sir.

19      Q.   Could you point to him and describe an

20  article of clothing?

21      A.   He's right there sitting in the

22  Defendant's chair wearing orange.

23              MR. RIZZO:  Your Honor, may the

24  record reflect he's identified the Defendant.

25              THE COURT:  Yes.

1       Q.   (By Mr. Rizzo)  Now, you -- you

2    had some conversations with -- with

3    Dashan Glaspie over a period of time,

4    did you not?

5       A.   Yes, sir.

6       Q.   There are allegations that were made in

7    this Motion for New Trial -- you understand what

8    this is about, don't you?

9       A.   Yes, sir.

10      Q.   Okay.  And you have -- who is your

11   attorney, by the way?

12      A.   Joe Bailey.

13      Q.   You've talked to your attorney about this

14   at length, also, have you not?

15      A.   Yes.  Yes, sir.

16      Q.   And in -- at some point Mr. Bailey, your

17   counsel, after speaking with you and advising you,

18   allowed me to speak with you, too?

19      A.   Yes, sir.

20      Q.   And also allowed an investigator, Pat

21   Smith, who is sitting behind me to be present,

22   also; is that right?

23      A.   Yes, sir.

24      Q.   And we questioned you about the issues

25   that are contained in this Motion for New Trial?

1      A.   Yes, sir.

2      Q.   Let me talk to you specifically about

3   that.   There's allegations that you heard Dashan

4   Glaspie claim that he was the person who shot the

5   police officer and not Alfred Brown.   You

6   understand that that's an allegation that has been

7   made?

8      A.   Yes, sir.

9      Q.   And specifically, so I can be clear for

10  the record, the allegation is that Dashan Glaspie

11  admitted he was the shooter and not this

12  Defendant, Alfred Brown?

13     A.   Yes, sir.

14     Q.   Okay.   Did Dashan Glaspie ever tell you

15  that while he was in the jail?

16     A.   No.

17     Q.   Did he ever make any allegations saying,

18  "I shot him," referring to the police officer?

19     A.   No.

20     Q.   Did you tell Mr. Purcell that -- you know

21  who Mr. Purcell is, don't you?

22     A.   Yes, sir.

23     Q.   He's also an inmate in the Harris County

24  Jail?

25     A.   Yes, sir.

17

1   Q. Did you tell Mr. Purcell that Glaspie had

2 told you that he shot the police officer?

3   A. No, sir.

4   Q. You never told him?

5   A. No, sir.

6   Q. I also -- at some point you talked to the

7 Defense attorney in this case; is that right?

8   A. Yes, sir.

9   Q. And you know who I'm talking about?

10   A. Yes, sir, Mr. Hinton.

11   Q. Could you tell us about that?

12   A. Well, he came in, he introduced himself.

13 He said he was Mr. Hinton and he's here on behalf

14 of Mr. Brown or -- I think that's his name,

15 Mr. Brown, right?

16    And he had said the reason why he

17 was here, he had pulled out Mr. Purcell's letter

18 and put it up to the thing and showed me what

19 Purcell had wrote to him.  And he showed it to me

20 and I read it off.  And then, you know, he said,

21 "Well, you know, is this true and this and that

22 and can you sign an affidavit?"  I said, "I'm not

23 signing any affidavit, you know.  I've got to

24 talk" -- first of all, I told him that Joe Bailey

25 is my lawyer.  I didn't even know why he was there

1   without talking to Joe.

2           He said that he was in a rush and he

3   asked me these things and I said, "He never said

4   that to me.  He cuts my hair, but he never said it

5   to me."

6       Q.   You're saying -- you're saying -- you're

7   claiming now that you never said -- you never told

8   Defense counsel, Mr. Hinton, that Glaspie admitted

9   to being the shooter?

10      A.   I never said that.

11      Q.   At the time that you made -- that you

12  were referring to some of the -- you did talk to

13  some people about Glaspie, did you not, in the

14  jail?

15      A.   Yeah.  It was -- he was in the newspaper.

16  I mean, it was obvious, you know.  You know, word

17  gets around.  Just like my case, his case was in

18  the newspaper, too.

19      Q.   And the person who was -- you had a

20  fairly newsworthy case, did you not?

21      A.   Yes, sir.

22      Q.   And the person who was killed in your

23  case was who?

24      A.   A fireman.

25      Q.   A fireman.  And so you are charged with

1  the murder of a fireman during an arson case; is

2  that right?

3       A.   Yes, sir.

4       Q.   I'm not asking you about your case, just

5  the allegations.

6            Did you talk to Mr. Brown, this

7  Defendant, at some point after you had talked to

8  Mr. Hinton or was it before.

9       A.   It was before.

10      Q.   Okay.  When you talked to this Defendant,

11 Mr. Brown, what did he tell you?

12      A.   Well, it was after I talked to

13 Mr. Purcell.  He had said that Brown was right

14 there --

15      Q.   Who said?

16      A.   Mr. Purcell.  I had talked to Paul and he

17 had asked me about Glaspie.  He had said, "You

18 know, do you know anything about Glaspie," because

19 he knew that Glaspie cut my hair.

20      Q.   Who knew that?

21      A.   Purcell.

22      Q.   Okay?

23      A.   Mr. Purcell.  Because he was in 7-B-1.

24 At one time he was my next-door neighbor.

25      Q.   Okay?

```
 1        A.   You know, in the next-door cell to me.

 2   So he had asked me, you know, "Did Glaspie ever

 3   tell you anything, this and that" I said, "He told

 4   me that he got a good deal and that's about it."

 5                 He said, "Can you find out if, you

 6   know -- can you talk to him anymore."  I said, "I

 7   really don't talk to him anymore."  And he said,

 8   "Well, his co-defendant is right there," and I

 9   went up and said, "What's up?"

10        Q.   To who?

11        A.   Mr. Brown.

12        Q.   The Defendant?

13        A.   Yes.  I said, "What's up?"  And he said,

14   "What's up?"  He said, "Do you know anything?"

15   And I said, "Not really."  He said, "Man, I'll do

16   anything.  I'll pay you.  I'll do whatever you

17   need".

18        Q.   He said he would pay you for what?

19        A.   To say that Glaspie said he shot the

20   police officer.

21        Q.   So this Defendant offered you money if

22   you would testify falsely?

23        A.   Yes.

24                 MR. RIZZO:  Pass the witness, Your

25   Honor.
```

```
 1              THE COURT:  Mr. Weiner, I'm going to
 2   ask you some questions right now.
 3                    EXAMINATION
 4   BY THE COURT:
 5       Q.   When you met with Mr. Hinton, was that in
 6   a regular interview?
 7       A.   Yes, sir.
 8       Q.   In a room, I guess, you call it?
 9       A.   Attorney booth.
10       Q.   Which jail were you at?
11       A.   701.
12       Q.   And my recollection is that's a
13   plexiglass window and you're on one side and he's
14   on the other, correct?
15       A.   Yes, sir.
16       Q.   When Mr. Hinton talked to you, he did
17   tell you expressly he was representing Mr. Brown,
18   correct?
19       A.   Yes, sir.
20       Q.   And, although -- and I understand your
21   confusion at that point.  You had never talked to
22   him before; is that correct?
23       A.   Yeah.  I didn't even know who he was at
24   this time.  I was really confused because when he
25   walked right in, it wasn't my lawyer, Mr. Bailey.
```

1    Q.   Okay?

2    A.   And the first thing I said, "Have you

3  talked to my lawyer" because my lawyer told me

4  don't say nothing to anybody --

5    Q.   Okay.  You need to speak loud enough for

6  her to hear you?

7    A.   I'm sorry.  I asked him -- the first

8  thing I said, "Do you have permission from Joe to

9  come see me?"  He said, "I know your lawyer.  I'm

10  in a rush".

11    Q.   Now, did Mr. Hinton -- did anything

12  Mr.  Hinton say to you, was any of it unclear?

13  Meaning did you understand what he was talking to

14  you about?

15              I understand that you were concerned

16  that he not talk to Joe, but did you understand

17  why he was there and why he was talking to you.

18    A.   Well, at first when he pulled out

19  Mr.  Purcell's letter, I didn't understand what

20  was going on.  I didn't know that Mr. Purcell had

21  wrote a letter to Mr. Hinton on me, you know, so I

22  was like -- and he read it up there and I sat

23  there and read it, you know, kind of like mumbled

24  it out, you know, and he said, "Are you ready to

25  sign the affidavit?"  I said, "I'm not signing

1   anything".

2        Q.   Let's back up.  The letter from

3   Mr.  Purcell, I assume it was signed by

4   Mr. Purcell; is that correct?

5        A.   Yes, sir.

6        Q.   And how long -- how had you met

7   Mr.  Purcell?

8        A.   Well, we had been locked up next to each

9   other in the seventh floor in the 7-B-1 pod.

10       Q.   For how long a period of time?

11       A.   Three or four months next to each other.

12       Q.   During that period of time while y'all

13  were next-door neighbors, did you ever discuss

14  your -- this particular case with him?

15       A.   Never.

16       Q.   So after y'all were no longer next-door

17  neighbors is when y'all ultimately had a

18  conversation about Dashan Glaspie; is that

19  correct?

20       A.   Yes, sir.

21       Q.   Where did that take place?

22       A.   When I go to visitation -- when I was

23  coming back from visitation, there's a double door

24  lockdown and they open a door and there's four

25  cells in there.  That's where, like, they put the

24

```
 1   Death Row inmates and the gang related inmates.

 2   Sometimes they let me stop by and I'd say, "Hey,

 3   what's up?"

 4               And I went over there and he said,

 5   "Hey, Weiner, come talk to me" so I went over

 6   there and talked to him.

 7        Q.   Now, with Purcell -- in that setup, is he

 8   behind bars, behind plexiglass?

 9        A.   He's behind a door.

10        Q.   Behind a door.  All right?

11               So y'all visited through the door.

12        A.   Well, you know, they have a pan hole

13   where they put the meals, the pan hole was opened.

14        Q.   So when -- now, why was Mr. Purcell in

15   jail, do you know?

16        A.   Something about some weed getting caught

17   in the County Jail.  I'm not sure about it.

18        Q.   So some sort of drug case?

19        A.   Yes.  And he's back on a Habeas Corpus.

20        Q.   Okay.  So when you talked to Mr. Purcell

21   at that point in time -- I know it's hard to

22   remember when all this stuff took place, but that

23   was before you talked to Mr. Hinton, correct?

24        A.   Yes, sir.

25        Q.   All right.  And it was after y'all had
```

1   been next-door neighbors?

2       A.   Yes, sir.

3       Q.   Okay.  So somewhere between then is when

4   the discussion happened, correct?

5       A.   Yes, sir.

6       Q.   Now, when you talked to Mr. Purcell, did

7   you bring up Glaspie or did he bring up Glaspie?

8       A.   He brought up Glaspie.

9       Q.   And do you remember specifically what he

10  asked you or what he said as best you can?

11      A.   When I bent down, he said, "Hey, what's

12  up," you know.  I had sent him a magazine.  I had

13  gotten to look at and he said, "Thanks for the

14  magazine."  He said, "Do you know Glaspie?"  Well,

15  they call him Dead End.  "Do you know Dead End" I

16  said, "Yeah" and he said, "He cuts your hair" and

17  I said, "Yeah".

18      Q.   Okay?

19      A.   And he said, "Well, that's his fall

20  partner right there" and then he started asking me

21  questions.  He said that the fall partner

22  didn't -- didn't shoot the guy.

23      Q.   Okay.  Now, for edification of Judges,

24  what is "fall" -- you said fall --

25      A.   Partner.

```
 1        Q.    -- partner.  What does that mean to you?
 2        A.    Like a guy -- say you commit a crime and
 3   the guy with you is your fall partner.  The guy
 4   that did it with you.
 5        Q.    All right.  And you know in court a lot
 6   of times we call those people co-defendants or
 7   parties.  You've heard that language before,
 8   right?
 9        A.    Yes, sir.
10        Q.    But that's the same thing, right?
11        A.    Co-defendant, yes.
12        Q.    Okay.  So at that point are you talking
13   to Mr. Brown at all or are you just talking to --
14        A.    I'm still talking to Mr. Purcell.
15        Q.    Okay.  And so what does he say about
16   Glaspie -- I mean, you establish that you know
17   him --
18        A.    He's saying that Mr. Brown was housed
19   next to him, that Mr. Brown had completely said he
20   was innocent.  His story had never changed, you
21   know, and that he asked me did Glaspie ever tell
22   me anything, you know, did he pull the trigger or
23   anything.  And I said, "You know, Dead End, he's
24   not fixing to tell me that after I testified
25   against my fall -- my co-defendants".
```

27

1    Q.   Now, did Mr. Glaspie know that you

2  testified?

3    A.   Yes, sir, it was in the paper.

4    Q.   And, of course, y'all were sort of in the

5  same situation because he testified against the

6  other two defendants in his case?

7    A.   Yes.

8    Q.   Had y'all talked about that, I mean, not

9  what you said, but just about having that in

10  common?

11    A.   We had kind of said to each other when he

12  was cutting my hair that we had both been in the

13  wrong place at the wrong time with the wrong

14  people.

15    Q.   Okay?

16    A.   And that's about as far as it went.

17    Q.   All right.  So the answer to the question

18  of Mr. Purcell did he ever say he was the

19  triggerman, your answer was why would he tell me

20  that?

21    A.   Yes.

22    Q.   Did you ever answer it yes or no?

23    A.   I told him no.

24    Q.   Okay.  Did he ask you any other questions

25  about Glaspie at that point?

```
 1        A.   Not really, just to keep my ears open,
 2   you know.
 3        Q.   Did he say why?  I mean, anything
 4   specific or just --
 5        A.   Well, he thought Mr. Brown was innocent.
 6        Q.   Now, at that point did you have any
 7   discussion with Mr. Brown?
 8        A.   Yes.  I stepped over to his cell and said
 9   "Hi," or "What's up".
10        Q.   Okay.  How far apart were the cells of
11   Mr.  Purcell and Mr. Brown?
12        A.   Okay.  There's four cells and there's A,
13   B, C and D.
14        Q.   Okay?
15        A.   Mr. Purcell is in D and Mr. Brown is in
16   B.
17        Q.   All right.  So there's one --
18        A.   Cell in between.
19        Q.   All right.  Was his tray whatever -- what
20   do you call it?
21        A.   The pan hole.
22        Q.   Was the pan hole open on Mr. Brown's?
23        A.   Yes, sir.
24        Q.   All right.  Now, I know you don't have
25   any way of knowing if he heard what you said, but
```

```
 1  were you talking in a loud voice?
 2       A.   You can hear in there.  It echoes -- you
 3  know, the door is closed.  You can hear.
 4       Q.   Okay.  And the whole space itself is not
 5  very big, correct?
 6       A.   I'd say it's about as big as the jury
 7  box.
 8       Q.   Okay.  And so there's a hallway -- not
 9  a -- but there's a walk space and then the four
10  cells?
11       A.   Yes, sir.
12       Q.   Okay.  When you stepped over to talk to
13  Mr. Brown, who starts that conversation, you or
14  him?
15       A.   I did.
16       Q.   And what did you say?
17       A.   "What's up".
18       Q.   What did he say?
19       A.   He said, "Hey".
20       Q.   All right.  What happened next?
21       A.   He said, "Do you know I'm innocent?  I
22  didn't do this, you know.  Do you know if Dead End
23  pulled the trigger?  Did he ever tell you that?"
24  And I said no.  And I said I wouldn't want to get
25  in anybody else's case because I've got to worry
```

1   about my case.  Myself comes in front of

2   everybody.  And I told him -- I said, "I'm not

3   fixing to get in anybody else's case right now

4   because I got to worry about myself."

5        Q.   Okay.  And then what happened next?

6        A.   I left.

7        Q.   All right?

8        A.   Well, he said -- you know, he offered me

9   a little bit of money.  He said, "You know, you

10  need anything or anything, I can help you out."  I

11  said, "No, I'm all right.  I got my own stuff".

12       Q.   After that time, did you ever have

13  another discussion with either Mr. Purcell or

14  Mr. Brown?

15       A.   After that -- after that Mr. Brown was

16  gone like two days later.  Because I had seen

17  Mr.  Purcell -- two or three days later I had seen

18  Mr. Purcell and he had never said another word to

19  me.  And then all of a sudden Mr. Hinton showed

20  up.

21       Q.   Okay.  So the next time you saw

22  Mr. Purcell was where?

23       A.   Was -- they had moved me out of 7-B-1 to

24  7-N-1, across the hall from Purcell.  When we had

25  gone to the law library, I had seen him at law

1   library.

2       Q.   Okay.  Did y'all talk at that time?

3       A.   He never told me about any letter.

4       Q.   But did y'all talk?

5       A.   Yes, sir.

6       Q.   All right.  Did y'all say anything else

7   about Mr. Glaspie at that point or Mr. Brown?

8       A.   Not a word.  I didn't even know.

9       Q.   Okay.  Did you have any further

10  discussion with Mr. Purcell after the law library?

11      A.   No, sir.

12      Q.   So that's the last conversation you had

13  with Mr. Purcell?

14      A.   Yes, sir.

15      Q.   You never spoke to Mr. Brown after that

16  one time there in the four-cell situation?

17      A.   Never again.  One time only, about a

18  minute.

19      Q.   Now, as far as Glaspie was concerned you

20  said he cut your hair.  How did that work?

21      A.   Well, you know, the pan hole, he'd take a

22  little razor blade and stick it on a hairbrush and

23  cut my hair through the pan hole.  I'd sit on a

24  little box and he'd cut my hair.

25      Q.   All right.  Were y'all ever housed

1  together in the same pod?

2       A.   7-B-1, sir.

3       Q.   For how long a period of time?

4       A.   About 18 months.

5       Q.   Okay.  I imagine you saw him reasonably

6  frequently?

7       A.   Yes, sir.

8       Q.   Now, was that a lockdown or were y'all

9  able to --

10      A.   23-hour lockdown where you come out two

11 times for 30 minutes a day.

12      Q.   Would that be alone?

13      A.   Alone.

14      Q.   So your conversations with Mr. Glaspie,

15 how did those take place?

16      A.   Well, sometimes -- T.V. is right in front

17 of Mr. Glaspie's house.  In my house I can't see

18 the T.V.

19      Q.   Okay?

20      A.   So every now and then like when the

21 Rockets would play or something, I would go in

22 there and Dead End or Glaspie and I would talk

23 about the Rockets.  And, you know, he liked

24 basketball and I liked basketball.

25      Q.   Okay.  Now, I'm confused.  How are you

33

1   able to go where he is?

2       A.   Okay.  In a tank -- it's called a tank or

3   a pod.  There's 12 bottom cells with sliding doors

4   and there's 12 on the top.

5       Q.   All right.  And then the guard --

6     it's like a triangle?

7       A.   Yeah, and then the guards are in the pod.

8       Q.   Okay?

9       A.   Well, everybody gets 30 minutes out in

10  the morning.  There's first, second and third

11  shift.  Okay?  And say you get your 30 minutes on

12  the first shift, you're going to get 30 minutes on

13  the third shift.  It works out that way sometimes.

14      Q.   Okay.  So occasionally you'd be out at

15  the same time as Mr. Glaspie?

16      A.   No, he'd be in his cell and I would walk

17  up by his cell where the T.V. was and he'd be

18  standing by the door and I'd say, "Hey, what's

19  up".

20      Q.   And you'd talk through the pan hole,

21  again?

22      A.   We talked through the glass on the side

23  of the door.

24      Q.   Okay.  All right.  At any point during

25  your relationship with Mr. Glaspie or talking to

1   Mr.  Glaspie, did you ever talk about the specific

2   facts of his case, what he did or didn't do in the

3   capital murder case?

4        A.   No, we never -- we never specifically.

5   Really it was pretty much always about me, because

6   my case was always in the newspaper.  It was

7   always in the newspaper.  And he said, "You know,

8   my fall partner" -- well, my co-defendant, they

9   had put him in the cell block with us and he was

10  talking to Mr.  Glaspie about my case.  And

11  Mr. Glaspie was like, "Man, this dude, you know,

12  you kind of like me in the wrong place at the

13  wrong time," but we never got in specifics about

14  the case because I didn't want to ask him

15  personally.  You know, he's a big dude.  I wanted

16  to stay away from him.

17       Q.   All right.  So bottom line, did y'all

18  ever talk specifically about what happened in

19  Mr.  Glaspie's case?

20       A.   No.  Never specifically, no.

21       Q.   Did he ever make any statement to you in

22  any way, shape or form indicating that he shot

23  anybody or killed anybody?

24       A.   No.

25       Q.   I guess one more thing:  Of course, you

1  realize in your situation your testimony today has

2  no affect on what happens in your case?

3       A.   Absolutely.

4       Q.   Just to make sure, nobody has promised

5  you any benefit for this; is that correct?

6       A.   No.

7       Q.   You're not under any impression that this

8  is going to help you in the resolution of your

9  case?

10      A.   No.

11                THE COURT:   Okay.   Anymore

12  questions.

13                MR. RIZZO:   Just one, Your Honor.

14                  REDIRECT EXAMINATION

15  BY MR. RIZZO:

16      Q.   I didn't -- for purposes of the record,

17  could you state your prior convictions and arrests

18  just for purposes of the record?

19      A.   Okay.   I don't know them all

20  specifically, but I've been arrested for driving

21  with suspended license, I think about three times.

22  I've been arrested for theft twice out of Fort

23  Bend and Harris County and I've been arrested for

24  murder.   This is my charge right now.

25      Q.   And how many of those were convictions?

1    A.   One of them I was on felony probation so

2    I guess that's a conviction.   And the one out of

3    Fort Bend was a deferred.

4    Q.   For what offenses?

5    A.   Theft.

6    Q.   Two theft, felony thefts, and you had a

7    probation and a deferred?

8    A.   Yes, sir.

9                  FURTHER EXAMINATION

10   BY THE COURT:

11   Q.   Are you still on probation or deferred?

12   A.   I don't have any conviction.   I'm still

13   on probation.

14   Q.   So they haven't been resolved yet?

15   A.   Yes, sir.

16   Q.   Is the deferred over with?

17   A.   No, sir.

18   Q.   So the probation and deferred are still

19   pending?

20   A.   Yeah, the one in Fort Bend -- yeah,

21   they're both pending, yes, sir.

22   Q.   Again, bottom line, has anyone promised

23   you anything or in any way, shape or form told you

24   what to say today?

25   A.   No, sir.

37

```
 1              MR. RIZZO:  One other question,

 2   Judge, if I may.

 3              THE COURT:  Sure.

 4          FURTHER REDIRECT EXAMINATION

 5   BY MR. RIZZO:

 6      Q.   When I met with you along with the

 7   investigator, Pat Smith, your attorney was present

 8   the whole time; is that right?

 9      A.   It was -- can I say something?  It was my

10   idea when my lawyer came to me and told me what

11   happened and showed me.  It was my idea for him to

12   seek you out to come and tell you this wasn't

13   true.

14      Q.   Okay.  And my point, though, is that your

15   attorney was present when I talked to you; is that

16   right?

17      A.   The whole time, sir.

18      Q.   And that is Joe Bailey?

19      A.   Yes, sir.

20      Q.   He's a licensed attorney in the State of

21   Texas and practices in Houston and Harris County?

22      A.   Yes, sir.

23      Q.   When I spoke with you, did I ever try and

24   intimidate you or threaten you in any way to get

25   you to say one thing or another?
```

1    A.   Never.

2    Q.  Did I at some point tell you I don't care

3 what the truth is, I just need to know what the

4 truth is?

5    A.   You told me that you wanted to know who

6 the guilty person was.  You wanted to know if you

7 had an innocent man behind bars.  You wanted to

8 know the truth.  That's what you told me.

9    Q.  And I didn't try to get you to say one

10 thing or the other, did I?

11    A.   No.  You just said tell the truth, which

12 I told the truth.

13    Q.  This is in front of your attorney, also?

14    A.   Yes, sir.

15           MR. RIZZO:  That's all I have,

16 Judge.

17           THE COURT:  One more thing.  Again,

18 just to -- I know we keep asking, just trying to

19 make everything clear and think of everything we

20 can think of.

21             FURTHER EXAMINATION

22 BY THE COURT:

23    Q.  When Mr. Hinton visited with you, he

24 certainly made no threats against you or any

25 promises; is that correct?

1    A.   No.

2    Q.   And understanding the confusion of the

3 situation, did Mr. Hinton ever ask you any

4 questions about your case, your specific case?

5    A.   I don't -- I don't recall him asking any

6 questions.

7    Q.   So it was all about Mr. Brown's

8 situation?

9    A.   It was all about Mr. Brown's situation.

10    Q.   All right.  And as far as any affidavit,

11 did you -- did you do that or not do that?

12    A.   No way.  No.

13    Q.   Okay.  As far as with Mr. Purcell, as far

14 as you know, has there ever been any issues or

15 problems between the two of y'all?

16    A.   No.  Actually, I think we were pretty

17 good friends.

18    Q.   So do you have any reason to think or

19 any -- know of any possible reason why Mr. Purcell

20 would say something about you that was not true,

21 any -- whatever it may be, any issues, any fight,

22 anything that y'all may have -- that may have

23 happened between the two of y'all?

24    A.   No.  Actually, you know, he's never

25 really lied.  I mean, when Mr. Bailey came and

1 showed me the affidavit when I was in court, I was

2 pretty shocked.

3     Q.   Right?

4     A.   When Mr.  Hinton came up, I was like, you

5 know, wow, you know, like, I was pretty much --

6     Q.   Right?

7     A.   It came -- it came out of the woodworks.

8 I was surprised.

9     Q.   But since then, I mean, you haven't had

10 any contact with Mr. Purcell after you saw the

11 affidavit, right?

12     A.   I was still -- I went to the law library

13 twice more, but we didn't ever talk about it.  He

14 didn't know that I had seen the affidavit because

15 Mr. Bailey had told me to keep my mouth shut and

16 not say another word to him.

17     Q.   Good advice.

18          THE COURT:  All right.  Any other

19 questions, Mr. Rizzo.

20          MR. RIZZO:  No, Your Honor.

21          THE COURT:  Mr. Hinton, do you have

22 anything else you'd like to ask.

23          MR. HINTON:  Judge, I have no

24 questions of Mr. Weiner.

25          THE COURT:  You may step down.

```
 1                    State call your next witness.
 2                    MR. RIZZO:  State calls Dashan
 3   Glaspie.
 4                    Judge, may I approach the bench for
 5   a second.
 6                    THE COURT:  Sure.
 7                    (Off-the-record discussion; court
 8   reporter not requested.)
 9                    (Witness sworn.)
10                    THE COURT:  Mr. Hinton, do you have
11   any questions at this time?  Do you have any
12   questions at this time of this witness.
13                    MR. HINTON:  No, I don't, Judge.
14                    THE COURT:  All right.
15                    Mr. Rizzo.
16                        DASHAN GLASPIE,
17   having been first duly sworn, testified as
18   follows:
19                      DIRECT EXAMINATION
20   BY MR. RIZZO:
21        Q.   Could you state your name, please?
22        A.   Dashan Glaspie.
23        Q.   And, Mr. Glaspie, you testified in the
24   case of the State of Texas versus Alfred Brown,
25   did you not?
```

1       A.   Yes.

2       Q.   He was your co-defendant in a capital

3  murder?

4       A.   Yes.

5       Q.   Do you see him in the courtroom here

6  today?

7       A.   Yes.

8       Q.   Could you point to him and describe an

9  article of clothing?

10      A.   Orange jumpsuit.

11      Q.   Okay.

12           MR. RIZZO:  Your Honor, may the

13  record reflect he's identified the Defendant?

14           THE COURT:  Yes.

15      Q.   (By Mr. Rizzo)  And you are also

16    aware that the Defendant in this case --

17    and I'm talking about Mr. Brown --

18    received the death sentence?

19      A.   Yes.

20      Q.   You got a deal in exchange for your

21  testimony, did you not?

22      A.   Yes.

23      Q.   And what was -- for purposes of the

24  record, what was the deal?

25      A.   Thirty years aggravated robbery.

1       Q.   And we -- we did not proceed on the

2  prosecution of the capital murder after your

3  testimony; is that correct?

4       A.   Yes.

5       Q.   Okay.  You got -- do you know a person by

6  the name of Weiner or Weiner?

7       A.   Yes.

8       Q.   And who is he?  What's his first name?

9  Do you know?

10       A.   Brian.

11       Q.   Brian.  And how do you know him?

12       A.   He was in the same tank I was in.

13       Q.   Were you friendly with him, unfriendly

14  with him?  What was your relationship with him?

15       A.   I didn't really associate with him.

16       Q.   Did you cut his hair one day?

17       A.   Yes.

18       Q.   And how long were you in the same tank

19  with him?

20       A.   Well, I was here a year.  He came

21  after -- a year after I was here.

22       Q.   Would that be a year or so?

23       A.   Yes, about a year or so.  Well, almost

24  two years because he came after I was back there a

25  year already.

1       Q.   Did you ever tell Mr. Weiner or Weiner

2  that you, Dashan Glaspie, were the shooter of the

3  police officer and not the Defendant in this case,

4  Alfred Brown, as how you testified in the trial of

5  Alfred Brown?

6       A.   No, I never told him that.

7       Q.   Have you ever talked about your case in

8  the cell, in the jail?

9       A.   No.

10      Q.   And you've been in custody since April of

11  2003; is that correct?

12      A.   Yes.

13      Q.   Have you -- have you talked to any

14  other -- other inmates about your case?

15      A.   No.

16      Q.   Do you also -- you also know a person by

17  the name of Deontra Smith?

18      A.   Yes.

19      Q.   And who is he?

20      A.   He's some -- a dude that stayed in The

21  VA.

22      Q.   He's a friend of yours from The VA?

23      A.   Yes.

24      Q.   Did he -- you've already testified that

25  you were -- you were involved with some people who

45

1   were involved in some aggravated robberies, too;

2   is that right?

3        A.   Yes.

4        Q.   You testified to that in the Alfred Brown

5   case?

6        A.   Yes.

7        Q.   And actually the Joubert case, too, I

8   believe, did you not?

9        A.   Yes.

10        Q.   Was Deontra Smith ever a member of a

11   group -- that group that was involved in

12   aggravated robberies?

13        A.   No.

14        Q.   Did he ever do any robberies with you at

15   all?

16        A.   No.

17        Q.   Was he present on April 3rd of 2003 in

18   the 5900 block of South Loop East at the ACE check

19   cashing store where Alfredia Jones and Officer

20   Charles Clark were killed?

21        A.   No.

22        Q.   Was he in any way involved in that case

23   at all?

24        A.   No.

25        Q.   Did you ever attempt or did anybody of

1    the co-defendants, that would be you, Joubert or

2    Alfred Brown, attempt to bring in Deontra Smith

3    into that conspiracy?

4         A.   No.

5         Q.   Did any of you -- did you ever try and

6    bring him into any other robberies that you may

7    have been involved in?

8         A.   No.

9         Q.   When he was -- and I'm talking about

10   Deontra Smith.  When he was in custody in Dallas,

11   you did give some money to his mother to help him

12   get out on a bond, did you not?

13        A.   Yes.

14        Q.   So he was a friend of yours, I guess?

15        A.   Yes.

16        Q.   Could you help us understand, you know,

17   what kind of friend he was?  Was he someone you

18   were doing crimes with, too, or is he somebody

19   that you were hanging with and partying with, what

20   kind of --

21        A.   Someone I hung with around the

22   apartments.

23        Q.   But you never did any robberies with him?

24        A.   No.

25        Q.   Now, one other thing I was going to ask

47

1    you about Mr. Weiner.  He had told us -- I'm

2    talking about Pat Smith.  You know who Pat Smith

3    is, don't you?

4        A.   Yes.

5        Q.   You told Pat Smith and I when we

6    interviewed you shortly before Christmastime that

7    Weiner had been asking different people in the pod

8    about different things; is that correct?

9        A.   Yes.

10       Q.   Could you tell us about that?

11       A.   Well, basically he was -- he don't want

12   to go to TDC.  He was always trying to get less

13   time by asking people about their cases.  So

14   everybody in the tank basically knew what he was

15   trying to do so nobody would talk to him on that

16   level about none of their cases or nothing like

17   that.  Whenever they talk to him about it, it

18   wouldn't be about that.

19       Q.   So he was trying to get information on

20   other people's cases?

21       A.   Yes.

22       Q.   Did you and other people in the pod steer

23   clear of him in saying anything to him about

24   cases?

25       A.   No.  I don't know.  I mean, I don't know

48

```
1    the dudes that he was next door to upstairs.  It
2    was upstairs and downstairs.  And I'm downstairs.
3    But the only time I talked to him, he wanted me to
4    cut his hair before.

5              And my cell right in front of the
6    T.V., so he always -- any time he come out, he
7    always right there in front of the T.V.
8         Q.   And you -- you never talked about your
9    case to him at all?
10        A.   No.
11        Q.   Did you think he was somebody that was
12   trying to help himself when you were in the jail?
13        A.   I don't -- what you mean?
14        Q.   You said that he was trying to --
15   everybody in the pod was leery of him.  They
16   didn't want to say anything because they thought
17   he was trying to work something?
18        A.   Yes.
19        Q.   Did you talk about that with other people
20   in the pod that Weiner or Weiner was --
21        A.   Everybody did, I mean.
22        Q.   What do you mean?
23        A.   I mean, he -- his fall partner, his
24   co-defendant, signed a statement, got in our tank
25   and everybody was reading it or whatever and he
```

1  was --

2       Q.   Stop for a second.   What does that mean?

3  Tell me what that -- somebody got his statements,

4  are you talking about Weiner's?

5       A.   Yes, his statement that he made on his

6  case.

7       Q.   Yes?

8       A.   And some people read it inside the tank

9  and he was mad or whatever.

10       Q.   So he was not the most popular guy in the

11  tank?

12       A.   What you mean popular?

13       Q.   The -- did other people like him?

14       A.   No, don't nobody like him.

15            MR. RIZZO:   I'll pass the witness,

16  Your Honor.

17                      EXAMINATION

18  BY THE COURT:

19       Q.   Mr. Glaspie, I just need to ask you a

20  couple of questions.

21            Now, you've been sentenced on your

22  case.   Your case is done, correct.

23       A.   Yes.

24       Q.   Are you under the impression that this

25  testimony today will be of any benefit to you?

1    A.   No.

2    Q.   Are you testifying here because of any

3 promise or inducement or any other reason other

4 than to testify under oath?

5    A.   No.

6    Q.   You're -- just ballpark -- and I know it

7 may be hard to figure out.  How many times do you

8 think you talked to Mr. Weiner?

9    A.   Several times.  I mean, I can't really

10 give a certain amount of times.

11    Q.   Did you ever talk to him about any

12 specific facts of your case?

13    A.   No, never.

14    Q.   Anything?

15    A.   Anything, never.

16    Q.   Did you ever talk to him about Mr. Brown

17 or Mr. Joubert?

18    A.   Never.

19    Q.   Did he ever talk to you about his case?

20    A.   I mean, yeah, he always try to -- yes.

21 Yeah, he have.  I mean, never just really gave me

22 details about his case, but always saying that he

23 didn't do nothing.  It was always his fall partner

24 Jade.

25    Q.   Now, you were aware, I guess, from your

51

1    conversations that he was testifying against his

2    co-defendants?

3        A.   Yes.

4        Q.   And that was -- sort of put y'all in a

5    similar situation?

6        A.   Yeah.

7        Q.   In terms of he made a deal, he testified,

8    you made a deal, you testified?

9        A.   Yes.

10       Q.   Did that in any way make you trust him

11   any more or trust him any less?

12       A.   No.

13       Q.   Which one?  Trust him more or less?

14       A.   I didn't trust him at all.  I never did

15   trust him at all.

16       Q.   Did you ever tell him or any other

17    inmate at the County that you shot the

18    officer?

19       A.   No.

20       Q.   Or Ms. Jones, for that matter?

21       A.   No.

22             THE COURT:  All right.  Anymore

23   questions.

24             MR. RIZZO:  No, Your Honor.

25             MR. HINTON:  No, Your Honor.

```
 1                  THE COURT:  You may step down, sir.

 2                  Okay.  Anything else on the Motion

 3   for New Trial from the State.

 4                  MR. RIZZO:  Yes, Your Honor.  State

 5   calls Pat Smith.

 6                  THE COURT:  Okay.

 7                  (Witness sworn.)

 8                  THE COURT:  Mr. Rizzo.

 9                     PATRICK SMITH,

10   having been first duly sworn, testified as

11   follows:

12                     DIRECT EXAMINATION

13   BY MR. RIZZO:

14        Q.   State your name, please?

15        A.   Patrick Smith.

16        Q.   And how are you employed?

17        A.   As an investigator with the District

18   Attorney's Office.

19        Q.   How long have you been an investigator

20   with the D.A.'s Office?

21        A.   Twenty-two years.

22        Q.   And how long have you been a peace

23   officer?

24        A.   A little over 30.

25        Q.   How many different agencies were you with
```

53

1  before you went with the Harris County D.A.'s

2  Office?

3       A.   Three.

4       Q.   Let me ask if you were involved in the

5  investigation prior to trial as well as the trial

6  preparation of a case involving the State of Texas

7  versus Dashan Glaspie, Alfred Brown and Elijah

8  Joubert?

9       A.   Yes, sir.

10      Q.   And you also were assigned -- involved in

11 an investigation of a Motion for New Trial and any

12 evidence or any information that was received by

13 the D.A.'s Office concerning the State of Texas

14 versus Alfred Brown in a case where he received

15 the death penalty?

16      A.   Yes, sir.

17      Q.   Let me -- I'm just going to ask you if

18 you can go through generally and not go through

19 every specific fact of what you did.  But, again,

20 generally the things that you did and why in

21 reference to the post-conviction investigation of

22 information that came to the District Attorney's

23 Office?

24      A.   Yes, sir, there was a lot of them.  We

25 received -- or I got information from you in late

1   November regarding a Motion for New Trial had been

2   filed on behalf of Alfred Brown.

3                We had -- I read the Motion for New

4   Trial and saw that there was a statement attached

5   to it from Paul Purcell and there was also in the

6   body of the motion, there was some information

7   regarding a Brian Weiner and the allegations were

8   that Brian Weiner had told Purcell that Dashan

9   Glaspie had, in fact, shot Officer Charles Clark.

10      Q.   Now, that would be inconsistent with the

11  facts that were presented in either of the trials

12  where they received the death penalty, that would

13  be Alfred Brown and Joubert; is that correct?

14      A.   That's correct.

15      Q.   At that point did I instruct you as to

16  how I would like the investigation proceeding?   In

17  other words, did I tell you that I wanted it to

18  turn out one way or how did I talk to you about

19  how I wanted it dealt with?

20      A.   Well, you just wanted -- told me that you

21  wanted to discuss or wanted me to look into this

22  matter and see if these allegations were, in fact,

23  true or not.

24      Q.   Okay.  What did you do then next

25  generally?

55

1        A.   Well, I did a little research on the

2   computer, located where these two inmates from the

3   Harris County Jail were housed, where Mr. Glaspie

4   was housed, where Mr. Brown was housed.  And the

5   reason for that was to see if they would have any

6   contact with each other on any kind of a routine

7   basis where they could discuss this matter.

8        Q.   And did you find out that they were

9   housed -- and I'm talking about Weiner and Glaspie

10  were housed in an area, the same pod, for a period

11  of time?

12       A.   Yes.

13       Q.   What else did you do after that?

14       A.   Well, after that, we went to -- I checked

15  on the computer on JIMS and found that Weiner was

16  scheduled to appear on his case in the 228th

17  District Court on December 1st.  And I advised you

18  of it.

19            We went up to talk to his attorney

20  about it, which was Joe Bailey.  At that

21  particular moment in time we were not able to talk

22  to Mr.  Weiner.

23       Q.   We didn't get a whole lot of

24    details of anything as to what

25    Mr. Weiner was going to say one way or

1    the other at that point from his

2    attorney, did we?

3        A.   Correct, we did not.

4        Q.   Did we also make -- have an agreement

5    with him -- and I'm talking about Joe Bailey -- to

6    get with us after he had a chance to speak with

7    his client in private?

8        A.   Yes, sir.  He said he would talk to his

9    client and see if he could get his client to talk

10   to us.

11       Q.   What else did you do then?

12       A.   Well, we also found out that Paul Purcell

13   was scheduled to be in court on the 8th of

14   December in the 232nd -- in the 232nd District

15   Court.  And we found out his attorney's name and

16   we were going to contact his attorney to get

17   permission to talk with him.

18       Q.   Now, did you also receive -- in terms of

19   another investigation concerning post-conviction

20   information, did you also get some other

21   information about something else, some other

22   informants in another jail?

23       A.   Yes, I did.

24       Q.   And what was that?

25       A.   I received information that there were

57

1 two other inmates in the Federal detention

2 facility downtown here on Texas who might have

3 information regarding this case.

4     Q.   Okay.  And did you talk to other family

5 members of these two additional informants in

6 Federal custody concerning what information they

7 may have had?

8     A.   Yes, I did.  The first -- one of the two

9 defendants was named Kevin Brown.  I talked to his

10 mother, Pamela Brownstone, who advised me that he

11 was in jail there at the Federal detention

12 facility downtown on a narcotics case.  He was due

13 to be sentenced.  And allegedly he had some

14 information that might be of interest to us in

15 this case.

16     Q.   And who else did you speak with?

17     A.   Well, later that same day we also got a

18 phone call from a Federal inmate by the name of

19 Stevie, S-T-E-V-I-E, Joe Sherman, from his

20 girlfriend -- well, from him.  And he said to call

21 his girlfriend because she could receive calls and

22 get messages to him, that he had information as

23 well on this case.

24     Q.   Now, for purposes of the record what is

25 Kevin Brown's Department of Correction number?

58

1      A.   You mean his Federal number?

2      Q.   Yes.

3      A.   Federal number is 24602-179.

4      Q.   And Stevie Sherman, what is his?

5      A.   His Federal I.D. number is 15932-179.

6      Q.   Did you make any arrangements then to at

7  some point in the future speak with both of these

8  other informants?

9      A.   Yes, we did.  I advised you who their

10 attorneys were and you contacted their attorneys

11 to get permission for us to interview these two

12 individuals in the Federal detention facility.

13 You had them on the phone.  I talked to each one

14 of them individually.  And they did advise us that

15 it was okay for us to talk to them.

16     Q.   And they also said they didn't have to be

17 present?

18     A.   That's correct.

19     Q.   Now, these two guys that were giving

20 information, were they trying to get help on the

21 pending Federal cases that they had?

22     A.   Yes, one of them was scheduled to do 14

23 and a half years.  That would be Mr. Sherman.  He

24 was on an access device fraud and he was looking

25 for some help.  And they made it very plain that

1  that's what they were looking for was some help on

2  their case.

3              And Kevin Brown was scheduled to get

4  four years, ten months, but he also had 30 years

5  out of -- I believe it's Jackson County.  And I

6  think he was looking -- from what I could

7  gather -- for more help on that case than he was

8  his Federal case.

9      Q.   Now, you did a lot of background

10  investigation before you went and talked with

11  these people, did you not?

12      A.   Yes, sir.

13      Q.   Including calling the D.A.'s in different

14  counties?

15      A.   Right.

16      Q.   I don't need you to go into everything

17  you did, but generally what was the next step that

18  you took in terms of your investigation?

19      A.   At that point in time I contacted the

20  Federal detention facility and set up appointments

21  for us to go see -- for you, Mr. Rizzo, and myself

22  to go see Stevie Sherman and Kevin Brown.

23      Q.   Did you also find -- did you -- before

24  you went and met with them, did you have an idea

25  from talking to their family members the gist of

```
 1  what they were going to say?

 2      A.   Yes.  Tiffany Sanders, who is, I believe,

 3  the girlfriend of Stevie Sherman, and I talked.  I

 4  advised her that we needed to know what kind of

 5  information he had to offer so we could be

 6  prepared when we talked to him and who his

 7  attorney was.  She called him evidently or he

 8  called her and we found out that his attorney was

 9  out of Dallas.  His name was Franklyn Mickelsen.

10              And we also found that the person

11  who had been spreading these stories over there at

12  the Federal detention facility was a person by the

13  name of Deontra Smith.  And that's all the

14  information she had on him.

15      Q.   Okay.  But what was the story that you

16  were hearing?

17      A.   Well, the story we were hearing was that

18  a person -- before we found out the name -- a

19  person over there was saying that he had, in fact,

20  been the person who was supposed to be on that

21  deal and --

22      Q.   What are you talking about "on that

23  deal"?

24      A.   Well, he was -- he was involved -- I'm

25  getting confused here.  There's a lot of
```

1    information and it all kind of starts running

2    together after a while.

3                    Deontra Smith was supposedly

4    involved in the ACE check cashing robbery and

5    capital murders and that allegedly Mr. Brown was

6    not even there.  It was him that was there and did

7    those murders with Glaspie.

8        Q.   So Deontra Smith, according to the

9    information that you had before you went and

10   talked with them, Deontra Smith was making

11   statements in the Federal Detention Center that he

12   was the person who was involved in the robbery

13   where Ms. Jones and Officer Clark were killed and

14   it was not Alfred Brown?

15       A.   That's correct.

16       Q.   Okay.  Did you also -- did we also go

17   talk with Glaspie to interview him about

18   Mr. Weiner?

19       A.   Yes, sir.

20       Q.   And did he also deny making those

21   statements?

22       A.   He did deny them, yes.

23       Q.   Okay.  Let me also ask you, did you check

24   to see what Deontra Smith had been in custody for

25   before we went and talked with him, too?

1     A.   Yes.  He had been arrested in Dallas,

2  Texas, for aggravated assault with a deadly weapon

3  in two cases, January 2003.  He was in that jail

4  until March 28th of 2003.  That's after he made

5  bond.

6     Q.   Okay.  Let me direct you to December 6th

7  of 2005, and ask if you had an occasion to meet

8  with Stevie Joe Sherman and Kevin Darnell Brown?

9     A.   Yes, we did.

10     Q.   What did Stevie Joe Sherman say

11  concerning his conversation with Deontra Smith

12  generally?

13     A.   Generally speaking that Deontra Smith was

14  part of the crew involving Dashan Glaspie and, I

15  assume, Elijah Joubert, alias Ghetto.  And that he

16  had done a lot of licks, which in layman's terms

17  is he had done a lot of robberies with those guys

18  in the past.

19     Q.   Okay.  Did Stevie Joe Sherman tell you

20  and myself that sometime after the trial of Alfred

21  Brown, somewhere around the 1st of November, that

22  this Deontra Smith told him -- that would be

23  Stevie Joe Sherman -- that, quote, "That guy took

24  my place.  I was the one who killed the officer"?

25     A.   Yes.

1       Q.   And then when you met with Kevin Darnell

2  Brown, did he make any statements concerning what

3  Deontra Smith said similar to what Stevie Joe

4  Sherman claimed?

5       A.   Yes, sir.  He said that they had hit --

6  that Deontra Smith had told them they had hit a

7  bunch of licks.  And he also stated that that guy,

8  meaning Alfred Brown, took his place.  It was

9  supposed to be me.

10      Q.   Okay.  He claimed that Deontra Smith also

11  admitted it to him that he had killed the officer,

12  not Alfred Brown?

13      A.   Correct.

14      Q.   Did he also make a statement -- and I'm

15  talking about Kevin Darnell Brown.  Did he make a

16  statement claiming that Deontra Smith said, quote,

17  "The bitch was killed so we had to finish it off"?

18      A.   Yes, sir.

19      Q.   Is that statement that was allegedly made

20  by Deontra Smith to Kevin Darnell Brown, was that

21  statement, "The bitch was killed so we had to

22  finish it off," was that consistent with the

23  evidence, both physical and testimonial evidence,

24  that was presented during the trial?

25      A.   No, sir.

64

1      Q.   And why is that?

2      A.   Well, the evidence presented at trial was

3  that the officer was killed first outside the

4  building and then the clerk, Mrs. Jones, was then

5  killed and then the defendants made their escape.

6      Q.   The statement that Deontra Smith, if he

7  made that, to his -- to Kevin Darnell Brown, was

8  not consistent with the facts as you know it from

9  the investigation of this capital murder over at

10  the ACE check cashing store?

11      A.   That's correct.

12      Q.   After concluding the interview with both

13  of those inmates, did you also then go back and

14  speak with Dashan Glaspie concerning his knowledge

15  of Deontra Smith?

16      A.   Yes, sir.

17      Q.   And did he -- while he was interviewed,

18  did he give similar or the same answers as he gave

19  here in court to you?

20      A.   Yes, sir.

21      Q.   In other words, that he was -- this

22  Deontra Smith was not part of this crew, that they

23  hung out, they were friends, that he was never --

24  I'm talking about Deontra Smith -- was not present

25  during the offense and that he was -- Deontra

1  Smith was not a co-conspirator in any way with the

2  check cashing aggravated robbery and killings?

3      A.   That's correct.

4      Q.   Now, did you also then -- after we left

5  Glaspie, did we happen to run into Joe Bailey at

6  the County Jail?

7      A.   Yes, sir.  Actually we ran into Joe

8  Bailey as we were going into the jail to see

9  Glaspie and we talked to him before we went

10  upstairs.

11      Q.   Okay.  And did we tell him that we wanted

12  to see Brian Weiner?

13      A.   Yes, sir.

14      Q.   After we spoke with Glaspie, did we then

15  go with Joe Bailey, the attorney for Weiner, to go

16  speak with Weiner?

17      A.   Yes, sir.

18      Q.   And did we question him as to the

19  statements that are the subject of this Motion for

20  New Trial that were allegedly made by him?

21      A.   Yes.

22      Q.   Did he tell us essentially the same

23  things concerning whether Glaspie made that

24  statement to him admitting that he was the one who

25  shot the officer?

1    A.   Yes, sir.  His statements were

2  consistent.

3    Q.   In other words, he denied that Glaspie

4  ever said that, No. 1?

5    A.   Correct.

6    Q.   And did he also deny that he told anybody

7  else that Glaspie said it?

8    A.   Correct.

9    Q.   And did he also tell us that Brown, this

10  Defendant, offered to pay him money or whatever he

11  wanted if he would say that Glaspie did it?

12    A.   Yes, sir.

13    Q.   On December 12th of 2005, did we have an

14  occasion to meet with Deontra Smith over at the

15  Federal Detention Center?

16    A.   Yes, sir, we did.

17    Q.   Did you give him his Miranda warnings

18  from the Blue Card at 1:42 p.m.?

19    A.   Yes, sir, I did.

20    Q.   Did you -- while interviewing him, did

21  you ask him if he was involved in the shooting of

22  Officer Clark?

23    A.   Yes, sir.  That was the first question we

24  asked him.

25    Q.   And did he deny it?

67

1      A.   His answer was no.

2      Q.   Did he also deny ever making the

3  statements to any other inmates saying that he was

4  part of the robbery where the officer and

5  Mrs. Jones were killed?

6      A.   I'm sorry --

7      Q.   In other words, he denied -- you

8  testified already that he denied being part of the

9  robbery?

10     A.   Correct.

11     Q.   Did he also deny making the statements to

12  the inmates in there about being part of the

13  robbery?

14     A.   Yes, sir, he denied that.

15     Q.   He denied everything?

16     A.   Yes, sir.

17     Q.   Did he make the statement, "I didn't

18  shoot Officer Clark.  How could I do it when I

19  wasn't even there"?

20     A.   Yes, sir, he made that statement.

21     Q.   Did you form an opinion as to whether or

22  not you believed that he had, in fact, made those

23  statements to other inmates, though?

24     A.   My opinion would probably be that he

25  probably made statements like that, but it was not

1  that they were accurate.  He was just trying to

2  puff himself up, what we call a puffer.  He was

3  puffing and throwing out information.  Most of the

4  information that he could get or that he got was

5  information that came through the news media and

6  the papers.

7      Q.  To make himself look bigger before he

8  went to the pen?

9      A.  Right.

10      Q.  And he was actually getting ready to go

11  to the pen?

12      A.  He was.

13      Q.  Federal pen?

14      A.  Yes.

15      Q.  And did you also then allow or have a

16  member of the D.A.'s Office allow Mr. Hinton, the

17  Defense attorney in this case, to review all the

18  information that you generally spoke of here

19  today?

20      A.  Yes, sir.

21      Q.  And that was sometime before Christmas?

22      A.  Yes, sir.  I believe it was Friday

23  morning, the 16th, if I remember correctly.

24            MR. RIZZO:  Is that right,

25  Mr. Hinton or --

1          MR. HINTON:  I initialed the

2  investigative report that I had read it.  So

3  whatever date that was.

4      A.   Yes.  I believe it was the 16th.  It was

5  a Friday morning he came by.

6      Q.   (By Mr. Rizzo)  And you obviously did

7  additional things in your investigation that you

8  have not testified to in terms of checking out

9  these two particular but similar investigations

10  that occurred post-conviction of Mr. Brown?

11      A.   Yes, sir.

12          MR. RIZZO:  I'll pass the witness,

13  Your Honor.

14          THE COURT:  Any questions.

15          MR. HINTON:  No questions, Judge.

16          THE COURT:  You may step down, sir.

17          Anything else from the State.

18          MR. RIZZO:  No, Your Honor.

19          THE COURT:  Anything else from the

20  Defense.

21          MR. HINTON:  No, Your Honor.

22          THE COURT:  The Motion for New Trial

23  is denied.

24          (Proceedings concluded.)

25

70

1   THE  STATE  OF  TEXAS      :

2   COUNTY  OF  HARRIS      :

3
              I,  TONI  GOUBEAUD,  Official  Court
4   Reporter  in  and  for  the  351st  District  Court  of
    Harris  County,  Texas,  do  hereby  certify  that  the
5   above  and  foregoing  contains  a  true  and  correct
    transcription  of  all  portions  of  evidence  and
6   other  proceedings  requested  in  writing  by  counsel
    for  the  parties  to  be  included  in  this  volume  of
7   the  Reporter's  Record,  in  the  above-styled  and
    numbered  cause,  all  of  which  occurred  in  open
8   Court  or  in  Chambers  and  were  reported  by  me.

9
              I  further  certify  that  this
10  Reporter's  Record  of  the  proceedings  truly  and
    correctly  reflects  the  exhibits,  if  any,  admitted
11  by  the  respective  parties.

12
              I  further  certify  that  the  total
13  cost  for  the  preparation  of  this  Reporter's  Record
    is  $_____  and  was  paid  or  will  be  paid  by
14  _____.

15            WITNESS  MY  OFFICIAL  HAND  on  this  the
    18th  day  of  September,  2017.

16

17
                        /S/  Toni  Goubeaud
18                      TONI  GOUBEAUD,  CSR  No.  5774
                        Expiration  Date:   12-31-17
19                      Official  Court  Reporter
                        351st  District  Court
20                      1201  Franklin,  14th  Floor
                        Houston,  Texas
21                      (713)  755-5620

22

23

24

25