# EXHIBIT 7

**C.A. No. 4:-17-CV-01749;**
*Alfred Dewayne Brown v. City of Houston, et al.*

1                     REPORTER'S RECORD

2                  Volume 32 of 41 Volumes

3                  Trial Court No. 1035159

4              Court of Appeals No. AP-75,294

5

   THE STATE OF TEXAS      :   IN THE DISTRICT COURT OF
6                          :
   VS.                     :   HARRIS COUNTY, T E X A S
7                          :
   ALFRED DeWAYNE BROWN    :   351ST JUDICIAL DISTRICT
8

9

10        _____

11                      JURY TRIAL

12        _____

13

14            On the 14th day of October, 2005, the

15   following proceedings came on to be heard in the

16   above-entitled and numbered cause before the

17   Honorable Mark Kent Ellis, Judge presiding, held

18   in Houston, Harris County, Texas.

19            Proceedings reported by computerized

20   stenotype machine.

21

22

23

              TONI GOUBEAUD, CSR NO. 5774
24   Official Court Reporter - 351st Judicial District
                 1201 Franklin, 14th Floor
25                    Houston, Texas
                     (713) 755-5620

```
 1   that, let's take a break.
 2               MR. LAFON:  Okay.
 3               THE COURT:  Please retire to the
 4   jury room.
 5               THE BAILIFF:  All rise.
 6               (Jury retired.)
 7               (Short recess.)
 8               (Jury seated.)
 9               THE COURT:  Please be seated.
10               All right.  You may continue,
11   Mr. Lafon.
12               MR. LAFON:  Thank you, Judge.
13               DIRECT EXAMINATION CONTINUED
14   BY MR. LAFON:
15       Q.  Officer McDaniel, I wanted to focus on
16   kind of another area that you helped out in
17   regards to this investigation.  And can you tell
18   the ladies and gentlemen of the jury basically
19   kind of generally what you did?
20       A.  In the case you mean?
21       Q.  Uh-huh.
22       A.  Well, of course, in the beginning we were
23   all assigned to this and we spent a great deal of
24   time following up whatever leads there were in the
25   case that came in interviewing many people.  So I
```

78

1  began with that and as we honed in on some

2  suspects and began to try to track these

3  individuals down, I worked a lot on the phone

4  records because I developed some knowledge on how

5  the phone records work and expertise in that area.

6          And so I worked on that a great deal

7  in the beginning and throughout the investigation.

8      Q.   Okay.  When we say -- when you say phone

9  records, are we talking about just regular old

10  telephone records or are we talking about cell

11  phones?

12      A.   Both.  Primarily, though, we concentrate

13  on the cell phone records on most cases that I've

14  encountered.

15      Q.   Okay.  Let me ask you some questions

16  generally about that practice first of all.

17          Have you received any kind of

18  formalized training in regards to the use of cell

19  phone records and tracking and things of that

20  nature as it relates to investigations by the

21  police and its application and its use in

22  investigations by the police.

23      A.   Yes, sir, I have.  I've received

24  extensive training.  The first formal school I

25  went to was the Secret Service school on the

1  issues.  And in addition to that the majority of

2  my work has been with the U.S. Marshal's

3  Electronic Surveillance Unit on-the-job training,

4  essentially with them throughout the last several

5  years in which we've worked these type of cases.

6       Q.   Okay.  And on how many cases would you

7  say you've worked on where you've actually used

8  this technology that you're going to be testifying

9  about?

10      A.   Hundreds now.

11      Q.   And have you also in your career been an

12 instructor on these issues and the use of cell

13 phone records and its application in criminal

14 investigations as well?

15      A.   Yes, sir.  I have gotten to the point

16 where I do now teach on it within our division and

17 department as well as to other agencies.

18      Q.   Okay.  Have you been called upon as a

19 witness to testify about this before?

20      A.   Yes, sir, I have.

21      Q.   And how many cases would you say that

22 you've testified about this specific technology

23 before?

24      A.   At least 20 felony trials that I can

25 think of.

1        Q.   Is that in state court or also in Federal

2    court?

3        A.   In state court primarily.  I don't

4    believe I've testified about phone records in

5    Federal court that I can remember.

6        Q.   Okay.  Obviously, most of what you do is

7    in state court; is that correct?

8        A.   The vast majority, yes, sir.

9        Q.   In this situation can you tell the ladies

10   and gentlemen of the jury at some point in time

11   did you come to know that there was a cell phone

12   attributed both to the suspect Shon Glaspie and

13   also the suspect Elijah Joubert, also known as

14   Ghetto?

15       A.   Yes, we did.  Early on in the

16   investigation we were able to identify phones that

17   were being used or believed to be being used by

18   those two defendants.

19       Q.   Okay.  And also in your investigation

20   were you ever able to develop whether or not the

21   Defendant, Alfred Brown, had a cellular telephone?

22       A.   We were never able to find any record or

23   any claim by any person that he did, in fact, have

24   a cell phone during the period of this

25   investigation.

1    Q.   Okay.  The fact that you knew or got

2  information that Shon Glaspie as well as Elijah

3  Joubert had cell phones, did that open up your

4  ability to then go and use some of the technology

5  that you're aware of in helping try to track these

6  individuals as well as, you know, help in aiding

7  the investigation generally, so to speak?

8    A.   Absolutely.  I'm first able to look at

9  are we on the right track here.  Did these

10  people's phone records, are they consistent with

11  what we believed has happened in the

12  investigation.  Did they conflict in any way,

13  first.  And then, second, if we're still looking

14  for these individuals, it's a great assistance in

15  locating people in most cases.

16    Q.   Okay.  Let me show you what I've marked

17  for identification purposes as State's Exhibit

18  No. 222.  I'm sorry.  I've actually marked it as

19  State's Exhibit No. 240 and ask you if you're

20  familiar with this document?

21    A.   Yes, sir, I am.

22    Q.   All right.  And are you also familiar

23  with the information that's included in State's

24  Exhibit No. 223?

25    A.   Yes, sir.

82

 1     Q.   State's Exhibit No. 223 are cellular

 2   telephone records for both Shon Glaspie and Elijah

 3   Joubert that we've obtained with records custodian

 4   affidavit from T-Mobile; is that correct?

 5     A.   Yes, sir.

 6     Q.   All right.  And State's Exhibit No. 240,

 7   is that basically both a compilation of

 8   information that you acquired during your

 9   investigation and also the application of the data

10   that's included in State's Exhibit No. 223?

11     A.   It is a compilation of those two sets of

12   information.  These maps, of course, don't have

13   every bit of information that are contained in the

14   records, but a large bit of it, yes, sir.

15     Q.   All right.  And do you also think that it

16   would aid this jury in understanding your

17   testimony if they were able to use and see State's

18   Exhibit No. 240 to understand the application of

19   the technology that you applied in this case and

20   in this investigation?

21     A.   Yes, I do.

22          MR. LAFON:  Your Honor, at this

23   time, first off, I'd ask that State's Exhibit

24   No. 223 be admitted into evidence, just the phone

25   records.

1          MS. MULDROW:  With the same as

2  previously discussed, Your Honor, same objection.

3          THE COURT:  That will be overruled.

4  223 is admitted.

5          (State's Exhibit No. 223 offered and

6  admitted.)

7          MR. LAFON:  All right.  We'd also

8  ask that State's Exhibit 240 be admitted as well.

9          MS. MULDROW:  Same, Your Honor.

10          THE COURT:  State's 240 is admitted.

11  Overrule the objection.

12          (State's Exhibit No. 240 offered and

13  admitted.)

14     Q.   (By Mr. Lafon)  What is significant about

15  the use of cell phones versus just regular phones

16  which allow you to use them as an investigative

17  tool in a criminal investigation?

18     A.   Well, both tools are useful, home phones

19  as well as cell phones.  However, cell phone

20  records are in most cases much easier to access.

21  The call detail records, who calls whom.

22  Moreover, they have geographic information

23  associated with most calls, thereby we can

24  determine the approximate geographic area that a

25  handset was in when a call was made or received.

1            Obviously, with a landline phone,

2  barring some exceptions, you know where the phone

3  is installed, the physical address.

4       Q.   All right.  And in regards to -- in

5  regards to geographic location, how is it that a

6  use of a cell phone can help you with the

7  geographic location as to where that handset might

8  be?

9       A.   The way that works is that the phone

10  companies record the cellular site information.

11  When I say site, a site is the tower that is used

12  to make or receive a call.  Your handset has to

13  connect to this tower for the cell phone system to

14  connect the call to the regular telephone network.

15  That's commonly called a site.

16            This site data is recorded on the

17  telephone records with the phone company.  In

18  addition to just the site of that particular

19  tower, in most cases we get a side or a sector of

20  that site, gives you roughly one-third of that

21  site's approximate range that further hones down

22  the area from which that particular call occurred

23  in or at least a portion of that call.

24            That is maintained by the phone

25  companies at least for some period of time after

1    it occurs.  And with the appropriate legal

2    documentation we can get those records and then

3    make some sense of them and use them in our

4    investigations.

5          Q.   So, basically, if I take my phone out, I

6    activate it, I get ready to make a call, send a

7    call to -- I guess to the point to where I'm

8    accessing the phone line, one of the pieces of

9    information recorded by the phone company is what

10   cell tower that signal is being received from?

11         A.   That's correct.  And in most cases with

12   almost all of the companies, with only one

13   exception that I know of in the Houston area, it

14   will also record the sector, the side of the

15   particular tower -- with most towers having three

16   sides -- that you're in as well.

17         Q.   Okay.  Now, are you familiar with GPS or

18   I think it's called global positioning satellite?

19         A.   It's global positioning system, yes, sir.

20         Q.   Okay.  This is not the same thing as GPS;

21   is that correct?

22         A.   No, it is not.  And there are some newer

23   technologies in cell phone systems that do have

24   some GPS capabilities.  That's not been deployed

25   widely yet.  We are not able to access that in

1  most cases.  But, of course, that's more exact and

2  tells you exactly where a handset is with a very

3  small margin of error, maybe only ten meters or

4  something like that, maybe 30 feet.

5            But, no, this is -- it's an

6  approximate geographic area that is determined

7  based on that tower's range in relation to other

8  towers and physical obstructions in the area, like

9  large buildings or in some cases if there were

10 land masses, like a mountain ridge, in between, of

11 course, that would affect as well.

12    Q.   Okay.  Looking here I have on the

13 projector basically the first page of State's

14 Exhibit No. 240.  Can you describe and explain to

15 the ladies and gentlemen of the jury what we're

16 looking at here?

17    A.   Sure.  This is simply an overview map of

18 the Houston area with the towers from T Mobile,

19 which is the company from which these records

20 came.  Every small yellow triangle you see

21 situated throughout that map represents an

22 individual tower for T Mobile or a site as I refer

23 to it.

24            And as you can see that those towers

25 are often clustered around denser areas of town

1   like downtown as well as along common traveled

2   areas, like interstates, freeways and whatnot.

3                As you get out to the more rural

4   areas of the Houston area you can see there are

5   fewer towers.

6   Q.   Okay.  All right.  Let me zoom in because

7   I've also got it on the communicator as well,

8   maybe just to the downtown area.  And we see these

9   little yellow pyramids, almost kind of look like

10  Christmas trees in a way.

11               Can you tell the ladies and

12  gentlemen of the jury what those represent there

13  on the map.

14  A.   Those are those towers I spoke about.

15  They are the cell phone towers for T Mobile that

16  existed during the time of this investigation and

17  for the most part still exist today situated

18  throughout the Houston area.

19               In fact, where you see the "O" in

20  Houston is roughly where we are downtown.  As you

21  can see, there is some cell towers right on the

22  east and west of us really from where we are here.

23  Q.   Okay.  And in regards to the information

24  that is collected by the tower, can you explain,

25  again, not only the tower location but the other

1  information that's also collected?

2      A.  Yes, sir.  When a call is made or

3  received to the handset, the system is going to

4  record what sector is used to connect that call.

5  So not only do you get the tower -- like let's say

6  that tower next to the "O" in Houston is Tower

7  12 -- you also get the side of that tower that

8  that call was -- the system used to connect the

9  call.

10              So, as opposed to just a rough

11  circle around that tower, we can say that this

12  person was in a roughly 120 degree sector off of

13  that tower when that call was made or received.

14  So you get the area and more specifically a sector

15  of that tower information.

16              And in most cases you get an

17  originating and a terminating center of

18  information, so you get up to two tower

19  information.

20      Q.  Okay.  Let me switch the DOAR presenter

21  over to a chalkboard and have you just kind of

22  illustrate what you're talking about.

23              You know how to use the monitor next

24  to you.

25      A.  Yes, sir.

89

1     Q.  When you're talking about the three sides

2  of the cell tower, can you show us kind of maybe

3  an aerial view of the tower and describe for us

4  what we're looking at?

5     A.  Sure.  In most cases, almost all systems

6  are like this.  There are some variations, but

7  this is pretty universal.  A cell site is roughly

8  shaped like that (indicating).  It's never really

9  a perfect circle because it depends on the

10  neighboring towers and the range in height and

11  power.  But as an illustration that's what the

12  center will be like.

13           And the sectors I spoke about are in

14  most cases like so (indicating), upside down peace

15  sign is what it's often called.  This will be the

16  north sector (indicating), this is your southeast

17  sector, this is the southwest sector (indicating)

18  and those are denoted in different ways sometimes

19  by different systems.  Sometimes they call it

20  north, southeast, southwest.  More often they'll

21  call it A, B, C, one, two, three or even X, Y, Z.

22  It just depends on the particular recording method

23  for that company or how they were recording

24  certain records.  But we can determine what sector

25  was used.

90

1      Q.   Okay.  So not only does the information

2   that's recorded in the phone records indicate what

3   cell tower was used, but it would also indicate

4   which of these three sectors would have been

5   supporting that phone call?

6      A.   Yes.  And I should clarify.  They're

7   originating and terminating records as well here

8   with T Mobile and in most cases.

9      Q.   And I'm going to ask you about those.

10   I'm about to get to that?

11      A.   Okay.

12      Q.   Let me give you an example to illustrate

13   that point.

14      A.   Okay.

15      Q.   Let's say I'm downtown, I'm going to

16   visit a friend of mine who lives in Kingwood and

17   the minute I walk out of the door, I pull my phone

18   out and I call a friend and I talk to the friend

19   the whole way that I'm on the phone all the way to

20   Kingwood?

21      A.   Right.

22      Q.   Can you tell us if we were to pull the

23   records from that phone call, what information

24   would you have in order to show or what could you

25   show a juror or somebody about my location in

91

1  regards to that phone call?

2       A.   Okay.   What we can tell you is that when

3  the call began, you were in a sector of a tower

4  that was in the downtown area.   When the call

5  ended, you were in a sector of the tower in the

6  Kingwood area.

7               We could not tell you exactly what

8  route you took along the way.   We could surmise

9  based on the length of the call and the distances

10  between the two towers that it's likely that you

11  did travel from Point A to Point B, being downtown

12  to the Kingwood area.

13               And then even determine, if we went

14  out and tested it, how long it would take to drive

15  at a certain time of day to further determine.   If

16  we think you took, for example, Highway 59, which

17  is probably the most likely.   But we could not say

18  definitively that we knew what route you took or

19  where you were in the interim.

20               But if there was -- if you say you

21  were on the phone for an hour and a half during

22  that time and you made some stops or went some

23  other places, we could say that you could have

24  gone any other number of other places.   We just

25  wouldn't know.   So we're only going to get the

1  originating and terminating, with one exception.

2  If we are investigating you at real time for some

3  reason like let's say you're charged and we're

4  looking for you, there are some capabilities where

5  we can watch your phone in real time and see where

6  you're traveling through.

7           In those cases, we can see what

8  towers you are connecting with, but that's a real

9  time investigation as opposed to an after-the-fact

10 analysis of historical records.

11    Q.   Okay.  Let me ask you this question:  In

12 regards to the use of this technology in the

13 investigation of this case and the arrest of the

14 three suspects in this case, did you use both

15 basically the historical data as well as real time

16 in ascertaining information about the suspects?

17    A.   Yes, sir.  We were able to get some

18 historical records quickly from the phone company

19 and we were able to get the help of the U.S.

20 Marshals and get some real time information while

21 we were still pursuing them.

22           That combined with more traditional

23 methods of police work, interviewing, out there

24 looking, we were able to find all three

25 individuals through those two methods.

93

1       Q.   All right.   In fact, in regards to the

2   arrest of Shon Glaspie and the arrest of Elijah

3   Joubert, were the cell phone records employed in

4   actually, you know, getting close to locating

5   those individuals?

6       A.   They were.   They helped us figure out

7   areas of town that it appeared that the phone was

8   being operated in.   The investigation revealed

9   they were believed to be using these phones.   And

10  then other facts caused us to believe that they

11  might be in those areas possibly at least in one

12  of the cases.   And so investigators or officers

13  were able to find the individuals that way.

14      Q.   Okay.   Obviously, the phone records are

15  kind of multidimensional.   Not only do they

16  indicate this location data, but the mere fact

17  that somebody calls somebody and times and things

18  like that, they're able to be used in various

19  ways; is that correct?

20      A.   Sure.   You can see what -- who calls who

21  and how long it lasts.

22      Q.   What I want to do is with the aid of you

23  and some of the computer technology people here at

24  the District Attorney's Office, have we taken some

25  of the phone calls from Shon Glaspie's cell phone

94

1   records and kind of illustrated not only the call

2   but the time of the call and then we also have the

3   general geographical data information included as

4   well; is that correct?

5        A.   Yes, sir.

6        Q.   Okay.  What I want to do is just go to

7   the next slide and have you first spend a moment

8   telling us -- because basically the format of the

9   slides are exactly the same on all the remaining

10  slides; is that correct?

11       A.   Yes, sir, they are.

12       Q.   Just the individual data is different?

13       A.   Right.  Each slide should represent an

14  individual call.

15       Q.   Okay.  And so in regards to State's

16  Exhibit No. -- what was it -- 240, this being

17  Page 2 of that, can you tell the different

18  information that's included in that to illustrate

19  this first call by Mr. Glaspie?

20       A.   Yes, sir.  This is Defendant Glaspie's

21  phone records.  And it started -- we started this

22  with the first call, I believe, or one of the

23  first calls technically on the Thursday, the day

24  of this offense.

25              At 1:03 a.m. on the 3rd of April,

95

1   2003, Glaspie's phone call made a call to

2   Defendant Brown's girlfriend at the time

3   apartment, Ericka Dockery.  And I can tell from

4   the records as well where the handset was

5   approximately when that call took place.

6       Q.   Okay.  And what was the cell tower that

7   basically was picking up that phone call from

8   Mr. Glaspie's cell phone?

9       A.   It's a tower located at 216 Winkler

10  Street there in Southeast Houston.  This is not

11  far from the Gulf Freeway, I-45 South and the

12  Loop, on the south part of town.  And you can see

13  there where it says cell tower location.  That's

14  physically where the tower is from that arrow.

15  And that arrow upward is an arrow towards the area

16  on the north side of that tower that the records

17  indicated that the handset was in when that call

18  took place.

19      Q.   Right.  Basically we have an inset of the

20  map --

21      A.   Right.

22      Q.   -- with the arrow locating where that's

23  coming from showing us essentially the cell tower?

24      A.   Yes.

25      Q.   Okay.  And this is pretty much the format

1  that we use on all the remaining slides?

2     A.  Yes, sir.  And we're trying to show from

3  the inset, where the arrow goes to that's the --

4  the smaller area that's blownup is represented on

5  the larger map of the Houston area to hopefully

6  give some reference to where that inset is being

7  blownup from in the Houston area.

8     Q.  So the first call we have diagramed here

9  is a call in the early morning hours from Shon

10 Glaspie's cell phone to the Defendant's

11 girlfriend's apartment?

12    A.  Right.  To a landline.

13    Q.  Right.  To a landline.  Indications were

14 that Shon was at his girlfriend's house.  Is that

15 consistent with the map?

16    A.  It is, yes, sir.

17    Q.  All right.  The same thing, it's a call

18 approximately 36 minutes later.  What is that

19 documenting?

20    A.  It's a call, 1:39 a.m. on April 3rd,

21 2003, from Glaspie's phone and it is to Defendant

22 Joubert's cell phone.  And the tower data

23 indicated that it was on the southwest side of a

24 tower, that same tower located at 216 Winkler

25 Street.

97

1       Q.   If we had indications that the Defendant

2   was at his girlfriend's house, is that consistent

3   with the cell tower location that you had in the

4   records?

5       A.   It is.   And the reason that it is is

6   because you can see from that line that it's very

7   close to the line where the call would go from one

8   sector to the other.

9            In those cases, my experience and

10  training has shown me that you can hit either side

11  of that tower from the location such as that.

12      Q.   All right.   The third phone call that

13  we've illustrated is a call at 6:42 a.m. on the

14  date of the incident?

15      A.   Yes.   It's a call from Defendant

16  Glaspie's phone to Defendant Brown's apartment --

17  correction -- Defendant Brown's girlfriend at the

18  time apartment.   Her name is Ericka Dockery.   And,

19  again, we're on 216 Winkler Street hitting the

20  southwest sector of that tower for this call.

21      Q.   Okay.   So essentially at this point in

22  time, the cell tower location off of Mr. Glaspie's

23  phone has been the same on these three slides thus

24  far?

25      A.   The first one is a --

1      Q.    Slightly different?

2      A.    Slightly different, but it is indicative

3   of possibly being stationary for that entire time,

4   but cannot say that for sure.

5      Q.    The next call we have at 6:43?

6      A.    It's a call from Defendant Glaspie's cell

7   phone to Defendant Joubert's cell phone at 6:43

8   a.m. on April 3rd, 2003.

9              Again, we're getting the same site

10  data, same sector, the southwest side of the tower

11  at 216 Winkler Street.

12     Q.    Okay.  The next call at 6:44?

13     A.    6:44 a.m., a call from Glaspie's cell

14  phone to Glaspie -- to Defendant Brown's

15  girlfriend's apartment again.  That's Ericka

16  Dockery's apartment, landline, at the apartment

17  physically.

18             And the same sector data showing the

19  southwest side of the tower located at 216 Winkler

20  Street.

21     Q.    6:48?

22     A.    6:48 a.m., call from Glaspie's phone

23  again -- correction -- it's a call from Defendant

24  Brown's girlfriend's apartment, Ericka Dockery's

25  apartment, to Defendant Glaspie's cell phone at

 1   6:48 a.m. with the same southwest side of that

 2   tower.

 3        Q.   And this kind of -- kind of reviews what

 4   we've already talked about in regards to the use

 5   of these cell phone records.  I mean, they're

 6   definitely kind of dual purpose.  Not only are we

 7   getting geographical information for where the

 8   cell tower is that's being used, but we're also

 9   getting information that these suspects are

10   potentially in contact with one another?

11        A.   That is correct, yes, sir.

12        Q.   Next call 6:50?

13        A.   There is a call from Glaspie's cell

14   phone, 6:50 a.m., to Tonikia Hutchins' cell phone,

15   another woman.

16        Q.   And Tonikia Hutchins, in your

17   investigation, you determined her to be who?

18        A.   Glaspie's sister, I believe; is that

19   correct.

20        Q.   Actually I believe Ms. Hutchins was his

21   girlfriend?

22        A.   Girlfriend.  All right.  I'm sorry.  I

23   stand corrected.

24        Q.   All right.  In regards to --

25        A.   A person close to Glaspie.

100

1      Q.   Do you recall whether or not the vehicle

2   used by the suspects in the robbery belonged to

3   his girlfriend?

4      A.   That is correct.   There was a white

5   vehicle that she accessed that was used.

6      Q.   7:15 a.m., we have a call by Glaspie to

7   Joubert's cell phone.   We have a different cell

8   tower location on this call; is that correct?

9      A.   That is correct, yes, sir.

10     Q.   All right.   We have one located at 8411

11  Villa or Villa Street.   Can you tell us what that

12  is close to?

13     A.   Yes.   That is a different tower, probably

14  a few miles away from the first location we were

15  looking at.   As you can see from the blow-up of

16  the inset where it says cell tower location, that

17  represents Hobby Airport right to the right of the

18  tower there.   And so at this point in time that

19  handset is somewhere near the northwest area of

20  Hobby Airport.

21     Q.   Okay.   Where would that be in relation to

22  Almeda and Telephone Road?

23     A.   Very close.

24     Q.   So at 7:15 a.m. we see a call by the

25  Defendant Glaspie to Joubert's cell phone and they

1   are located in an area that's in close proximity

2   to Almeda and Telephone Road; is that correct?

3        A.   Yes, sir.  Right to the left of the

4   airport that is Telephone Road, and Almeda is

5   right above that, I believe.  It's not shown but

6   it's right there.

7        Q.   The next call 8:26 a.m.?

8        A.   Okay.  This is an example of a call that

9   we get two different sites.  So there was possible

10  movement during the incident, but not necessarily

11  movement.  It occurred at 8:26 a.m.  it was from

12  Glaspie's cell phone and it was to Ericka

13  Dockery's phone, which Ericka Dockery is Defendant

14  Brown's girlfriend at the time.

15            The call originated on the southeast

16  side of the tower located at 7318 Cullen, that's

17  the southeast area of town very near the offense

18  location, really, off of the Loop.  And the

19  termination site of that call is the north side of

20  a tower located at 3926 Fuqua, which is further

21  south from that location.

22       Q.   Okay.  I've tried to blowup on the DOAR

23  presenter the inset that we have on that

24  particular slide.  And can you show us -- you've

25  labeled both the towers and then you've labeled an

1   item of interest in between.

2              Can you tell us what 5901 Selinsky

3   Street Apartment is.

4       A.   Yes, sir.  That's the Villa Americana

5   Apartments.  It is an apartment complex that was

6   central to this investigation of which all of the

7   defendants spent a great deal of time.  And we

8   found lots of people that knew the defendants and

9   we know that they spent time there and around the

10  complex, both before and after the offense.

11      Q.   Okay.  So not only do we document that

12  there's a call from Ms. Dockery's phone to Shon's

13  cell phone, but we also have geographic

14  information that locates that at the time this

15  call was made Shon's cell phone was in or near the

16  area of The VA apartments; is that correct?

17      A.   That is correct.  Cannot guarantee it was

18  there, but it is certainly consistent with being

19  there or in the immediate vicinity.

20      Q.   Okay.  Let me ask you this:  I think

21  you've said this, but the fact that we have this

22  phone or this specific call hitting off of two

23  towers, does that necessarily mean that we had

24  movement at that point in time?

25      A.   No, in my experience it does not mean

1  there's always movement, especially when the

2  sectors work out to be where they can overlap

3  possibly or point at each other.  In my

4  experience, the systems can carry calls and

5  sometimes multiple towers for redundancy reasons.

6  So if one tower has to drop a call, the other one

7  can continue it.  So that's one of the reasons

8  I've found and been told by the engineers of the

9  companies and, secondly, there may be movement in

10  between the towers.  But they don't go outside the

11  bounds of those sectors.

12      Q.   Okay.  The next call at 8:45 a.m.?

13      A.   It is a call to a phone in the name of a

14  woman named Sharhonda Simon.  That was a landline

15  phone at the Villa Americana Apartments we spoke

16  about on Selinsky Street.  It occurred at 8:45

17  a.m. and it was made from Defendant Glaspie's

18  phone.

19      Q.   All right.  And does this slide also

20  illustrate the failures of technology on occasion

21  as well?

22      A.   That is correct.  In this case the

23  records did not record a cell site for any number

24  of reasons, most likely of which in my experience

25  the call may have been very short and cutoff for

1   some reason before much information registered.

2   But they did get the dialed numbers in the system.

3        Q.   Okay.  We have a phone call -- well, let

4   me go back to illustrate.  What time is the phone

5   call that we have here?

6        A.   8:45 a.m.

7        Q.   All right.  And the next phone call we

8   have is at what time?

9        A.   10:14 a.m., after the offense.

10       Q.   All right.  And where does that put us

11  back at?

12       A.   This one is more conclusive of the 5901

13  Selinsky Street apartments for originating and

14  terminating off of a tower at 10903 Cullen there,

15  again, consistent with those apartment complex we

16  just spoke about, the apartment complex.

17            In this case Defendant Glaspie's

18  sister's cell phone or home phone is calling

19  Defendant Glaspie's cell phone.

20       Q.   All right.  Do you recall approximately

21  the time of the incident at the ACE check cashing

22  store?

23       A.   I know they were opening at 10:00.  It

24  was 9:40, 50 a.m. time frame.  It was late, right

25  before 10:00 a.m. time frame I know.

105

1      Q.    Okay.  So the last call we have from --

2  the call we have before that is a call at 8:45.

3  The very next call that we have on Shon Glaspie's

4  cell phone records is at 10:14.  So from 8:45

5  until 10:14 we don't have any cell phone activity

6  for Mr. Glaspie?

7      A.    From his phone, that is correct, yes,

8  sir.

9      Q.    At 10:17 we have another phone call?

10      A.    Yes, a man named Jesse Coleman or a phone

11  he had access to called Defendant Glaspie's cell

12  phone at 10:17 a.m.  and the site data in that

13  case, again, is consistent with being at or near

14  those apartments on Selinsky Street.

15      Q.    Another one at 10:18.

16      A.    10:18 a.m., there was a call received on

17  Glaspie's phone from an 832 phone number.  And

18  there, again, two originating and terminating

19  sites, in this case both consistent with being at

20  or near those apartments.

21      Q.    At 10:27?

22      A.    There's a call on Shon's cell phone to

23  another man in this investigation or a phone he

24  had access to named Aaron Brown, which is the

25  Defendant's brother, Defendant Brown's brother.

106

 1  It occurred at 10:27 a.m.  and, again, an example

 2  of where the system did not record cell site data.

 3      Q.   Okay.  10:29?

 4      A.   It's a call by Defendant Glaspie's phone

 5  to Defendant Glaspie's girlfriend, Tonikia

 6  Hutchins who we spoke about, who was identified

 7  for that or a phone she had access to.  Again, two

 8  cell site datas consistent with the apartment

 9  complex.

10      Q.   Being at The VA apartments?

11      A.   Yes, sir.

12      Q.   10:42?

13      A.   A call from Glaspie's phone, again, to a

14  phone that was linked to Tonikia Hutchins,

15  Glaspie's girlfriend.  Again, the cell site data

16  is consistent with those apartments or being near

17  them.

18      Q.   At 10:47, basically the same thing?

19      A.   Basically the same thing.  From Glaspie's

20  cell phone to a phone connected to his girlfriend

21  Tonikia Hutchins.

22      Q.   10:48?

23      A.   10:48 still shows to be at or near the

24  apartment complex and it was a call from the phone

25  connect link to Tonikia, Glaspie's girlfriend, to

1   Glaspie's phone.

2       Q.   We have a call at 10:53?

3       A.   Yes, sir.  It's a call off of Glaspie's

4   cell phone to a phone connected to Aaron Brown,

5   who is Defendant Brown's brother.  It was on

6   Glaspie's phone again.  Again, the cell site data

7   is consistent with being at or near the Selinsky

8   Street apartments we spoke about.

9               10:54 a.m., a call from Glaspie's

10  phone to a phone connected to a landline at an

11  apartment complex.  Actually went to this

12  apartment.  The woman's name is Sharhonda Simon.

13  It identified she had a child with Defendant

14  Brown.  The tower data shows consistent with being

15  at or near the apartment complex again.

16              11:03 a.m., Defendant Glaspie's

17  phone is in contact with Defendant Joubert's cell

18  phone, which is another defendant in this case.

19  And the site data off of Glaspie's phone is still

20  consistent with at or near the apartments.

21              11:31 a.m., a call from Glaspie's

22  phone -- a call to Glaspie's phone from a woman or

23  a house with a woman named Tammy Rogers and still

24  consistent with the apartments.

25              1:25 p.m., this is important to

1   point out the phone has moved by this point.  So,

2   by 1:25 p.m. the afternoon of that Thursday, we

3   did not get the dial digits in this case, but we

4   did get some tower information.  And we're hitting

5   the southwest side of that Winkler Street tower we

6   spoke about earlier.  It's near the Loop and I-45

7   South.

8       Q.  All right.  So the next time that we see

9   something as far as the phone records can go, is

10  at 1:25 we know that they've left the Selinsky

11  Street apartments, The VA, and it appears they're

12  located somewhere in the vicinity of the Loop and

13  45 South?

14      A.  Yes, sir.  Whoever is using Glaspie's

15  phone, yes, sir.

16      Q.  Right.  The phone?

17      A.  Yes, sir.

18      Q.  And the next call?

19      A.  The next call is a call by Glaspie to a

20  commercial number, some business number, but the

21  cell site data is near where we just were, near

22  the Loop 610 and I-45 South, at 2:06 p.m. that

23  afternoon.

24      Q.  2:27?

25      A.  At 2:27 p.m., we're already off a

1  completely different part of town, Southwest

2  Houston at this point.  And Glaspie's phone is

3  hitting a tower at 10615 Rockley Street, the

4  southeast side of that tower as well as the north

5  side of a tower at 11915 Southwest Freeway.

6  That's Highway 59 South.

7              This is going out right near the

8  Beltway and 59, going towards Missouri City into

9  the Sugar Land area.

10             3:27 p.m., similar cell site data.

11  It's a call to Glaspie's cell phone from a cell

12  phone connected to Aaron Brown, Defendant Brown's

13  brother.  And the cell site data is consistent

14  with the same area out on the southwest side of

15  town as well as the motel where we arrested

16  Glaspie.

17             4:08 p.m., a call by Defendant

18  Glaspie to -- it says Ghetto there, that was the

19  alias of Defendant Joubert, to his cell phone.

20  And, again, it is consistent with that motel where

21  Glaspie was arrested.

22             5:31 p.m., similar cell site data

23  consistent with the motel where Glaspie was

24  arrested.  It was a call to Glaspie's cell phone

25  from Defendant Joubert's cell phone.

110

1                      5:34 p.m., cell site data still at

2     or near the motel where Glaspie was arrested and

3     it was a call to Glaspie's cell phone from Ericka

4     Dockery, Defendant Brown's apartment.

5                      6:06 p.m., we still have cell site

6     data consistent with the motel.  And it was a call

7     by Glaspie's cell phone to Elijah Joubert,

8     Defendant Joubert's cell phone.

9          Q.   Okay.  And that's the last one that we've

10    charted; is that correct?

11         A.   That is correct, yes, sir.

12         Q.   Let me talk to you just about this last

13    location?

14         A.   Sure.

15         Q.   Obviously, once again, it illustrates

16    what could be perceived as contact amongst the

17    suspects, but we also have the geographic location

18    of the phone itself at that point in time.

19                      And at some point in time in the

20    investigation, did you learn that there was -- the

21    type of vehicles that were driven by the suspects.

22         A.   We did, yes, sir.

23         Q.   All right.  And at some point in time you

24    learned that there was -- that Shon, in all

25    likelihood, was either going to be in a white

1    Lumina or a white Grand Am type vehicle; is that

2    correct?

3         A.   That's correct.  That information, those

4    vehicles were linked to his girlfriend Tonikia's

5    family.

6         Q.   Okay.  And so based on the fact that you

7    knew that the Defendant would either be most

8    likely either in a white Lumina or a white Grand

9    Am -- and in addition you knew this information on

10   that date, is that correct, or shortly thereafter?

11        A.   We did know that information by -- by

12   that early morning hours that Friday morning, the

13   4th, when we were looking for Glaspie, yes, sir.

14        Q.   All right.  So understanding the data

15   that you had based on these cell phone records and

16   understanding the type of vehicle he would be in,

17   how is it that you employed this technology to

18   arrest him?

19        A.   As we just commented, I was able to see

20   some of these cell site data by Thursday evening

21   and going into Friday morning after I was able to

22   obtain it from T Mobile.  Combined with the

23   intelligence we just spoke about regarding some

24   vehicle information, we were able to get that

25   information to officers who were scouring this

1  area looking for the vehicle that Defendant

2  Glaspie may be driving.  And a patrol officer that

3  works in that area of town was able to spot what

4  we believed was Glaspie's vehicle or the vehicle

5  he was driving at a motel, which is where he was

6  arrested.

7      Q.  So, the information that you had based on

8  the cell phone records led to the arrest of Mr.

9  Glaspie combined with the fact that you knew what

10  kind of vehicle he would probably be driving?

11      A.  Yes, sir.  And astute officers in the

12  area, scouring the area and they did require going

13  to the manager and showing pictures of people to

14  see if they recognize anyone like that being

15  checked in a room.  That's how we found the room.

16      Q.  Okay.  And similar occurrence in regards

17  to the arrest of Mr. Joubert as well; is that

18  correct?

19      A.  Mr. Joubert's cell phone was being

20  monitored and we were able to see geographically

21  that he traveled to the Intercontinental Airport

22  area, north Houston, later in this day, that

23  Friday, the 4th, towards the later morning hours

24  as well as some other investigators had found some

25  information about an address associated with

113

1   Defendant Joubert in that area from a bondsman the

2   Defendant Joubert had used before.

3              And so those two facets of

4   information combined led investigators to

5   Joubert's location.

6        Q.   And that's where he was arrested as well?

7        A.   Yes, sir.

8              MR. LAFON:  Pass the witness.

9              THE COURT:  Ms. Muldrow.

10                 CROSS-EXAMINATION

11   BY MS. MULDROW:

12        Q.   Well, I guess it's good afternoon.  How

13   are you?

14        A.   All right.  Thank you.

15        Q.   You're a multi-tasker, right?

16        A.   I try, yes, ma'am.

17        Q.   Let's go back to the lineup.  Your

18   supplement, is that 56?

19        A.   That sounds right.  I have a printout of

20   it that does not have the number on it, but that

21   does sound right, yes, ma'am.

22        Q.   All right.  Now, you were working the

23   lineup along with Sergeant Bloyd; is that right?

24        A.   Yes, ma'am.  He was there, yes, ma'am.

25        Q.   Was Lieutenant Zoch there?